UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:19-cv-00449-CEH-JSS

WAHEED NELSON,

    Plaintiff,

vs.

BOB GAULTIERI, Official Capacity as
Sheriff of Pinellas County, FLORIDA
DEPARTMENT OF CORRECTIONS,
CORIZON, LLC, MAXIM
HEALTHCARE SERVICES, INC.,
MATTHEW SWICK, M.D., ALL
FLORIDA ORTHOPAEDIC
ASSOCIATES, P.A., and WITCHNER
BELIZAIRE, M.D.,

    Defendants.
_____/

**DEFENDANT CORIZON, LLC'S RESPONSE TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CORIZON**

Defendant Corizon, LLC ("Corizon") files its Response to the Plaintiff's Motion for Partial Summary Judgment as to Corizon [ECF #223] as follows:

**I.**      **Material Facts**

    **A.**      **Agreed Material Facts**[1]

Corizon agrees with facts ##1, 2, 3, 4, 7, 8, 9, 10, 11 and 12, but only to the

---

[1] Nelson's facts include information from expert reports [ECF#223, ¶¶19, 20, 29-31]. Aside from reports not being affidavits or declarations as required by rule, the Court has disallowed the experts [ECF ##136, 138].

extent the referral was made as written, not whether it was originally written as an emergency, 13, 16, 17, 18, 23, 24, 35.

### B. Corizon's Material Facts

According to the record, Nelson arrived at the Reception and Medical Center ("RMC"), which includes a licensed Florida hospital operated by FDOC, on April 16, 2015, and a nurse performed a medical evaluation. He was sent to the urgent care portion of the complex and was examined by Marie Garcon, M.D. at 5 p.m. Dr. Garcon ordered x-rays of Nelson's right foot and ankle. Those x-rays were done the same day and the radiologist signed the reports on April 17 and 18. The reports indicated a damaged right foot and ankle [ECF #221-1, pp. 4, 6].

By Saturday, April 18, 2015, Nelson was transferred to the hospital portion of RMC and was examined by Clifford Adam, M.D. Dr. Adam requested a consultation with an orthopedist, which was approved, and an appointment was set for April 27, 2015. In the meantime, Dr. Witchner Belizaire ("Dr. Belizaire") ordered follow-up x-rays, which were performed on April 21, 2015 [ECF #52, pp. 7-8]. On April 27, 2015, the orthopedist reported a condition known as Charcot Foot, and recommended follow-up with Dr. Steele, a surgeon [ECF #52, pp. 5-6]. The appointment with Dr. Steele was originally set for May 4, 2015, but he cancelled his appointments at RMC that day and the evaluation was reset for May 18, 2015. Dr. Steele ordered an MRI and noted that Nelson was likely to require a below-the-

knee amputation. The same day, Dr. Belizaire recognized the order, noting that the MRI was preapproved. [ECF #52, pp. 9-10]. The MRI was done on May 22, 2015, and the resulting diagnosis was "Right ankle fracture with Charcot joint and bone loss." On June 11, 2015, Dr. Williams, a Corizon physician, referred Nelson back to Dr. Steele. Nelson returned to Dr. Steele on June 29, 2015, and he recommended a right below-the-knee amputation. After Nelson consented to the surgery, Dr. Belizaire submitted a request for the surgery the following day, and it was approved on July 10, 2015. The leg was amputated on July 28, 2015 and a follow-up procedure was done two days later [ECF #52, p. 15].

In the meantime, Dr. Belizaire provided care to Nelson. The first encounter was on April 20, 2015, where Nelson claimed to have fractured his foot while in the Pinellas County Jail. Dr. Belizaire ordered x-rays and planned a consultation with an orthopedist. Of course, the orders were redundant to those entered by Drs. Garcon and Adam days before. Dr. Belizaire saw him two days later, noting Nelson had hemodialysis the day before and was "doing well." On April 23, 2015 Dr. Belizaire ordered a CT scan. Dr. Belizaire evaluated Nelson following the first visit with the orthopedist on April 27, 2015, finding cellulitis in the left foot and a possible bone infection in the right. He ordered a wound culture and Vancomycin, a broad-spectrum antibiotic. [ECF ##221-3, pp.20, 23, 28; 221-4, pp. 3, 6].

On May 1, 2015, Dr. Belizaire ordered a consultation with a podiatrist and a

left foot x-ray, along with instructions to provide topical medications to the left foot. He also ordered Lortab, a prescription pain medication also known as Vicodin, which replaced another pain medication, Tramadol. The order was for 325 mg. four times per day for 20 days. On May 5, 2015, Dr. Belizaire ordered Zosyn, an antibiotic, but due to availability issues was changed to Augmentin on May 7, 2015. Dr. Belizaire saw Nelson on May 8, 12, 13, 14 and 15 in follow-up to the antibiotic therapy without any concerns. Another physician ordered Neurontin, a narcotic pain medication for 30 days on May 17, 2015. On May 23, 2015, Dr. Adam renewed the Augmentin order for 14 days and added Tylenol 650 mg. to the medication ensemble [ECF ##221-3, pp. 28-33; 221-4, pp. 8-12]. Dr. Belizaire examined Nelson on May 18, 19, 20, 22, 25, 26, 27 and 29, and renewed the Vicodin order for 10 days on May 22, 2015 [ECF ##221-3, pp. 34-38; 221-4, p. 14].

In June 2015, Dr. Belizaire examined Nelson on June 2, 4, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26 and 30. He renewed Vicodin for 10 days on the 4th and 22nd [ECF ##221-3, pp. 29-46, 50-51; 221-4, pp. 17, 22]. Other physicians ordered pain medications Toradol, Naproxen and Gabapentin throughout the month [ECF #221-4, pp. 16, 19, 21, 23].

Dr. Belizaire examined Nelson on July 1, 6, 7-11, 13-17, 20-21, 23 and 27, 2015. He ordered an injection of Demerol on July 20 and Tylenol 650 mg. for 14 days on July 23. Dr. Gonzalez renewed pain medication for 28 days on July 3, 2015,

which provided pain medication to the time of surgery [ECF ##221-3, pp. 51-57, 59-62; 221-4, pp. 28-29].

Dr. Belizaire's deposition, which lasted nearly six hours, was taken and he was asked to explain the rationale behind his treatment. He did. [ECF #221-5]. But he explained more. Once Nelson was referred to specialists, which was done before Dr. Belizaire ever encountered him, it was up to the specialists to determine the plan of care. The orthopedists visited RMC weekly [ECF #221-5, pp. 15-16, 27-28, 41, 46-49, 76-77]. In this case, it was up to the specialists to inform the physicians at RMC of the plan, including whether and when surgery would be done. If the specialist decided surgery should be done immediately, that order would be carried out, but that never happened in this case. [ECF #221-5, pp. 64-66, 81-91, 95-100, 160-64]. In any case, Dr. Belizaire knew surgery would not happen if Nelson was on antibiotics, and he was until at least mid-June 2015 [ECF #221-5, pp. 41-42, 50-52, 82-83, 115-16]. Throughout the pertinent time, from April 16, 2015 to the surgery, Nelson remained in the RMC hospital and in a hospital bed so he could not further injure the foot [ECF #221-5, p. 47].

Donna Graham testified to the scheduling of appointments with specialty physicians. Specialists come to RMC according to their own schedule and patients are seen either in a clinic or in their own bed in the hospital. If the specialist determines treatment must be done immediately, no one can override that decision.

In this case, orthopedics came on Mondays, but Dr. Steele cancelled his appointments for May 5, 2015, when he was to initially examine Nelson. Once a patient is examined by the specialist, whatever testing is ordered is done and if surgery is to be done, it is scheduled by the specialist according to the specialist's availability and available operating room space at Jacksonville Memorial Hospital [ECF #221-6, pp. 13-15, 22-24, 31-33, 48-50].

Corizon retained experts. Dr. Arthur Fournier is an internal medicine physician, who opines that Nelson's overall care, including that for Charcot Arthropathy of the right foot and ankle was excellent. The fractures were caused by diabetes and peripheral neuropathy, for which Nelson was appropriately referred to specialists who alone determined the course of treatment [ECF #221-7]. Dr. John Krause is an orthopedic surgeon. He opines that amputation was the only treatment for this condition, which was Charcot Foot; the condition was the result of poorly-controlled diabetes and no delay changed the outcome [ECF #221-8].

## II. Argument

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  In 1986, the Supreme Court decided a trio of cases which encourage the use of summary judgment as a means to dispose of cases which are not factually or legally supported.  *See Celotex Corp.*, 477 U.S. at 317; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The primary purpose of granting summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute, so if the evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment should be granted. *See Anderson*, 477 U.S. at 249-50.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323. Furthermore, once a moving party identifies those portions of the record showing the absence of a genuine issue of material fact, the party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may not rely on mere allegations or denials.  *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256-57.  If the record as a whole could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue of fact precluding

summary judgment. *See Matsushita*, 475 U.S. at 586.

Evidence that is "merely colorable, or is not significantly probative" of a disputed fact, or a "mere scintilla of evidence" is not sufficient; there must be enough of a showing that the (trier of fact) could reasonably find for that party. *Anderson*, 477 U.S. 242; *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999); *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations, whether based on speculation or subjective beliefs, are insufficient for summary judgment. *Waddell v. Valley Forge Dental Assoc., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that plaintiff's "conclusory assertions . . . , in the absence of (admissible) supporting evidence, are insufficient to withstand summary judgment"); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of party's own conclusory allegations is not sufficient to oppose summary judgment. . . . ").

### B. Corizon's Constitutional Liability

Because Corizon is a corporation, liability only attaches if an official unconstitutional policy or custom of the corporation caused the alleged deprivation of constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997) (extending the application of *Monell* to private corporations performing traditional public functions); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*) (stating that a

"[corporation] is liable under section 1983 only for acts for which [the corporation] is actually responsible"), *abrogated in part by Bell Atl. Corp.*, 550 U.S. at 561-63. Therefore, a corporation's liability may not be vicarious. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694.

"A policy is a decision that is officially adopted by the [corporation], or created by an official of such rank that he or she could be said to be acting on behalf of the [corporation]. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "To establish a policy or custom, it is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the [corporation]." *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986). The Supreme Court requires "a plaintiff seeking to impose liability on a [corporation] under §1983 to identify a [corporate] 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997).

However, a plaintiff must do more than merely identify a policy—there must be proof the policy was created with "deliberate indifference to its known or obvious consequences." *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000); *see also Monell*, 436 U.S. 658. That is, "liability under §1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among

various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986).

> The *Brown* Court also narrowed the test for causation when it stated:
>
> [I]t is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, 520 U.S. at 404 (emphasis in original). A plaintiff's burden is heavy, and the Eleventh Circuit described both the required showing and the reason for heightened showing:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to *respondeat superior* liability—a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under §1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.

*Gold v. City of Miami*, 151 F.3d 1346, 1351 n.10 (11th Cir. 1998); *see also Brown*, 520 U.S. at 415 (stating that "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability").

While a corporation may be liable for deliberate indifference regarding medical care, claims of negligence are never enough to satisfy pleading requirements, as "should haves" are not grist for constitutional litigation. *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).

The Eleventh Circuit reviewed the necessary showing in *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004). There, the plaintiff brought section 1983 claims against a Georgia county, claiming policies constituted and resulted in deliberate indifference to his medical needs. Specifically, the plaintiff claimed a policy of understaffing officers to transport inmates to the hospital caused a delay in his transport to the hospital.

In *McDowell*, an inmate was seen and treated for back pain at a local hospital on June 5, 1997. At 9:30 the next night, he reported an inability to urinate and difficulty walking, and medical personnel in the employ of a private medical contractor decided to send him back to the hospital. But transporting officers could only take one inmate at a time, and another inmate with trauma was transported first. The next morning, McDowell's transport was bumped several times by mental health inmates, as his condition was not considered an emergency and mental health transports were given priority by policy. Later, McDowell reported no feeling in his legs; was examined by a physician; his condition deemed emergent; and he was taken to the hospital by ambulance. A spinal abscess was diagnosed, and surgery

was performed. After surgery, McDowell was an incomplete paraplegic. *See McDowell* at 1286-87.

*McDowell* arrived at the 11th Circuit after the district court granted summary judgment to the county. The court noted the longstanding rule that municipalities cannot be vicariously liable in section 1983 cases, and a plaintiff must show a custom or policy constituted deliberate indifference and a constitutional violation. *Id.* at 1289 (citing *Monell*, 436 U.S. at 692).

"This threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.' " *McDowell*, 392 F.3d at 1290 (quoting *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). That identification "prevents the imposition of liability based upon an isolated incident." *Id*. "Rather, the incident must result from a demonstrated practice." *Id*. The Eleventh Circuit concluded that "based on these instructions, McDowell must establish that the county's policy was to understaff the field division, and that this practice left the division unable to execute medical transports." *Id.*

McDowell could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition." *Id*. Therefore, the court determined this occurrence was an "isolated

incident" rather than a "persistent" or "widespread" policy. *Id.* at 1290-91.

Next, the *McDowell* court analyzed whether the "municipality's action was 'taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.'" *Id.* at 1291 (citing *Davis ex rel. Doe v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000)). The court found McDowell could not rely on a "generalized policy of understaffing, and a resultant inability to transport." Instead, he had to show the county had a "deliberate intent" to inadequately staff the jail. *Id.*

Relying on the Supreme Court's decision in *Brown*, the *McDowell* court found that in a case "where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights . . . , 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" *Id.* (quoting *Brown*, 520 U.S. at 405). "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Brown,* 520 U.S. at 415, 117 S.Ct. 1382 (emphasis in original). For municipal action "to meet this burden, a plaintiff must demonstrate that the lawful action was 'taken with deliberate indifference as to its known or obvious consequences.' " *McDowell*, 392 F.3d at 1291 (quoting *Brown*, 520 U.S. at 407). A "showing of simple or even heightened negligence is not enough." *Id.* (citing *Brown* at 407).

Applying these rules, the Eleventh Circuit found McDowell's argument without merit. The court determined there was no evidence the governing body knew of any potential medical concerns caused by its decision, and found the policy to be sound. *Id.* (stating that the policy to transport inmates or call an ambulance was a "clear, simple directive that said if you cannot transport with your resources you are to call an ambulance for needed medical transportation"). McDowell could not establish "that the Board would anticipate that inmates would not receive timely medical attention." *Id.* at 1292. Thus, the court found the alleged constitutional violation was not a "highly predictable consequence" of the county's failure to budget and staff the jail. *Id.*

The court then considered causation. The county's "deliberate conduct" had to be the "moving force" behind McDowell's injury. *Id.* The court recognized the Supreme Court's caveat in *Brown* that "[t]o prevent municipal liability for a . . . decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* (quoting *Brown*, 520 U.S. at 410). To "test the link" between the injury and the County's conduct, the *McDowell* court looked "to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that the injuries were a 'plainly obvious consequence' of that decision." *Id.* (stating that "[w]hile it may be true that the Board's budget decision

would make a violation of his constitutional rights 'more likely," that alone cannot 'give rise to an inference that a policymaker's failure to scrutinize the [budget]. . . produced a specific constitutional allegation)(quoting *Brown* at 411). Again, relying on *Brown*, the court went on to state that "liability must be premised on a finding that "*this*" budget decision was 'highly likely to inflict the *particular* injury' McDowell suffered."  *Id.* at 1292 (quoting *Brown* at 411) (emphasis in original). The *McDowell* court stated:

> McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally, McDowell did not demonstrate that the County was the moving force behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable. Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before. To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

*Id.* at 1292-93.

Nelson has two methods to prove Corizon's unconstitutional policy: (1) an officially promulgated unconstitutional policy, or (2) a widespread unconstitutional and unofficial custom or practice created by a policymaker for Corizon.  Nelson must also prove the policy was created with knowledge that his injuries were a highly probable consequence of the policy's creation.

Nelson makes none of the required showings.  There is no identification of an

unconstitutional policy. There is no mention the policy was created with the required knowledge. There is no argument that the policy directly caused Nelson injury. In fact, there is no mention of the applicable law, as Nelson relies only on the standards to be applied to <u>individuals</u>, not corporations [ECF #223, pp. 10-11]. He may have meant to make the pertinent argument, but he did not, and the Court is not obligated to read his mind or create arguments unmade in the Motion. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (recognizing "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it . . . .").

To the extent Nelson claims the policy was to deny medical care based on costs, the record obliterates the claim. Corizon physicians promptly sent Nelson to specialty physicians upon recognition of his medical needs. Not once was he denied those referrals. From the first referral, care was directed by those specialists. If there was a rule to deny care based on cost, someone sure forgot to inform the physicians.

Nelson discusses a series of court cases, one from a Florida jail and all others from other states, and asks the Court to take judicial notice [ECF #223, pp. 12-14, 16-19]. That, the Court cannot do. Federal Rule of Evidence 201 provides, in relevant part:

> The court may judicially notice a fact that is not subject to reasonable dispute because it:
>
> (1)   is generally known within the trial court's territorial jurisdiction;

>           or
>
>     (2)   can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b). "The Eleventh Circuit has explained that a court may take judicial notice of filings in court cases under Rule 201(b)(2) of the Federal Rules of Evidence." *Turner v. AMICO*, CV-15-BE-1202-S, 2015 U.S. Dist. LEXIS 161982, 2015 WL 7770232, at *6 (N.D. Ala. Dec. 3, 2015) (citation omitted) (citing *Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1255 (11th Cir. 2010)). "In addressing whether a court properly takes judicial notice of the nature or substance of court filings and other legal documents, the Eleventh Circuit has distinguished between taking judicial notice of the fact that court records or court filings exist versus taking judicial notice of the truth of matters stated within those court records or court rulings." *Id.* The Eleventh Circuit explained that:

> "[A] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Accordingly, a court may take notice of another court's order only for the limited purpose of recognizing the "judicial act" that the order represents or the subject matter of the litigation.

*Id.* (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)); *Grayson v. Warden, Comm'r, Ala. Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (citation omitted).

The Court can only take notice that certain documents were filed; it cannot

notice the content of those documents or consider them for the truth of the content. But that is exactly what Nelson proposes. He is wrong—the documents in those files are not summary judgment evidence. They are hearsay without exception and have nothing to do with Florida prisons, or more importantly, the RMC hospital.

Nelson also discusses a review by an outside company retained by the Florida Legislature [ECF #223, pp. 15-16]. The purpose of the study was to determine which model of patient care was best suited in terms of cost to the Florida Department of Corrections [ECF #222-18, pp. 3-4]. This document is not what Nelson believes it to be. It is also rank hearsay, which is not summary judgment evidence unless it is shown to be admissible at trial, as the "'general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment,'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (citation omitted), the Court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112-13 (11th Cir. 2010) (per curiam) (unpublished) (internal marks omitted) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). Nelson makes no attempt at the required showing.

### III. Conclusion

For the foregoing reasons, the Motion should be denied.

By:    /s/ Gregg A. Toomey
    Gregg A. Toomey
    Florida Bar No. 159689

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of November, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, which will send a copy of the foregoing electronically to the following:

Linda Bellomio Commons, Esq.
*Attorneys for Plaintiff*
Law Offices of Linda Bellomio Commons, P.A.
PO Box 340261
Tampa, FL 33694
Phone: 352.610.4416
Fax: 813.265.3010
Email: lcommons@aol.com
Commons.litigation@gmail.com
Dmheiser1@gmail.com

James V. Cook, Esq.
*Attorneys for Plaintiff*
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
Phone: 850.222.8080
Fax: 850.561.0836
Email: cookjv@gmail.com

Jason Gordillo
*Attorneys for Defendant Gualtieri*
Pinellas County Sheriff General Counsel's Office
10750 Ulmerton Road
Largo, FL 33778
Phone: 727.582.6274
Fax: 727.582.6459
Email: jgordillo@pcsonet.com
rreuss@psconet.com

THE TOOMEY LAW FIRM LLC
*Attorneys for Defendants Corizon, FDOC and Belizaire*
The Old Robb & Stucky Building
1625 Hendry Street, Suite 203
Fort Myers, FL  33901
Phone:  239.337.1630
Fax:  239-337.0307
Email:  gat@thetoomeylawfirm.com, alr@thetoomeylawfirm.com, and hms@thetoomeylawfirm.com

By: \_\_\_\_/s/ Gregg A. Toomey_____
      Gregg A. Toomey
      Florida Bar No. 159689