UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

-   -   -

HONORABLE JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE PRESIDING


WAHEED NELSON,                          )
                                       )
                PLAINTIFF,             )
                                       )
        VS:                            )8:19-cv-449-T-36JSS
                                       )
BOB GUALTIERI, capacity as Sheriff of  )
Pinellas County, Florida, DEPARTMENT   )
OF CORRECTIONS, CORIZON LLC, MAXIM     )
HEALTHCARE SERVICES, INC., MATTHEW     )
SWICK, M.D., ALL FLORIDA ORTHOPEDICS   )
ASSOCIATES, P.A., and WITCHNER         )
BELIZAIRE, M.D.,                       )
                                       )
                DEFENDANTS.            )
_____)


MOTION HEARING
TRANSCRIPT OF REPORT OF PROCEEDINGS
September 23, 2020


SHARON A. MILLER, CSR, RPR, CRR,FCRR
IL CSR 084-2617
FEDERAL OFFICIAL COURT REPORTER
801 N. FLORIDA AVENUE, SUITE 13A
TAMPA, FLORIDA 33602

Proceedings recorded by mechanical stenography,
transcript produced by computer-aided transcription

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFFS:

3            LINDA BELLOMIO COMMONS, ESQ
             5629 Glencrest Boulevard
4            Tampa, FL  33694
             (352) 610-4416
5            lcommons@aol.com

6            JAMES V. COOK, ESQ.
             314 W. Jefferson Street
7            Tallahassee, FL  32301
             (850) 222-8080
8            Cookjv@gmail.com

9

10   ON BEHALF OF DEFENDANTS:

11

             PINELLAS COUNTY SHERIFF'S OFFICE
12           BY:  JASON GERARD GORDILLO, ESQ.
             10750 Ulmerton Road
13           Largo, Florida 33778
             (727) 582-6274
14           jgordillo@pcsonet.com

15

16           THE TOOMEY LAW FIRM,LLC
             BY:  GREGG A. TOOMEY, ESQ.
17           1625 Hendry Street,Suite 203
             Fort Myers, FL  33901
18           (239)337-1630
             gat@thetoomeylawfirm.com

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE COURT:  Hello.  Good morning, everyone.  We're

2     here in the case of Waheed Nelson versus Bob Gualtieri, et

3     al., and it's case, 8:19-cv-449-T-36JSS.  Can I have the

4     lawyers state your appearances for the record starting

5     with Counsel for Plaintiffs?

6          MR. COOK:  James Cook for Waheed Nelson.

7          MS. COMMONS:  Linda Commons for Waheed Nelson.

8          MR. GORDILLO:  Jason Gordillo on behalf of Sheriff

9     Bob Gualtieri.

10          MR. TOOMEY:  Greg Toomey for Corizon and

11     Dr. Belizaire.

12          THE COURT:  Is that everyone?  Very well.  Okay.

13     Good morning once again to all of you.  We're here on two

14     motions, Plaintiff's motion to compel better Answers to

15     Interrogatories, and that's Document No. 135, and we also

16     have Plaintiff's motion to compel documents for production

17     and inspection and that is Document No. 168.

18          I would like to just mention to everyone that we

19     are proceeding by videoconference because of the

20     coronavirus pandemic, but I do want to remind everyone

21     that although we are proceeding by videoconference, just

22     as we would in an in-court proceeding, recording or

23     broadcasting this hearing remains strictly prohibited.

24          Also, I can see and hear everyone very well.  If

25     at any time you all are unable to see or hear well, just

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    say so and then we'll address that issue right away and we

2    also are joined here with our official court reporter, so

3    I just want to remind everyone to be sure to speak loud

4    enough so that we can be sure that we have an accurate

5    record.  Let's hear from the movant.

6             MR. COOK:  Your Honor, I'm going to present on the

7    motion for Better Answers to Interrogatories, and if it

8    please the Court, Ms. Commons will present on the request

9    for production.

10            THE COURT:  That's fine.

11            MR. COOK:  Just initially I'd like to say that we

12   had -- we began with a set of medical records, about 2200

13   pages initially and basically standard operating

14   procedures that were two or three-page documents that were

15   basically aspirational, we'll provide you with timely

16   medical care, we'll respect your medical privacy and so

17   forth.  When we tried to fill out those documents with

18   specific -- requesting specific information, we were

19   pretty much rebuffed right down the line.  There were

20   about 40 objections to vague or ambiguous or both, broad

21   or burdensome.  Throughout the discovery requests and

22   after a four hour meet and confer with Counsel for the

23   Sheriff, we still had serious gaps in the information that

24   we needed to proceed in this case.

25            Just starting with Interrogatory 2 where Plaintiff

1   asks for the identity of the ultimate policymaker as to

2   health care at the jail and also to any policy designees,

3   designated health care policy authorities, that was pretty

4   much dismissed as vague and ambiguous and the Sheriff

5   quite rightly says that that is a fact-based inquiry

6   ultimately but doesn't give us any facts.  So, basically

7   we get nothing from the Sheriff on that issue, and one of

8   the purposes of certain interrogatories are to determine

9   what position the Defendant will take at trial, and we are

10  not able to determine that from this, just that he reminds

11  us that it's our burden to prove what acts are the acts of

12  the municipal entity.

13          So, basically we're just brushed off.  We did do

14  some research and found out that the sheriff was the Chief

15  Corrections Officer under the county charter.  That's --

16  although the Florida statutes say that a Sheriff can be in

17  charge of corrections, there are counties where the county

18  is actually in charge of the Sheriff, staffs the jail but

19  there's a different administrator for the jail.  But

20  anyway, we did find that according to the county charter

21  for Pinellas County that he was the Chief Corrections

22  Officer, but we got nothing from him on that subject, and

23  of course, interrogatories it's very important to see what

24  the position of the Sheriff himself is going to be on that

25  question.

1          Now, Counsel for the Sheriff does make the point

2     that contention interrogatories are -- can be disfavored,

3     however, they tend to be disfavored early in discovery,

4     and toward the end of discovery they are very pertinent.

5     And so we felt that at the point that we asked this

6     question we were entitled to an answer as to what the

7     Sheriff's position was and perhaps more importantly who he

8     designated policy-making authority to in the realm of

9     medical care.  We didn't get any of that information.

10          We then in Interrogatory 3 -- these are just the

11     interrogatories that we were unable to get closure on with

12     the Sheriff.  We asked for the policy for addressing

13     fractures.  That's kind of important.  In most fracture

14     cases the bones do tend to knit and reform.  If they are

15     not set within a certain time, they can reform, they could

16     be misaligned and effect the utility of the arm or the

17     joint or the leg because they have reformed in a way that

18     is disfigured.

19          In this case, it was exactly the opposite.  And

20     initially when this happened there was an x-ray taken that

21     showed that there was severe destruction of the bones and

22     ankle and heel, but nothing more was done until about a

23     month later.  Twenty-nine days later when a CT scan was

24     done, it showed the possibility of infection.  It also

25     showed that the bones were deteriorating, so it's kind of

1    an opposite case, but here time is also of the essence,

2    not that the bones are knitting back together, but they

3    appear to be steadily deteriorating.  And so we wanted to

4    know what their protocol was for addressing severe

5    fractures medically.  The Sheriff pointed us to a

6    document, Standard Operating Procedure which was I think

7    either two or three pages long and we provided that

8    document as an exhibit to our motion, but, anyway, it

9    basically just said nothing about fractures or any

10   particular kind of injury, but it just said that we will

11   provide you with timely medical care and we'll respect

12   your medical privacy and you could seek emergency care,

13   and so on.

14        One of the complaints that the Counsel for Sheriff

15   made in that respect was that we hadn't made a prima facie

16   case and they cited HandsOn Chiropractic versus

17   Progressive Select Insurance Company.  They cited that

18   about seven times; however, that case says that we make a

19   prima facie case when we pointed out that the response to

20   interrogatory does not contain all the information

21   requested.

22        Now, 33(d) certainly is a way to answer or

23   supplement an answer to an interrogatory, but it is not

24   sworn under oath, and so if it goes beyond something that

25   is merely a pretty much accepted fact, if it contains any

1    information or fails to contain information requested,

2    then it is not a complete answer.  And so our position is

3    that every -- in every case where they used Federal Rule

4    of Civil Procedure 33(d), they failed to answer all the

5    questions that we asked, and that even by the case law

6    that they've themself cited does not meet their

7    responsibility.

8         In Interrogatory 4 we asked for the organization

9    of medical care in the jail including the full names and

10   titles of medical providers who carry out assigned

11   responsibilities.  The Sheriff objects as he has in many

12   parts of this, their language is unclear that the terms

13   "organization of medical care" entail and the other

14   medical providers who treat jail prisoners are unclear,

15   vague and ambiguous, but as with most of the objections to

16   vagueness or ambiguity or breadth, there's no effort made

17   to specify in what respect these things are vague,

18   ambiguous or overbroad or burdensome.

19        Basically the Sheriff goes on to address other

20   issues, and so there is a passage in the ADA civil

21   discovery standards Section 3 that says that

22   interrogatories should be interpreted reasonably in good

23   faith and according to the meaning of the plain language

24   of the interrogatories.  The meaning, the plain language

25   of the interrogatories would naturally import.  Time after

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    time, the Sheriff claims to be confused about terms like

2    ultimate policymaker or designated authorized policymaker,

3    and this is just another case where clear English words

4    used in the normal everyday sentence are dismissed as

5    being unintelligible.

6         As to Interrogatory 5 which asks for the level of

7    access that the Sheriff staff has to the electronic

8    documents for inmates, and here we are referring to the

9    court docket that advises -- that is transmitted to the

10    jail and to State Attorneys and Public Defenders and

11    lawyers, if they subscribe to it, to find out whether

12    there was someone who was looking to see who had hearings

13    where bale conditions were changed or where release was

14    ordered or were transferred for a hearing that was coming

15    up for plea which might use -- might result in a transfer

16    of a prisoner to the Department of Corrections or release,

17    and the Sheriff basically claimed to not understand what

18    we meant by staff or what we meant by electronic court

19    documents, although we use the term docket in the same

20    sentence.

21         So it's pretty clear that we're looking for

22    someone who monitors the court docket because we believed

23    that the Sheriff was aware that Mr. Nelson was going to be

24    transferred within the foreseeable future and the time was

25    of the essence in providing him with treatment.

1          Interrogatory 7 asks about why it took

2   three-and-a-half months or why three-and-a-half months

3   passed without medical interventions and their Sheriff

4   claimed not to understand what we meant by medical

5   intervention.  So, we got this on these responses on May 4

6   of this year.  A week later, on May 11th, we clarified

7   that we were talking about the medical intervention that

8   are measured to improve health or alter the course of an

9   illness or injury and that intervention for a fracture

10  could be open or closed reduction, and that open reduction

11  is manipulation of bone fragments by surgery and closed

12  reduction is manipulating bone fragments without surgery

13  without opening the body.  And we never received any

14  further information about why it took -- why

15  three-and-a-half months passed without any sort of medical

16  intervention.

17          There was what's called an Unna boot applied which

18  is actually not for fractures at all but for vein problems

19  and as requested there was some level of pain medication

20  and at the point that there appeared to be infection in

21  the diagnostic imaging, antibiotics were prescribed, but

22  those basically showed no affect.  And typically when

23  infection is lodged in a bone, surgical debridement is

24  what's called for.  That was never done.

25          There are some other things as well that were

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    never done, but nothing was done really to alter the

2    course of Mr. Nelson's injury until the point to which

3    Percy lost his leg.  Of course, the Sheriff is only

4    responsible up to April 16th, but that's still

5    three-and-a-half months after the very concerning incident

6    of fracture that shattered the structure and seal.

7         So Interrogatory 9 asks for detailed description

8    of Plaintiff's medical consultations and how the Sheriff

9    or his designee followed up on observations and

10   recommendations of medical consultant and that was

11   dismissed as overly broad, unduly burdensome, vague and

12   ambiguous.  Actually that's right to the point.  We

13   subsequently noticed that something like 37 pages of the

14   Plaintiff's medical records had a statement that this

15   medical record should be pasted into an email and made to

16   the reviewer and sent to the reviewer.  We never found out

17   who those reviewers were, what they received, what the

18   contents were, and that would have been very helpful and,

19   of course, there were depositions both in choosing people

20   to depose and asking them about the contents of the

21   records they received as well, of course, as any comments

22   that were made in the course of conveying the material.

23        It's worthy of note that Mr. Nelson was receiving

24   medical treatment for foot ulcers including at some point

25   surgical debridement of infection in foot ulcers but never

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    for this condition as far as we were able to discern in

2    the electronic medical records that we received which were

3    fairly terse, fairly unhelpful in most parts and talked a

4    little bit about "what," and nothing about "why," and the

5    why question is the question that the Sheriff has

6    side-stepped throughout, this discovery process.

7         Interrogatory 11 which was the system for

8    scheduling and rescheduling consults, the Sheriff

9    responded that he had given us all the records we needed.

10   The records just don't give that information, so, for

11   instance, there was a consult scheduled in mid-January

12   that was canceled and never sent out again, never

13   rescheduled until into March.  We were asking about --

14   asking for information about why that might be, whether

15   there were any kind of ticklers or timelines or anything

16   that would indicate that, hey, you know, weeks and months

17   have passed without any treatment for this condition,

18   what's going on.

19        In Interrogatory 12 we asked for an explanation,

20   again, for why it took a month to get a CAT scan and

21   nearly three months to get an orthopedic consult,

22   three-and-a-half months all together without any treatment

23   and that was dismissed by the Sheriff as argumentative.

24   But, it wasn't argumentative in the rhetorical sense.  It

25   was just said to make a point.  We really did want to know

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    why all that time could have passed without any effective

2    treatment for that very severe injury.

3          In Interrogatory 16 we asked for a detailed

4    description of a protocol or communicating with outside

5    specialists to set up consultations.  There again the

6    Sheriff complains that, as he did in 9 of the 11 of these

7    interrogatories, that the request is vague and ambiguous

8    and says nothing further about why the request is vague

9    and ambiguous but goes on to explain that it is also

10   irrelevant to the extent that it seeks information beyond

11   the April 16th, 2015 timeline when Plaintiff went to

12   prison.

13          This ignores the fact that in the preface to the

14   first interrogatories the Plaintiff says unless otherwise

15   stated, the time frame for these discovery requests is the

16   period from January 7, the date of the injury, to

17   April 16th, 2015.  So, he goes on to say that to produce

18   his Standard Operating Procedure on continuity of care, we

19   made that an exhibit at ECF 135-4 at Page 25, and it is,

20   again, just a three-page policy that basically states

21   aspirational goals and doesn't give any effective

22   information about what policy or what protocol guides the

23   setting of specialty consultations where needed.

24          Incidentally in the course of depositions much

25   later, we discovered that there was a medical policy book

1    that medical providers in the jail had access to and also

2    online.  We never saw any of that.

3         As far as the Sheriff's own policies were

4    concerned, they ended up giving us a list of what they

5    called an index of their general orders but not the

6    general orders themselves, so all of that policy -- if the

7    answers we were seeking were in that policy, we never got

8    that.

9         As to 19, we asked, again, the identity of the

10   person who, and, I quote, "had the policy-making authority

11   to authorize surgical intervention to address Plaintiff's

12   medical needs regarding his right ankle and foot

13   fracture," and that was dismissed again as vague and

14   ambiguous.

15        What the Sheriff doesn't note is that the very

16   information that he asked for in Interrogatory 2 when he

17   complains that we didn't tell him what specific aspects of

18   decision-making we were looking for and the medical care

19   and treatment on which the inquiry is made, here we very

20   specifically give that information and yet it is not

21   responded to with information.  So, instead of getting

22   information that we could use in shaping our discovery and

23   choosing our depositions and further requesting medical or

24   other relevant records, we basically just got time after

25   time boiler plate and conclusory objections and a claim

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    that what we're asking for is not relevant to any issue in
2    the case.  That simply wasn't true.

3         We came away from these interrogatories with
4    almost nothing.  And we would ask this Court to require
5    the Sheriff to provide better answers and also to provide
6    us with the opportunity for a Rule 30(b)(6) deposition
7    where we can ask the appropriate persons these kinds of
8    direct questions and get the information we need hopefully
9    in time to use that information.

10        THE COURT:  There were some of the interrogatories
11   that were listed in the motion that were not discussed
12   here today.  I don't recall you discussing in particular 8
13   and 16.  Are you withdrawing those or you just didn't want
14   to focus on those today?

15        MR. COOK:  I'm sorry.  My notes -- I intended to
16   address 8 and 16 and I apologize that I apparently skipped
17   over them, but Interrogatory 8 was seeking more
18   information about the subject of the information that each
19   person listed in the Sheriff's 26(a)(1)(A)(i) disclosures,
20   so these are the initial disclosures where the Sheriff
21   listed a number of persons who he claims had information
22   which was relevant to some claim or defense in the case.
23   And the only description given for the information of each
24   of these persons who potentially could be his witnesses
25   was that they could testify as to care and treatment

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    provided to Mr. Nelson.  Some of these were medical

2    providers.  Others were non-medical witnesses.  Some of

3    them were basically described as having information about

4    the timing and awareness of and Plaintiff's awareness of

5    the injuries, but all of the information that we got was

6    very terse and very unhelpful.

7         Understood that that may suffice for 26(a)

8    disclosures, we felt that we had the right to know why

9    these people were listed in more specific and usable

10   terms, and, of course, we did not get that kind of

11   information from the Sheriff.

12        As to 16, that was the request about the protocol

13   for communicating outside specialists to set up

14   consultations and that was dismissed as vague and

15   ambiguous and, of course, it was something that was

16   fundamentally important to us.  The issue of whether

17   information was relevant or important was considered by

18   the Sheriff very narrowly, and we feel that we were

19   entitled to far more information than what we were given.

20        THE COURT:  You mentioned that you have conducted

21   some depositions.  In the depositions that you have

22   conducted, were you able to ask any of these questions?

23        MR. COOK:  Well, I think that Ms. Commons will be

24   able to address that more specifically because she

25   conducted most of the medical depositions; however, in the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    case of the approximately 37 references to the need to

2    send records by email to specific reviewers, we did not

3    have that information.  We did not know who the reviewers

4    were, and so the deponents had to be chosen without

5    reference to that information.  And although we would

6    normally say in examination, well, you received an email

7    on this date conveying these records and, you know, what

8    kind of concerns did you have about the records and what

9    they were indicating about the patient's condition and

10   what action did you take in reference to that, nothing of

11   that we could do because we simply didn't know about those

12   emails.  The Sheriff denied having any non-privileged

13   emails.  We assume that they were talking about emails to

14   or from -- between the Sheriff and his legal Counsel;

15   however, the Sheriff also declined to provide a privilege

16   log and so we couldn't even doublecheck that.  We feel

17   that there were a great many communications that would

18   have been helpful to us in these depositions and we just

19   didn't have them.

20         THE COURT:  Which requests are you specifically

21   referring to when you make that argument?

22         MR. COOK:  The first one was I think -- actually

23   that's going to come in the records that we asked for and

24   didn't receive, there were probably four or five different

25   questions about communications and especially emails that

1    Ms. Commons is going to speak to.  There were about 37

2    pages of records that said, you know, send the report out

3    by email to the reviewer, and I think she has that

4    specific information.

5          THE COURT:  All right.  Before we hear from the

6    defense, let me ask Ms. Commons.  You were involved with

7    the depositions.  What questions did you ask already

8    concerning Document No. 135 in the depositions?

9          MS. COMMONS:  Was that the --

10         THE COURT:  That's the motion that Mr. Cook just

11   addressed.

12         MS. COMMONS:  Oh, okay.

13         THE COURT:  You conducted the depositions and

14   asked the questions.

15         MS. COMMONS:  Right.  Okay.  I asked a lot of

16   questions about who was in charge of making decisions for

17   these consults and everyone answered one person and that

18   was Dr. Kyle.

19         THE COURT:  So that is question No. 2,

20   Interrogatory No. 2?

21         MS. COMMONS:  As far as only for the consults.

22   Now, the authority for all policy-making, I don't know the

23   answer.  He said that he had never even read the policies

24   and procedures when he was hired in 2014 and that he

25   wasn't aware of them and that he was conducting writing

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    new policies and procedures.  What I found out from other

2    deponents is that there was a large book in the nursing

3    director or supervisor's office that contained all

4    policies and procedures for medical care which was

5    different from Standard Operating Procedures that was

6    produced to me which was only an index and some scattered

7    SOPs, Standard Operating Procedures, that they chose to

8    give me, so I got one policy that showed a medical -- this

9    medical care and that was on -- it's called 13-29 and it's

10   --

11          THE COURT:  I don't want to talk about -- I'm

12   sorry.  I don't want to talk about the Request for

13   Production.  I really do at this point just want to be

14   sure that I understand the full argument on the

15   interrogatory, motion to compel, and Mr. Cook mentioned

16   that you asked if anyone would have asked any questions at

17   the depositions concerning any of the interrogatories it

18   would be you, so I just want to know from the

19   interrogatories that you're moving to compel on which one

20   of these questions were already addressed at the

21   depositions and you said consultation.

22          MS. COMMONS:  I did not get a full answer from the

23   deponents I took.  The shortest answer I can give you is

24   everyone said Dr. Kyle was the one who canceled the

25   consult and he had the full authority and there was no

1    appeal process, but it didn't give me who was above

2    Dr. Kyle.

3          THE COURT:  As to the request related to the

4    people designated in the initial disclosures that is No.

5    8, were those people deposed?

6          MS. COMMONS:  Some of them.  We were limited to

7    10, so ones that we chose were the nurse practitioners and

8    the physicians who took the sick call for issues with the

9    foot and the fracture, and three of those providers did

10   their own consult request for an orthopedic surgeon which

11   Dr. Kyle did not approve until March 30th.  An appointment

12   set on March 16th was canceled and rescheduled for the

13   30th.  I took the ones that did the major care and

14   decision-making under the medical aspects of the fracture

15   and who watched this man deteriorate from January to

16   March, swelling, decreased pulses, and numbness in his

17   foot with a history of osteomyelitis in the other foot,

18   and they chose to take parts of the x-ray and CT scan and

19   decide that the infection wasn't important, that this must

20   have been some chronic condition and that's been their new

21   defense since that deposition in August.

22         THE COURT:  Did you talk about the policy that

23   they follow when one of the inmates suffers an injury such

24   as your client suffered and needs medical care?

25         MS. COMMONS:  I did, Your Honor, and none of those

1    key witnesses, the three doctors and three nurse

2    practitioners knew what the policies and procedures were.

3    One said that -- two of them said that they could get them

4    online on the inner system of the Sheriff to look up

5    policies should they need to refer to them.  Another

6    doctor, Dr. Rangle said that there was a large book in the

7    nursing supervisor's office and also in the medical

8    director's office that contained all the policies and

9    procedures for medical care which I was never given an

10   index to or able to see.  I requested to inspect in person

11   and I have not been allowed to do that.  The request has

12   been ignored.  Nor have I been given the index of the

13   policies and procedures so that I could narrow down to my

14   issues on fractures.

15        But there is one policy that they gave me that

16   says that any threat to a limb has to be sent out to the

17   hospital, and none of the providers were able to answer

18   that or knew of that policy.

19        THE COURT:  All right.  Let's hear from the

20   defense.

21        MS. COMMONS:  You're on mute.

22        MR. GORDILLO:  Sorry about that.  Thank you, Your

23   Honor.  At the outset I guess I just need to clear up a

24   lot of what Plaintiff's Counsel has said.  Initially

25   before going through each interrogatory, they stated 2200

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    pages of medical records have been provided and

2    aspirational Standard Operating Procedures.  To date

3    they're all Bates stamped, so it's not hard to see.  It

4    follows from No. 1 to No. 5788 or whatever that number is.

5    I'm not positive but it's close to 5800 has been provided

6    throughout the course of discovery.

7         Furthermore, the SOP index was provided back in

8    August to both the Plaintiff's counsels and actually all

9    Counsel of record back on I believe it was August 14th.

10   It wasn't until September 10th, less than two weeks ago

11   where the Plaintiff chose what SOPs and general orders

12   that they wanted, so we're in the process of getting those

13   to them because there's quite a few of them.

14        But to stand here and say that no index has been

15   given, no SOPs have been given, obviously 56 pages were

16   attached to their initial motion, so they did get initial

17   SOPs.  However, the index was provided as I said on

18   August 14th and they waited until September 10th to give

19   the list of which ones they wanted which we're in the

20   process of doing.

21        The large book that Ms. Commons continues to talk

22   about and the director for the nursing office, that has

23   been provided.  It's the nursing protocols, I believe

24   there's about 1500 pages worth of this.  Those were

25   provided after Dr. Rangel made his statement at

1    deposition.  I went back to the director of nursing and I

2    did find out there were nursing protocols, and as of

3    August I believe 21st, somewhere in there, she was

4    provided with those nursing protocols.  And like I stated,

5    they're about 1509 pages worth of documentation.  I wanted

6    to make all that clear, that it's not quite what was

7    represented in the outset about what's been provided in

8    this case.  And I think we'll probably get into that a

9    little more when we go to the Request for Production.

10          Going also to Your Honor's questions about who's

11   been deposed and what questions have been asked.  In this

12   matter, the six people, three ARNPs and three physicians

13   who are named within the facts of this case that were

14   medical providers at the jail, they're the only six that

15   were listed in the Fourth Amended Complaint of people that

16   provided care to the Plaintiff regarding his right ankle

17   fracture and those six were deposed.

18          I can tell the Court that almost all of these

19   interrogatories that we're talking about now were

20   discussed at all those depositions, answers were given

21   about these at those depositions.  The one I will say that

22   I would agree with the Plaintiff that were not really

23   given at those depositions is probably No. 2 about the

24   office and the policymaker.

25          Again, our objection to that was that that is a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    question of law for the Courts to decide.  That's through

2    the Supreme Court findings in Jet v. Dallas.  It's a 1989

3    case.  It's cited in our response, but other than that,

4    the policy for a fracture, not only have all these

5    documents been provided and are still being provided, but

6    the policy for fracture -- and, again, SOPs aren't going

7    to list -- and this was also I believe described at

8    depositions, an SOP, a policy or procedure can't go

9    through every exact scenario that could possibly come up.

10   There are more general guidelines.  So as I think Mr. Cook

11   calls them aspirational SOPs, they're guidelines, they're

12   guidances, they're not "if this, then do this.  If this,

13   then do that."  You can't do that.

14        As with anything in life so many different things

15   can happen.  Everything, every situation is different, so

16   you could make a policy that accounts for every single

17   possible scenario that could happen.  So, if they're not

18   happy with the policies, those are what the policies are.

19   If it says get them care, you know, when needed, you

20   know -- and there's always an element within policies of

21   discretion, you know, and relying on the people to do, you

22   know, their job and do what they know to do.

23        No. 3, dealing with the policies.  Policies have

24   been provided.  Policies are still being provided.

25        No. 4, organizational, the medical care at the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    jail.  If you look at the response given to that, there

2    was also a response given to No. 4.  Talking about

3    Dr. Rangel, Dr. Yukna, the nurses Numiller and Newby, that

4    they're employed by the Sheriff, not Maxim.  These are

5    also people that were deposed that were talked about, who

6    do they report to, what are they over, what care did they

7    provide to the Plaintiff.  So those questions have been

8    answered.

9         Interrogatory No. 5, electronic court docket.

10   Again, they just said your staff.  There's over 3,000

11   employees at the Sheriff's office so it is a little vague,

12   a little ambiguous.  We also question the relevance of

13   this.  In their motion they talk about availability of

14   beds, planning for jail services, things of that nature.

15   That has nothing to do with this case, so the relevance is

16   just not there.

17        In addition, I know I believe it was Dr. Kyle in

18   his deposition was asked about electronic court dockets

19   and he discussed whether the medical staff look at them or

20   not, care about them or don't, you know, and to the extent

21   of all that.  So I believe that No. 5 has been answered.

22        No. 7, list of all medical interventions provided

23   the Plaintiff.  Again, all the medical records have been

24   provided.  In my response, I also added that there's an

25   11-page index which was attached so the Court can see it.

1    What this index does, it lists out every day of treatment

2    during these three, four months that we're talking about.

3    I think a little bit back to the version I gave going back

4    into December, we're really only talking about January to

5    April.  Nonetheless, it gives a comprehensive list of

6    every time some of the medical staff dealt with Mr. Nelson

7    or dealt with a record of his, and it lists it in

8    chronological order.  And it's 11 pages worth of just

9    straight down, just a list of all the dates and what --

10   just a general description of was it a treatment, was it a

11   chronic care visit, was it -- you know, depending on what

12   it was.

13        When you click on any one of those you want to

14   see, it takes you directly into the record itself so you

15   can see who did what, what they found, what they

16   considered, and everything that's contained within the

17   medical records, you can go straight to it.

18        The medical records at issue for the months that

19   we're talking about, the January through April of 2015,

20   there are 720 pages worth of medical records with this

21   11-page index attached to it that helps you jump around

22   through the records, therefore, for us to list all medical

23   interventions, that's been provided through the documents.

24        The defense shouldn't have to go and make an

25   outline of the medical records and provide that to the

1    Plaintiff.  They could just as easily read it for

2    themselves, you know, and make up their own outline to see

3    what medical interventions were provided.

4         Going to No. 8, description of testimony, same

5    type of objection.  They can easily go through the

6    records.  They can do a word search if they're .pdf

7    format, so you could do a word search of any witness' name

8    to see where they come up in the medical records, what

9    they did or didn't do, you know, what interactions they

10   had with the Plaintiff.

11        Again, also, this six that seem most important to

12   the Plaintiff have all been deposed.  They were deposed in

13   early August.  It was the three ARNPs and the three

14   physicians.

15        Interrogatory No. 9, follow-up on the description

16   of our understanding, a follow-up of consultant

17   recommendations.  Again, those were all provided in the

18   documentation.  You can see when consults were ordered.

19   You can see when he went out for consults.  You can see

20   when he returned from consults, when he was visited, the

21   day of his return by either an ARNP or a physician.  They

22   have their notes about their interaction with him.  They

23   also have their follow-up orders depending on what the

24   recommendations were made from the outside consultant.

25        Also, there's one page at the end of each consult

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    order where the outside consultants fills out whatever

2    recommendations they have, whatever treatment they think

3    is necessary.  Any follow-up they believe is necessary

4    they put on that one page.  All those pages are contained

5    within the medical records, so you see those and then you

6    see the follow-up from either the ARNP or the physician

7    who saw that record, saw the Plaintiff when he returned

8    and then made their follow-ups and their orders as to what

9    those recommendations were.  All that's in the medical

10   records, you know, so that answers that question.

11        And, again, all these people that saw him after

12   these consults have all been deposed as well.  And they

13   went through all the documents with them from the medical

14   records as to each one.

15        No. 11 described the scheduling and rescheduling.

16   They claim records don't provide the information, however,

17   we believe that they do.  It shows why certain

18   appointments didn't happen.  There's descriptions in the

19   records, whether it be a dialysis appointment that

20   conflicted or he got a CT scan instead or there's a

21   transportation issue.  All of that is within the medical

22   records.  I'm not making this up.  I've seen them in the

23   records myself.  Plaintiff's Counsel should have seen it

24   as well because they are in the records.  Also, this one,

25   No. 11, even within the interrogatory itself, it says feel

1    free to use documents to answer the question.  We did

2    that.

3         Earlier Mr. Cook brought up contention to

4    interrogatory.  This is one of the places we said this is

5    a contention interrogatory, because within the motion

6    itself, Document 135, I believe it's Page 11, they

7    state -- pull it up so I can just.  They state "Plaintiff

8    construes the appointments are set and broken to create

9    the appearance of care being given whereas the intent is

10   to run out the clock until the inmate is released or

11   transferred, thus saving costs."  We believe once you

12   start going into that type of language, that kind of

13   accusations with no evidence -- and, again, they have all

14   the documentation at this point at the time of filing this

15   motion.  They had taken those six depositions, so where

16   they get that allegation from I don't know, but we feel

17   that this is a contention to interrogatory at this point

18   and that turns this interrogatory into a contention

19   interrogatory which are disfavored.

20        Interrogatory No. 12 I believe from the outset was

21   a contention interrogatory.  In our response, it was even

22   objected to as argumentative.  Basically it's saying

23   explain why everything took so long and then it's also

24   asking a constitutional officer to give basically expert

25   testimony about "address the dangers of bone infection."

1    These are all objections that were properly made at the

2    time that these interrogatories were propounded, and we

3    also believe going back again to a medical records,

4    medical records do show when things were scheduled, when

5    they were rescheduled, when they were moved and reasons

6    for each one.

7          In addition to documents that have been provided

8    also back in August, the defense sent over to Plaintiff

9    and all parties transportation logs, consult logs, and

10   they were for the months that he was in the jail from May

11   of 2014 through April 2015 and they detail every inmate

12   and every outside consultation they went to, and it shows

13   the date when the consult was ordered and the date when

14   the consult happened.  If the consult got moved, it's also

15   shown within those consult logs.  Those are all things

16   that the Plaintiff has at their disposal which again

17   answers a lot of these questions that they are saying they

18   don't have answers to.

19         No. 16, describe the protocol for communicating

20   with outside specialists.  Again, SOPs have been provided

21   that answer those questions.  Medical records have been

22   provided that show when consults were ordered, that

23   indicate what documents were provided, that show the

24   recommendations made by the consult, and shows the

25   follow-up orders after those outside consults.  Those are

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      all within the medical records.  And again, the six

2      witnesses have been deposed.  They've been asked these

3      questions, so we believe the answer has been given.

4              Going to No. 19, I believe 19 is similar to No. 2.

5      Again, they're asking for an ultimate decision-maker.

6      Again, that's a question of law for the Court to decide

7      who -- the identity of that person, that individual is,

8      and the other part that was objected to is irrelevant is

9      because they said who had the authority to authorize

10     surgical intervention to address Plaintiff's medical needs

11     relating to his right ankle and foot.

12             When he was at the jail from January to April,

13     there was no medical provider that ordered surgery, so

14     it's an irrelevant question as far as we're concerned.

15             That's all I have at this point, Your Honor.

16             THE COURT:  All right.  Anything from Mr. Toomey?

17             MR. TOOMEY:  No, ma'am.

18             THE COURT:  Thank you.  Anything additional from

19     Mr. Cook?

20             MR. COOK:  Yes, Your Honor.  I would just like to

21     respond to the importance of the knowing who received

22     certain records, who was supposed to review certain

23     records and the Court asked what issues that was

24     relevant -- those were relevant to, and I just made a list

25     that's a little bit better than what I blurted out.

1          As to scheduling it, as to the delay, as to the

2     authority, as to knowledge, as to policy and as to

3     interventions or failure to provide interventions, the

4     transcript of the hearing will show that I complained that

5     we only got an index of general orders.  We did, in fact,

6     get certain select Standard Operating Procedures and we

7     got those early on.  As I said, they were aspirational,

8     they were very brief and they were unhelpful for the

9     purpose that we requested.

10         We later found out that there were other kinds of

11    records that would have been helpful.  It would not have

12    been burdensome for them to have provided us with the

13    general orders.  There's no way that that is not -- that

14    those are not digital, and if we needed to, of course, we

15    would go over there on site and scan the paper if it were

16    simply in paper format.  But -- anyway, so we never denied

17    that we received an index or certain Standard Operating

18    Procedures, only that they were unhelpful and that we

19    never have received the full set of general orders or the

20    medical policies that we later found out about.  We have a

21    right to see those things.  We have a need to see them.

22         Now, as to the electronic docket and the kind of

23    narrow construction of relevance that the Sheriff gives to

24    that issue, if a jail has to plan its use of space, then

25    they're going to monitor the docket to see who's going

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    to -- who's likely to be released, who's likely to be
2    transferred and that's the importance to them.  The
3    importance to us is that it shows that they knew that
4    Mr. Nelson was headed for a transfer and that they had a
5    limited time in which to provide treatment for his medical
6    condition, or they could just pass it on to another person
7    by just delaying another few weeks and someone else would
8    have to pay for the costly surgical processes that
9    Mr. Nelson actually needed.
10         We find in these failure-to-treat cases lots of
11   tests and lots of diagnostics and virtually no medical
12   intervention, because if you can get by with scheduling
13   and rescheduling appointments and scheduling diagnostic
14   imaging and then waiting a few weeks, you can frequently,
15   especially if you're a jail, you can frequently count on
16   the inmate to be released or transferred within some
17   period of time, and so that's -- that was the relevance to
18   us, that they would have -- it would have been important
19   for them to know.
20         THE COURT:  Let me just go back quickly because I
21   think I understand your argument on those points.  I did
22   not ask the defense about your 30(b)(6) request.  Do you
23   have any objection to that?  We're still within the
24   discovery time period.
25         MR. GORDILLO:  Yeah, and actually I was kind of

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    surprised by that because we're in the process of

2    scheduling that.  We have prospective dates.  Ms. Commons,

3    I believe it was last Thursday, sent over topics for us.

4    I'm currently in addition to answering all these motions

5    that have been coming out in late discovery that's been --

6    you know, that wasn't done sooner and has been waited

7    until the last month or so to begin, but I was kind of

8    surprised about that request because I thought we were in

9    the process of already scheduling that.

10           THE COURT:  All right.

11           MR. GORDILLO:  I did send over topics on Thursday

12    and it's probably going to take a couple witnesses to go

13    through the topics, so I've spoken to one witness already.

14    I just haven't had time to speak to any of the others,

15    but, yeah, that's something that I thought we were already

16    kind of scheduling --

17           THE COURT:  And then --

18           MR. GORDILLO:  -- and provided.

19           THE COURT:  And you mentioned that you provided

20    the index with the Standard Operating Procedure and that

21    Plaintiffs have designated certain chapters I suppose or

22    pages of the procedure manual for production.  When do you

23    plan on producing that?

24           MR. GORDILLO:  That should hopefully be done

25    hopefully the end of this week, you know, if not next

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    week, but, again, those are something that was provided to

2    them.  They waited almost a month to let me know which

3    ones they wanted, which is fine, but, you know, I need

4    some time now because there are a lot.  There are older

5    ones, so, you know, they're ones that have to go back and

6    get.  Those are not from that time period so we are in the

7    process of collecting those as we speak, Your Honor.

8           THE COURT:  So by Friday, you're thinking the

9    25th?

10          MR. GORDILLO:  Yes.

11          THE COURT:  All right.  I have heard the argument

12   related to the motion in Document 135.  I'm going to grant

13   it in part and deny it in part.  Some of the interrogatory

14   requests do relate to legal issues or they are matters

15   that were already answered either in depositions or in the

16   documents that have been provided, but as to certain other

17   requests, they are requesting more specific information

18   that I think appears to me appropriate for an

19   interrogatory request, and that's No. 3 talking about the

20   procedures and policies that you-all follow or what the

21   Sheriff follows when someone does suffer an accident.

22          And as you mention on the defense side, you know,

23   it's possible -- it's impossible for a procedure manual to

24   really discuss the intricacies of every situation and

25   that's why it will be helpful for you to provide the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    interrogatory response.

2         And No. 5 which talks about the access to the

3    electronic records, that seems to be a very specific

4    request to me.  11 which talks about the system for

5    scheduling specialists or making the outside appointments.

6    I understand that the records reflect that the

7    appointments were scheduled and rescheduled, but the

8    interrogatory is asking for specific information about why

9    those things were done.  And if they are in the records,

10   well, then fine, but it will be helpful I think to have a

11   specific response on 11.

12        Same thing with 16, detailing the protocol for

13   communicating with specialists.  And it may be that that's

14   in the procedure manual, and if it is, then you can --

15   they can rely on that and provide a response in accordance

16   with what the manual says, but it's also possible that

17   there are more specific practices that are inquired about

18   in 16 that wouldn't be reflected in a procedural manual.

19        And same thing on 19.  19 asks for -- it's a

20   little bit different than 2 in my opinion.  It asks for

21   the person who can make a decision to authorize a surgical

22   intervention, and then it may be that you said or from the

23   defense side that there's nobody that could have

24   authorized it, but there was no medical director or

25   somebody of that sort that you mention, but at the time

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    that the people are incarcerated, there has to be somebody

2    that can make that decision, and whoever that was at the

3    time that the Plaintiff was incarcerated, that might be

4    who you deem as the appropriate person, but, you know, you

5    should designate whoever that person is.  So other than

6    those, the request is denied.

7           And now let's move on to No. 168.  Let's hear from

8    Ms. Commons.

9           MR. TOOMEY:  Judge, before you continue, can I

10   interrupt for one second?

11          THE COURT:  Yes, sir.

12          MR. TOOMEY:  I don't have a dog in this fight.

13          THE COURT:  Yes, sir.

14          MR. TOOMEY:  You okay if I'm excused?

15          THE COURT:  You are certainly excused.  It was

16   nice to have you.

17          MR. TOOMEY:  Thank you.

18          THE COURT:  Enjoy the rest of your day.

19          MR. TOOMEY:  Thank you, Judge Sneed.  You too.

20          THE COURT:  Ms. Commons.

21          MS. COMMONS:  Yes, ma'am.  No. 1 was records

22   listed in their disclosures.  In their disclosures they

23   said that they were going to produce the employment

24   records for Gail Newby and Mauricio Rangel.  Now, if you

25   remember, we waited from May until August to have -- or

1   July, the beginning of August, to have our meet and confer

2   because we had a change in attorneys and we had to give

3   Mr. Gordillo time to catch up with what Mr. Rozelle had

4   already done, so we were patient and we waited and we

5   discussed that we would have the personnel files for the

6   six main providers.  We never said that these are the only

7   providers.  There are nurses and LPNs that also took care

8   of Mr. Nelson and the medical records.  What was produced

9   to us were records from 2006, 2009, 2010 and 2014, 2015,

10  and up to the transfer.

11       So, while it sounds like at times the records were

12  produced to us, I have read every single one many times,

13  Your Honor, looking for information.  Every request for a

14  consult, none of it is filled out.  It's got a blank form

15  in the note, and I have reference that I can give to you

16  after the hearing.  I didn't want to overwhelm you with

17  all these papers, but my basis for the motion was the

18  consult records are blank.  It tells the writer what to

19  fill in, and it says copy and paste this form in an email

20  and send it to the designated reviewer.

21       I don't know who that is.  I have not received one

22  email.  When I've asked every single provider, "so you

23  have this form," and three of them that I deposed did a

24  consult with the blank form.  They've never seen the form

25  that was filled out and sent to the actual consulting

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    doctor, and I have not been produced that form.  And that
2    is critical.  What did they put in the form?  When did
3    they send it to the consulting doctor?

4         Now, originally on January -- so Mr. Nelson
5    fractures his ankle on the 7th.  On the 8th he gets his
6    x-ray.  It shows a fracture of the major foot bone on the
7    bottom and on a toe, on part of the long bone to the toe.
8    And the Nurse Practitioner Carol on the 11th orders an
9    orthopedic consult, and this blank form is in the medical
10   record for the orthopedic consult and it says email it to
11   the provider.  And he says, "I've reviewed the x-ray and
12   CT advice and pending. Right foot needs," you know, pain
13   and swelling and what the x-ray shows.  So, after it goes
14   to this ward, the medical secretary to the appointment,
15   she has to then give it to Dr. Kyle to approve, so
16   apparently she set an appointment with the orthopedic
17   surgeon on the 11th and Dr. Kyle canceled it.

18        What was sent to the orthopedic surgeon I have no
19   idea.  There's no -- and this is throughout this Request
20   for Production.  There's not one communication put to the
21   consulting doctors, not one.  It says we're going to
22   consult with a doctor, but that's all it says.  The actual
23   consult that was filled out, we don't know.  There's a
24   fight about how many times Mr. Nelson saw Dr. Swick, the
25   orthopedic surgeon.  He says he saw him twice.  Dr. Swick

1      says he only saw him once.

2             The consult log that was given to me was a

3      handwritten log with chicken scratch on it.  I can't

4      figure out what it says except that it says that an

5      appointment was made, and then a line through it on

6      different dates, so that doesn't show me the

7      transportation of the client or the inmate to an

8      appointment.

9             Now, as far as the medical records or medical

10     index for the policies and procedures, that was never

11     given to me.  What was given to me were some policies and

12     procedures on medical care that had nothing to do with

13     fractures, nothing to do with the getting tests done,

14     nothing to do with the procedure for getting a consult

15     scheduled when you have three independent medical

16     providers ordering an orthopedic consult and the medical

17     director deciding not to honor those independent medical

18     judgment assessments.  There's nothing that explains to me

19     how that process is done that allowed Dr. Kyle, the

20     medical director, to ignore three independent medical

21     providers consults to orthopedic surgery in January.

22            And according to his testimony, Dr. Kyle, he

23     decided that, oh, it must be a chronic condition and his

24     bone just collapsed.  And he ignored all the independent

25     medical providers' assessments that he needed an

1    orthopedic consult immediately, and he didn't even know

2    what his own policies and procedures were, and I'd only

3    had one that said when the limb is threatened, the patient

4    has to go to the hospital because they have no testing

5    there, no CT scan, no MRI, no ability to do emergency

6    surgery.

7          And the history -- now, what's important is you

8    have to go back to 2014 because now they're saying in

9    their deposition, Dr. Kyle's deposition, this was a

10   chronic condition.  He has a Charcot foot.  Well, that's a

11   very specific diagnosis that's not on the list of any

12   diagnosis prior to this supposition in an x-ray report

13   that said traumatic Charcot deformity or traumatic

14   fracture and infection needs to be ruled out.  Nobody

15   ruled it out, infection.  When I asked nurse practitioners

16   what's the protocol for a fracture, they said they didn't

17   know.

18          So, when Mr. Gordillo tells the Court that all of

19   my questions were answered, no, they were not.  Not one

20   nurse practitioner quite shockingly knew what the policies

21   and procedures were.  They couldn't tell me what the

22   standard of care was for treatment of a fracture with a

23   possible infection when the patient had a history of just

24   finished being treated on his left foot for osteomyelitis

25   and infection where he was hospitalized and where he was

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      given a cast to get off his foot, because the treatment

2      protocol is get off the foot and possibly an IV

3      antibiotics, culturing the wound, make sure that IV

4      antibiotics are not resistant to the bacteria that's in

5      the foot.

6              So, none of these nurse practitioners and none of

7      these physicians did anything to intervene in diagnosing

8      the infection.  Dr. Kyle never saw Mr. Nelson.  He's only

9      reviewed his medical records in order to make a decision

10     whether or not he should go to orthopedic surgery or an

11     orthopedic consult.  There was a consulting record

12     produced to me from 2017.  It's not produced to me again

13     in the Federal case, and it's missing what was filled out

14     for Dr. Swick, the orthopedic surgeon.  And what records

15     were sent to the orthopedic surgeon, we have no idea and

16     our client testified at his deposition that there was a

17     medical file and a CD given to Dr. Swick, the orthopedic

18     surgeon, however, the Sheriff has not produced that.

19             And going back to his Rule 26 disclosures, he said

20     the insurance agreement that he had, that wasn't produced

21     either, and I haven't been offered a date to come see that

22     either.

23             Now, the policies and procedures manual that

24     Dr. Rangel talked about and the nurses said were both

25     online and in the nurse supervisor or nursing director's

1    office are different from the index of the Standard

2    Operating Procedures that were produced to me in August.

3    I still have not seen an index.  Some policies and

4    procedures were produced but it had nothing to do with

5    this case, like how to take a temperature, or how many

6    times a nurse should, you know, do a blood glucose level.

7    That has nothing to do with the issue of fracture and

8    sending him off for a consult.

9        So medical records do show that there are nurses

10   and LPNs that took care of Mr. Nelson.  I didn't have to

11   put every name.  There's over 50 names in the medical

12   record of people who took care of Mr. Nelson in the four

13   months, so to say that only these six I deposed took care

14   of Mr. Nelson is not accurate.  I deposed the ones that

15   did the sick call, that had the medical authority to do

16   the consults, and the nurse practitioners to my dismay

17   were like incredulously ignorant and ignored signs and

18   symptoms of this limb failing.

19       For example, they couldn't feel the pulse.  His

20   foot was hot at one visit.  His foot was cold at another

21   visit.  That's significant for different things.  They

22   didn't intervene at that time because they tried to say

23   that scheduling tests were medical care.

24       When I asked Dr. Rangel and another one of the

25   nurse practitioners is scheduling tests and tests medical

1       care, she said no, that's not treatment.  Treatment is an

2       intervention that is done by the provider to help heal the

3       injury.  Nothing was done from January until his transfer

4       in April, and nothing has been produced to show why there

5       was no intervention and why none of these providers knew

6       about what their policies and procedures were, and I still

7       have not been given an index, like I said, of the medical

8       policies and procedures.

9              For example -- and I didn't use this example in

10      the deposition.  In a hospital when you have to do a

11      particular procedure in the Intensive Care Unit let's say,

12      there's a policy and procedure that documents how to do

13      that procedure, so that's the medical policy and

14      procedure.

15             What I was given was general Standard Operating

16      Procedures, like how to get a transport and had nothing to

17      do with medicine at all.  It had to do with functionality

18      of the jail.  What I was looking for were the actual

19      medical policies and procedures, what is your intervention

20      for a fracture.  And the one that I did get that's

21      critical that none of them knew about was when a limb is

22      affected you must send the client to the hospital, and I'm

23      sorry for saying client -- I mostly do civil medical mal.

24      inmate -- whose is entitled to medical care the same as in

25      the community.

1          Now, we have two causes of action here.  One is a

2     medical malpractice and the other is the failure to treat

3     under the Constitution, so that's why these -- and medical

4     records are important.

5          Now, they use electronic medical records called

6     the NextGen program, and I attached as an exhibit a sample

7     of the NextGen program, and I asked Mr. Gordillo numerous

8     times to please give me some kind of communication because

9     there is a type of communication, whether this is not

10    exactly how they have their system set up, the point is

11    that the program allows a practitioner to go into the

12    electronic record and see all consults, all past medical

13    history, all tests, all communications between providers,

14    anything pending, days of dialysis.  Could days of

15    dialysis been changed?  Yes, they could have.  Because

16    they did them in-house, they could have changed the dates

17    of the dialysis in order to send Mr. Nelson out

18    immediately to an orthopedic surgeon.  And Dr. Kyle seems

19    to have taken it upon himself to decide how he's going to

20    treat the patient though he had never seen him, and didn't

21    know anything about the policies and procedures even

22    though he's the medical director.

23          When I asked him is there any procedure to go over

24    your head, he said I don't know, I don't think so.  I

25    think I'm the buck stops with me.  I need to know.  How

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1   did a nurse, not one nurse knew how to go over Dr. Kyle's

2   head, and that's dangerous, because these are independent

3   medical providers.  Nurse practitioners are similar to

4   physicians.  They operate on the same standard of care,

5   and not one of them -- the five of them intervened to go

6   over Dr. Kyle's head to get care for Mr. Nelson.  Why?  We

7   don't know.

8          Now, No. 2 and 3 are claims and defenses from

9   other parties in the litigation.  As far as I know these

10  have not been produced.  That's 3, 4 -- I'm sorry -- 2, 3

11  and 4.  2, 3 and 4.  I did finally get -- on No. 1, I did

12  finally get the actual films, but there is no fax, there's

13  no letters and there's no consulting records that are

14  filled out.

15         Now, there is a policy that when the client gets

16  transferred up to the Department of Corrections, there's a

17  policy that says we're -- not even a policy, an audit, the

18  audit.  One of the questions in the audit to get

19  accredited is do you send the medical records with the

20  client/patient in May to the next facility with an

21  envelope with the records and a CD of all the testing, and

22  that I can provide to the Court after the hearing if you

23  wanted to see it.

24         THE COURT:  Just a moment.  Just a moment.

25  Mr. Gordillo.  All right.  We were missing you for a

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    moment.  All right.  Go right ahead.  And if you can,

2    Ms. Commons, group these in large categories, the request

3    that you're discussing now.

4         MS. COMMONS:  I'll try, Your Honor.  Just so, you

5    know, on the audit, No. 29 says that there has to be a

6    summary of the medical file accompanying the inmate to the

7    receiving facility and medical records sealed in an

8    envelope are confidential with the records.  And that

9    would have been critical in this case because nothing was

10   done, and the leg is described by the receiving entity as

11   a monestrous edematose, an ankle measuring 19 centimeters.

12        THE COURT:  Let me just --  Let me ask you,

13   Ms. Commons.  It appears in a number of the requests that

14   the defense has agreed to provide documents already, and

15   is it your contention about those requests that you either

16   haven't received them or they have been insufficient?

17        MS. COMMONS:  Yes, ma'am.  And I have not received

18   the medical policies and procedures index to be able to

19   give him that.  The Standard Operating Procedure was like

20   40 pages and I gave him limited -- you know, a request for

21   those after he gave me the index.  It's not like I was

22   sleeping on my ability to go through thousands of pages

23   dumped on me at the end of August to go through, but I

24   did.  I went through all of them.

25        THE COURT:  Something seems odd on Request 8.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

 1          MS. COMMONS:  In the scheduling matrix, I have not

 2     received that.

 3          THE COURT:  All right.  What are you looking for

 4     there?

 5          MS. COMMONS:  I'm looking for how the medical --

 6     when a consult is ordered, how the -- what is the

 7     procedure to get that consult done, what's their

 8     procedure?  I don't know what it is.  I mean I do know

 9     that there's a consult filled out and emailed to the

10     provider.  Who picks the provider?  They didn't know.  The

11     nurses and doctors didn't know.  Apparently Ms. Toni Ward,

12     the secretary has the list of contracts.  I wasn't given a

13     list of all the contracts of medical providers with the

14     Sheriff.  I was only given the contracts with the ones

15     they decided I could have, which were three of them, but I

16     wasn't given any to the hospital or anything like that.

17          THE COURT:  Can you talk about the request in 14,

18     15, 18 and 19?

19          MS. COMMONS:  Yes.  This goes with the NextGen

20     program, and what I was saying with the communications for

21     emails or letters or faxes on providing medical care and

22     consulting care to Mr. Nelson.  There's not one email

23     between -- in the jail between the caregivers and

24     physicians.  (Internet connectivity issue.  They said that

25     they break up --

            UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1          THE REPORTER:  Your Honor, Ms. Commons screen is

2     frozen.

3          THE COURT:  Okay.  She's frozen for you, but she's

4     not frozen for me.  So let's just give it a minute and see

5     if she unfreezes.  I can hear Ms. Commons.

6          MS. COMMONS:  Ms. Miller, can you hear me?

7          THE REPORTER:  I can hear you.

8          THE COURT:  All right.  Go right ahead.  Thank

9     you.

10          MS. COMMONS:  Okay.  Well, Your Honor asked about

11     No. 16 I believe, 14 and 15.

12          THE COURT:  14, 15, 18 and 19.

13          MS. COMMONS:  14, 15 goes along with the prior

14     group that, yes, which was communication.  And the NextGen

15     program, electronic medical record allows a provider to

16     see all things for the inmate patient.

17          Dr. Yukna testified that there were paper doctor

18     orders that were written and I actually continued his

19     deposition because I was not produced the paper doctor

20     orders.  I was only given the electronic records.

21          Dr. Yukna said that there were paper records and

22     when I went back to 14 and looked at those records, there

23     were paper records for doctor's orders, but Mr. Gordillo

24     has not produced those.

25          THE COURT:  So you received a portion of the

1   NextGen records but not a complete copy?  Is that your

2   position?

3           MS. COMMONS:  I asked that at the deposition what

4   program they were using and they said NextGen, so they

5   were telling me that there was no communication, emails,

6   letters, consults, and so I went and did research on my

7   own and found this program.  And when you look at the

8   program, the entire history of the patient is on there.

9   All prior medical records should be on there.  In other

10  words, an electronic medical record is supposed to be

11  easier for the provider to look at past medical history, a

12  problem with communications to each other or through

13  consults and to, you know, the secretary to do the

14  consults, but what hasn't been provided is the procedure.

15          None of the nurses knew or the doctors knew once

16  they fill out this consult what happens to it, and so we

17  need to know what happens, how come they're not informed

18  that their consult that they decided needed to be done

19  wasn't fulfilled, and the electronic records should all be

20  on there, so I know that I'm --

21          THE COURT:  I'm sorry.  It appears -- did we lose

22  Mr. Gordillo?

23          MS. COMMONS:  I'm sorry, Your Honor.

24          THE COURT:  Mr. Gordillo doesn't appear here.

25  Let's see if he will call back in.  We'll see if our clerk

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    can reach out to him.  Just a moment, everyone.  We'll

2    just take a brief moment and we'll see if we can locate

3    Mr. Gordillo.  Just a moment.

(Brief pause.)

5         MR. GORDILLO:  Okay, I'm back.

6         THE COURT:  All right.  We're back with all of the

7    lawyers.  I'm sorry, Ms. Commons.  Go right ahead.

8         MS. COMMONS:  Okay.  Addressing the communications

9    issue, several of the requests in the NextGen program

10   should have all of the documents together, past medical

11   history.  The problem was communications between the

12   providers requesting a consult and Ms. Toni Ward, their

13   secretary, and Dr. Kyle, the medical director, also

14   between each other as to follow up to provide continuity

15   of care which they are required to do because of standard

16   of care.  And in researching the NextGen electronic

17   program, that's all available on that program.  While it

18   might not be exactly the way they set up theirs, the

19   information that there is is the point.  Whether it's on

20   Tab 2 or 3, it doesn't matter, as long as there's some

21   communication and not one email, not one letter, not one

22   fax being produced of what was sent to the providers for

23   consulting.

24        Now, No. 18, the audit that you asked about, Your

25   Honor, we were given 15 and 16.  I would like to have 14

1    because they raise the issue of the chronic condition as a

2    defense at the depositions, which seemed to be

3    unilaterally or all three -- all five of those doctors and

4    nurse practitioners seem to take the position that it was

5    a chronic condition versus an acute condition of a

6    fracture.

7         And in the audit which I was pointing out to Your

8    Honor earlier is a question -- different questions about

9    what kind of care is being provided to the inmate, so I

10   would request 2014 and any corrective action plan if one

11   was done because this -- because the Sheriff has been on a

12   consent of correction -- a corrective action required for

13   a long time, since around 1990, and I have not been told

14   whether there was any corrective action plans.

15        No. 19, I withdraw 19 because I think the

16   communication is covered in the other email, the other

17   requests.  And 20 would be also the communication and the

18   testimony of the nurse practitioner, if there was

19   communication through email or through the record, and she

20   says that a person can see all the consult dates of

21   appointments and dates of cancellation, and like I said,

22   the consult sheet that I have directs the user to email it

23   to provider but I've not been given any copies filled out

24   and I've not been given a copy of what records were sent

25   to the consulting doctor, nor why Dr. Kyle has exclusive

1       control and operation of overriding three consulting

2       consult requests by independent providers, and their

3       directive through the Sheriff is to provide independent

4       medical care.

5               THE COURT:  All right.

6               MS. COMMONS:  I think I got it all.

7               THE COURT:  Any additional argument that you want

8       to make other than as to No. 21 through 25?  Anything

9       additional?

10              MS. COMMONS:  Well, this goes back to the policies

11      and procedures for the medical care.  That would be for

12      fractures and infection, diagnostic imaging and scheduling

13      which kind of goes along with the other requests for what

14      happens in consults.  Like I said, I've not been told that

15      they checked any emails at all nor documents, letters to

16      Pinellas Surgical Associates, and I think it's important

17      to point out that the consulting record that I was given

18      in 2017 is missing records.  And the reason I know is

19      since I represent the client, I requested his medical

20      records from these doctors independently before the case

21      started, and I was given records that are not -- that have

22      not been produced to me.

23              And even in this case Dr. Swick produced records

24      that are not in the consulting records that I was given in

25      2017 and haven't been updated, and I did bring this up to

1     Mr. Gordillo's attention.  Our meet and confer was 7/23.

2     We waited from May until July to have a four hour meet and

3     confer with him, plus on email we've done meet and confers

4     consistently throughout August.  And even at the

5     deposition I said where are these records, and the answer

6     is look at the 4,000 pages.

7          Well, I have, and for 2015 there's only less than

8     800, but the consulting records is a separate folder that

9     I was given and that's missing Pinellas Surgical

10    Associates which is going to be important, the Bay Area

11    Associates that did surgery for another area and the prior

12    2014 records where he was hospitalized at Memorial

13    Hospital and treated by another doctor there and then

14    followed up with Dr. Lee, so none of those records have

15    been given to me.  I got them separately by my request, so

16    where are the communications between those providers in

17    '14 and '15 and the Sheriff?  It's not there.  That's why

18    I know there's records missing.

19         THE COURT:  All right.  Let's hear from the

20    defense.

21         MR. GORDILLO:  Yes, Your Honor.  Again, I don't

22    know because I froze out, so I'm not sure if I missed

23    anything.  Was that the entirety of her argument from 21

24    to 25?

25         THE COURT:  Well, I did ask her to make some

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    specific arguments about certain numbers including 14, 15,

2    18 and 19 and then she proceeded from there to talk about

3    the remainder, and I'll ask you not necessarily to

4    emphasize any of the requests that you have already

5    provided or agreed to provide documents concerning.  If

6    you would focus your argument on any disputed issues that

7    you have not already produced documents concerning.

8         MR. GORDILLO:  Sure will, Your Honor.  Also for

9    the Court's -- the motion at issue was filed on the 11th

10   of September, which under the rules I have 14 days, but I

11   know this hearing was set within the 14 days.  So

12   yesterday I did provide a response to it with 11 exhibits.

13   I want to make sure that everyone is aware that that was

14   filed, so I made reference to certain of those exhibits.

15        THE COURT:  Document 175.

16        MR. GORDILLO:  Yes, Your Honor.  First and

17   foremost, the first thing I would note about Document 168,

18   which is Plaintiff's motion to compel, is it is 30 pages

19   in length.  Under the rules they're entitled to 25 pages.

20   I was never asked that they wanted to exceed the page

21   limit.  I never saw a motion asking to exceed the page

22   limit, so that's the first thing I would note is that the

23   rule was violated as far as the page limit in this motion

24   to compel.

25        Going back into some of the stuff that was said,

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    I'm not sure where Ms. Commons saying no index was

2    provided.  Exhibit E of my response filed yesterday is an

3    email chain showing where and showing the dates as I've

4    provided earlier of when we provided the index to her, and

5    it's not -- it's all Standard Operating Procedures and all

6    general orders from the Sheriff's office from that time

7    period, so it goes over every facet of our agency is what

8    they were provided and they were free to chose anything

9    that they wanted off that list.

10        In that email in Exhibit E shows where she sent

11    back on September 10th that she highlighted which ones she

12    wanted, which, of course, the medical ones are included in

13    there since it's every SOP and every general order that

14    the Sheriff office had at that time, and that same

15    afternoon, the end of the email is me telling her we'll

16    get those to her and her saying thank you.  So I'm not

17    sure why this argument continues to come up when clearly

18    they've been provided.

19        Also, again, going back to the nursing protocols

20    that have been provided back in August, so there's nothing

21    left to provide other than once I get her these SOPs and

22    general orders that she requested.  There's nothing left.

23        The insurance agreement that she referenced in

24    Rule 26 disclosures, I'm looking at our response from back

25    in July of 2019.  It does talk about the excess coverage.

1    It says a copy of the declarations stated in policies were

2    sent to Plaintiff's Counsel years ago which is probably

3    referencing what she said.  The insurance agreement is

4    available for inspection and copying as permitted.  Today

5    is the first time I've heard that that's been an issue for

6    them.  I can certainly give them a copy of that.  That's

7    not a problem, but it's the first I heard despite the

8    emails and despite the extended phone conferences we have

9    had.

10        Again, going back to the phone conference, and,

11   again, this has nothing to do with all this.  It's just

12   clearing up the record.  Looking at the Plaintiff's

13   motion, their Exhibit No. 4 was the July 7th email from

14   Mr. Cook to myself.  In there he references that he and

15   the prior Counsel for the Sheriff, Ms. Rozelle, talked

16   back on May 11th and that was dropped off as of May 11th.

17   July 7th was the first time it was brought back up.  So to

18   try to paint some kind of picture or narrative that this

19   has been ongoing from May to June and into July is just

20   not true.  May 11th was the last discussion between

21   Mr. Cook and Mr. Rozelle, and it wasn't until July 7th

22   after I came on the case that I was -- that Mr. Cook

23   approached me about these issues.

24        Now, going into more of the other things, the

25   personnel records that are being requested now, those were

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    not requested in the initial request for production.

2    Plaintiff has since at the eve of the discovery cutoff

3    sent two more Requests for Productions.  They've called

4    them both second Requests for Production.  One was from

5    Mr. Cook and one was from Mr. Commons, but they're two

6    separate ones.

7         In those we've been asked for personnel records

8    for these people, so those are things that are now, you

9    know, on the table to be supplied or objected to, but

10   those aren't going to be due until the end of discovery

11   based on when they were filed and I believe those were

12   also added as an exhibit to my motion, those second

13   Requests for Production, so the Court can see that those

14   were given.  And I believe they're -- I'm trying to look

15   in my motion to see where I cite to it.  There we go.

16   It's Exhibit A which are the second Request for Production

17   dated September 1st, so they are due early October.  And

18   if you look, it's request 40, 41, 43 is where personnel

19   records are requested.

20        In the initial disclosures, in the initial 4100

21   pages of documents that have been provided and Bates

22   stamped, there are employment records in there.  There's

23   not many, but it is discussing when Nurse Newby and

24   Dr. Rangel switched from Maxim employee to Sheriff

25   employee, so those might be the employment records I

1   believe that we're probably discussing that were already

2   sent in response to this Request for Production.

3          No. 2 and No. 3 we don't have records from the

4   other parties.  We've never asked for any records.  We've

5   never subpoenaed records from other people, so going to

6   No. 2 and No. 3, we haven't produced any because we don't

7   have anything.  Plaintiff asked for stuff.  We've gotten

8   stuff through copies of discovery that's gone back and

9   forth between Plaintiff and the other parties.  But we've

10  never asked any of the Defendants for anything so we have

11  nothing other than what the Plaintiffs received and we've

12  gotten copies of from them.

13         The contracts as in No. 5, I believe Ms. Commons

14  made a comment she's never been given one at the hospital

15  which again is not accurate.  On August 21st we provided

16  them with Bay Surgical Specialists, the contract for Bay

17  Surgical Specialists who treated the Plaintiff during this

18  time, Pinellas Surgical Associates who treated the

19  Plaintiff during this time and Bayfront Hospital who

20  treated the Plaintiff during this time, so that is the

21  hospital contract.

22         Previously in the original production was

23  Dr. Swick.  His employer All Florida Orthopedics and

24  Maxim, contracts for Maxim were also provided.

25         Getting into I think No. 6, which I think is more

1   of the overall arching theme about all medical records,

2   emails things of that nature, Ms. Commons went through

3   great length talking about this NextGen program.  She has

4   no facts, no documentation, no evidence to support the

5   allegations she's making.  She basically said she did some

6   Internet research of her own.  I've supplied the Court,

7   it's Exhibit K from yesterday, with our information

8   technology, senior information technology person.  They

9   looked at this NextGen 120-page work flow document,

10   whatever the thing is called that Ms. Commons provided to

11   the Court and continues to discuss.  That is not the

12   version that the Sheriff's office used then or now or

13   ever, therefore, the version we use doesn't have all the

14   things Ms. Commons is saying we have.

15        We've provided everything we had in response to

16   these requests.  We've provided 5800 -- you know,

17   approximately 5800 pages' worth of documentation.  We've

18   provided multiple CDs with the Plaintiff's jail phone

19   calls from 2014 and 2015 and all diagnostic images that we

20   were able to get from anyone, have all been provided to

21   the Plaintiff.

22        Records that she is saying from consultants that

23   we haven't provided.  What we get back from the

24   consultants is one page where they fill it out by hand and

25   send it back with transportation.  That's what our staff

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    looks at, and that's what our staff uses.  Those are all

2    in the record.  If there's records that she's gotten from

3    Dr. Swick or other people, those are their records because

4    they're also medical providers for him at that point once

5    he goes there.  They have their medical records.  That

6    doesn't mean we get all those medical records.  All we

7    asked for when we send them the consult is for them to

8    fill out the one page by hand which they do, and all those

9    have been provided in the medical records.

10        I'm trying to think.  There's so much.  I don't

11   want to miss anything.

12        The audit, we did provide audits from 2015.  If

13   they're asking now for 2014, I'll see if there are any.

14   I'm not sure to be honest with you as we sit here today, I

15   don't know if these audits cover a couple years or not.

16   If there are audits that were done in 2014, I'll certainly

17   provide those.  Your Honor, I have no problem with that.

18   I'll go back and look, however, I'm just not sure at this

19   point.

20        The consent decree that Ms. Commons talks about,

21   that dated back decades.  I believe if I'm not mistaken

22   that might have gone back into the '70s and maybe went

23   through the early '90s or something.  I don't see what

24   that has to do with anything.  This matter, this is 2015,

25   not 1970, not 1990.  I am not sure where she's going with

1    the consent decree, but we did provide audits for the year

2    at issue.  If there are audits for 2014 as asked today, I

3    will look into that.

4          No. 8 she talked about, they said something about

5    schedule a matrix, but Ms. Commons today said she's

6    looking for what the procedure is to get them to the

7    consults.  Again, I think Your Honor already ruled that

8    we're to answer that interrogatory going to that, so I

9    think that that question is better to be answered in an

10   interrogatory.  That's not really something that's going

11   to be in any kind of document because, like I said, we've

12   produced everything.  We're in the process of producing

13   everything in the SOP and the general orders as requested,

14   so there's just nothing as to No. 8 from what Ms. Commons

15   said today she's looking for.

16         No. 12, what were the records given to Dr. Swick.

17   If you go back to our interrogatory answers, No. 18 asks

18   that question, and we stated that the CT scan and the

19   report, so the report of the CT scan and the images itself

20   is what went with him to Dr. Swick.  That report is in the

21   jail medical records that's been provided, and the scan

22   was provided.  We were able to get a copy of it in August.

23   We provided it to Plaintiff's Counsel on August 21st --

24   I'm sorry.  I believe that answers that question about

25   what were the records given to Dr. Swick, also kind of

1    comports with what the Plaintiff himself said that there

2    were some medical documentations and there was a CD.  The

3    CD would have been the images.  Medical documentations was

4    the CT report.

5         And, again, just going back again to the emails,

6    we don't have emails.  The NextGen program we had doesn't

7    have whatever Ms. Commons is talking about as is shown in

8    our affidavit, so at this point we've provided everything.

9    I don't know what else we can provide.  I can't make

10   documents.  I can't create things, and given the extent of

11   what we've provided, I'm just kind of surprised that this

12   is ongoing.

13        You know, I know Ms. Commons may not like that

14   certain things that are missing, but if that's the case,

15   then she can make a big deal about things that she thinks

16   should be there but aren't there in summary judgment and

17   how we fail in our duties as a record keeper, whatever,

18   but we've provided everything that we have.  It's 5800

19   pages' worth of documentation, multiple CDs with

20   diagnostics images and calls, and, you know, as I said

21   we're continuing to give them what they ask for on

22   September 10th, and there's more discovery that was sent

23   to us right before the 30 day.  September 1st we got stuff

24   and I believe September 8th we got more discovery

25   requests, so we're going through those as well.

1          So that based on those requests, there probably

2     will be some more documentation provided but it's based on

3     those requests that we just got.

4          As far as these first Requests for Production,

5     what they got was about 5800 pages' worth of documents and

6     multiple CDs with other stuff on it, and we had nothing

7     else to give in response to this.

8          THE COURT:  Do you have a system other than the

9     NextGen system that collects the emails and

10    communications?

11         MR. GORDILLO:  I mean they have emails.  My

12    understanding is it's been done through phone calls, it's

13    my understanding.  Again, that's going to be in an

14    interrogatory that we're set to answer, so I hate to

15    present things to the Court matter of factly, but my

16    understanding that those consultations are done via phone

17    calls which would again lead to there's no emails

18    scheduling those appointments.

19         THE COURT:  As to No. 13 asking for communications

20    related to Plaintiff's right ankle fracture.

21         MR. GORDILLO:  Again, Your Honor, if you go back

22    to the way they worded their Request for Production, they

23    didn't give a timeline which defaults to their defaulted

24    timeline of January 7th or April 2015, so there are none.

25    There are none.  There's nothing non-privileged or

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    privileged within that time frame other than what's in the

2    medical records.

3           THE COURT:  Meaning that they didn't use an email

4    system at that time?

5           MR. GORDILLO:  No.  What I'm saying is that all

6    the medical providers were seeing him and documenting

7    whatever within the medical records.  They weren't

8    emailing each other, the doctors and nurses within the

9    jail.

10          THE COURT:  What system did they use to

11   communicate if they're not using email?

12          MR. GORDILLO:  Probably just talking to each

13   other, phone call in person.  I mean they all work

14   together, but as far as written communication goes,

15   there's nothing in that time frame other than what's in

16   the medical records.

17          THE COURT:  Do you know if in 2015 they used

18   Outlook?

19          MR. GORDILLO:  I'm not -- I'm sorry?

20          THE COURT:  Go right ahead.  I was going to give

21   you an example of different electronic mail systems, but.

22          MR. GORDILLO:  I'm not sure what they used.  I

23   wasn't here at that time, so I can't tell you from my own

24   personal knowledge what the Sheriff's office was using at

25   that time as far as email goes.

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    THE COURT:  All right.  Well, that's something

2    that would be helpful for you to find out and make sure

3    you look at so that you can be sure about that response.

4    I understand that their communication might be reflected

5    in the medical records, but you should confirm and take a

6    look at whatever their electronic mail system is and was

7    back in 2015 to confirm that there are no emails that were

8    responsive to request 13.  And I also understand that with

9    respect to a number of the requests, you've agreed to

10   provide the production, and so as to all of those, I'll

11   just ask that you supplement those responses.

12            MR. GORDILLO:  Which ones are those?

13            THE COURT:  It appears to me that it's a large

14   number of them, but 1, 2 really through 6 you've agreed to

15   make those productions, so.

16            MR. GORDILLO:  I just made them all.

17            THE COURT:  So just take a look and supplement to

18   the extent that there is anything to supplement.

19            MR. GORDILLO:  Just for clarity sake, I don't want

20   to misspeak on the record.  No. 4 is the one that goes to

21   the policies and procedures which we're in the process of

22   getting them based on what they requested back on

23   September 10th, but as far as all the other ones, 1

24   through 6, we've provided everything other than also -- I

25   guess going back to No. 1 if they do want a copy of the

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1      insurance, we can get that as well.

2              THE COURT:  That will be by the next Friday.  Are

3      you able to do that, that's the 2nd?

4              MR. GORDILLO:  Yes, Your Honor.

5              THE COURT:  All right.  So that was 1 through 6.

6              And then 7, it does appear to be relevant to me,

7      not necessarily concerning a question about staffing

8      levels but it may be that the roster could provide

9      additional information about witnesses, so with the

10     amended response that I am going to require, if you would

11     go ahead and respond to that request.

12             MR. GORDILLO:  Your Honor, I'm not sure -- not to

13     be difficult, but as far as that goes, what exactly am I

14     to provide, every day, who was on duty during that time

15     frame, if we even have that?

16             THE COURT:  That's right.  A schedule, if you can

17     find it, a schedule of whoever was the personnel roster at

18     that time.

19             MR. GORDILLO:  For each day?

20             THE COURT:  During that time period.

21             MR. GORDILLO:  Just overall employees?

22             THE COURT:  I think that's sufficiently specific.

23             MS. COMMONS:  Your Honor --

24             THE COURT:  And it's talking about clinical staff.

25     Yes, Ms. Commons.

1          MS. COMMONS:  I pulled up the 1538 pages that were

2     produced to me in August.  There's a nursing protocol

3     manual and I was not given the index to that.

4          MR. GORDILLO:  There is no index.  I gave her the

5     protocols.  That's the entirety of the nursing protocols

6     what I provided.

7          MS. COMMONS:  Okay.

8          THE COURT:  All right.  And then in 8 I think

9     you've already answered that, and also that one is very

10    confusing, but I believe that one has already been

11    addressed.

12         13 was the one we were just talking about, so you

13    can provide the amended response as to 13.  Same thing

14    with 14.

15         MR. GORDILLO:  Well, that one, Your Honor, we

16    also -- that one we objected to because based on the case

17    law, request for all documents and records relating to any

18    of the issues, that's an improper -- that's way too

19    overbroad.  That's just an improper request, you know,

20    and, again, they don't give a time frame, so I default

21    through the January through April, and when I do that

22    there aren't going to be any because there were no

23    allegations, claims or defenses at that time because

24    that's when it was happening, so I got to object to the

25    Court being -- I'm sorry.  I just didn't include that in

1    my initial --

2         THE COURT:  Let's just stick with 13.  I think

3    that's reasonable.  Let's stick with 13, and I think it

4    encompasses what they are looking for on the Plaintiff's

5    side, and it will let you know or let everyone know

6    whether there are any emails at all.

7         18 you are going to supplement with the 2014

8    information, and then 21 and 22.  21 asks for training

9    material to the extent there are any.

10        MR. GORDILLO:  Your Honor, that one again, I

11   didn't cover that.  I don't know if I missed that through

12   Ms. Commons' presentation when my phone went out and I had

13   to get back on.  So I didn't prep for that in my initial

14   presentation but that one we also -- we objected to.

15   There's no cause of action for failure to train in this

16   matter.

17        Like I said, we were providing SOPs and general

18   orders have been requested.  We've provided the nursing

19   protocols.  You know, the six people that they were most

20   interested in have all been deposed, so they've been able

21   to find out there the extent of their training and

22   experience and education, but, again, there's no --

23   there's nothing about a failure to train within this

24   Fourth Amended Complaint, therefore, I think this goes way

25   beyond the bounds of proper discovery.  I think it's a

1      fishing expedition and it's not appropriately tailored to

2      the matters in this suit, so I would object to No. 21.

3              THE COURT:  Ms. Commons, do you have any

4      additional argument about that one?

5              MS. COMMONS:  I do, Your Honor.  Like I said in

6      the beginning, this is also a medical malpractice case

7      against them.  Under state law and certainly fractures,

8      infections, record keeping, diagnostic imaging and health

9      care scheduling are critical to the standard of care

10     issues, and none of these providers were able to talk

11     about any of their policies or even tell me what the

12     standard of care was for a nurse practitioner, let alone a

13     nurse or an LPN.

14             THE COURT:  I agree with Ms. Commons on that, and

15     I'm going to require that.

16             MR. GORDILLO:  Could I be heard real quick, Your

17     Honor?

18             THE COURT:  I heard your comments already as to

19     that.

20             MR. GORDILLO:  Well, just based off something

21     Ms. Commons said.

22             THE COURT:  Go ahead.

23             MR. GORDILLO:  Well, what she mentioned again were

24     policies, procedures, not training materials.

25     Furthermore, as far as medical malpractice claim goes, and

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    I don't want to go down a rabbit hole with this because

2    this isn't what's on the docket for today, but they missed

3    their expert deadline.  They asked for an extension.  That

4    was denied.  They asked for reconsideration which is still

5    pending.  They've since that time almost a month after

6    their deadline had passed, they served expert disclosures

7    on everyone, on all the Defendants.  As a result the

8    Defendants that remain in this matter which is ourselves

9    and Corizon and Dr. Belizaire have filed motions to

10   strike.  The Plaintiff has filed a motion to allow the

11   out-of-time disclosure that was initially missed and not

12   extended; therefore, there is really no claim as to a

13   medical negligence because the case law is very clear,

14   without expert documentation, that's going to be gone at

15   summary judgment along with other issues we're going to

16   raise in summary judgment.  But, nonetheless, even in

17   Ms. Commons' own presentation just now to the Court,

18   again, she referred again back to SOPs, policies, things

19   of that nature, not anything having to do with training

20   materials.  So, again, I would object to No. 21.

21        THE COURT:  All right.  I understand your position

22   there but it appears to me that that request is

23   encompassed in the complaint, Document No. 105, and a

24   number of the paragraphs related to negligence, 75 with a

25   number of subparts, 85 with a number of subparts, and I

1    think training is fairly encompassed within the failures

2    of care that are alleged.

3          It's possible that that request could be narrowed

4    further, but it does appear to be relevant.  And if

5    they're asking for current in 2015, so only 2015 and only

6    the materials that address the fractures, infections,

7    record keeping and care that is at issue in this case.

8          And the last one that I am granting the request

9    concerning is 22 which I believe you have indicated that

10   you've already provided, but, again, as part of the

11   supplement, to the extent there are any photographs,

12   videos or audios, if you'll produce all of that or

13   supplement your production with that information by the

14   2nd of October.

15         MR. GORDILLO:  Your Honor, again, we've already

16   produced everything, so if I just say already produced,

17   that's going to be fine?

18         THE COURT:  What you're doing here is contacting

19   your client to be sure that the production was fulsome.

20   Just like we talked about with respect to the emails, you

21   want to be sure that your client was not using some sort

22   of email system.  That seems like that would be unusual

23   even in 2015 not to have used any email system at all, but

24   you want to confirm that and confirm if there was email,

25   whether there are any relevant documents, so do your due

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    diligence, contact your client and correct.  If there are

2    no responses, additional responsive documents after you

3    have checked, then that is the answer.  So, again, it is

4    granted in part as to the request that I just mentioned

5    and otherwise denied and then the defense will also

6    provide a supplement.

7              MR. GORDILLO:  Can I just run down the list to

8    make sure I haven't missed anything in my note-taking?

9              THE COURT:  Let me just tell you as to the

10   production and I will provide an order on this.

11             MR. GORDILLO:  That's fine.  I'll wait for the

12   order, Your Honor.

13             THE COURT:  All right.  Any requests for fees are

14   denied, or costs.  Anything additional from the

15   Plaintiffs, Mr. Cook, Ms. Commons?

16             MR. COOK:  As I understand it, it wasn't clear

17   that the 30(b)(6) request would be accommodated until

18   today and so will the Court order a 30(b)(6) on these

19   issues?

20             THE COURT:  I don't believe that I need to order a

21   30(b)(6) because you're well within the time for

22   discovery.  It doesn't sound like you've exhausted all of

23   the depositions that you are allowed to take and you-all

24   are coordinating that deposition, so if there's no reason

25   why it shouldn't be able to proceed under the applicable

1  rules --

2        MR. COOK:  Thank you, Your Honor.

3        THE COURT:  -- and the deadlines you-all have.

4        MS. COMMONS:  I just wanted to point out we gave

5  them dates for depositions of our experts and they refuse

6  to give us any dates that they want to take.

7        THE COURT:  All right.  So you all coordinate as

8  to the depositions because there doesn't seem to be a

9  reason why that shouldn't take place, and it should take

10  place before the discovery deadline on October 9th.

11        MR. GORDILLO:  Well, again, going back to those

12  depositions, at this point in time, myself -- and I know

13  Mr. Toomey is not here -- but I think based on his email,

14  I think I can relate for him as well that we don't believe

15  they have experts at this point in time based upon the

16  current rulings of this Court and the missed deadline and

17  some of the behavior that's gone on since missing the

18  deadline, which, again, are part of pending motions which

19  I know are not up for today, but that's why we have not

20  scheduled any depositions because at this point in time we

21  don't believe that the Plaintiff has experts.

22        THE COURT:  All right.  But this is a 30(b)(6)

23  deposition as to your -- as to someone with defense.

24        MR. GORDILLO:  Correct.  Correct.  But Ms. Commons

25  at the end said that she provided dates for her experts'

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    depositions, that's why I made that response.

2          THE COURT:  I see.  Okay.  All right.  Well, as to

3    the 30(b)(6) depositions, you all will coordinate and work

4    to schedule those within the discovery deadline.

5          All right.  And I will enter a written order.  And

6    thanks so much for everyone's assistance here today.  I

7    was able to see and hear everyone well except when we had

8    a few times where Mr. Gordillo, we had technological

9    issues, but we were able to resume the hearing well.  Let

10   me ask from the Plaintiff's side, were you able to see and

11   hear well?

12         MS. COMMONS:  Yes, ma'am.

13         MR. COOK:  Yes, Your Honor.

14         THE COURT:  On the defense side?

15         MR. GORDILLO:  Yes, Your Honor, other than the

16   time I blew out and had to come back in.

17         THE COURT:  All right.  And then we have our court

18   reporter here with us today, and we had a few technical

19   issues related on her end.  Were you otherwise able to see

20   and hear it well?

21         THE REPORTER:  I was, Your Honor.

22         THE COURT:  Thanks, everyone.  Have a good day.

23   (End of proceedings.)

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

```
1   UNITED STATES DISTRICT COURT  )

2                                 )

3   MIDDLE DISTRICT OF FLORIDA    )

4

5           I, SHARON A. MILLER, Official Court Reporter for

6     the United States District Court, Middle District of

7     Florida, do hereby certify that pursuant to Section 753,

8     Title 28, United States Code that the foregoing is a true

9     and correct transcript of the stenographic notes taken by

10    computer-aided transcription taken in the above-entitled

11    cause by the undersigned and that the transcript format is

12    in conformance with the regulations of the Judicial

13    conference of the United States.

14  /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION