```
 1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3
    WAHEED NELSON,
 4                                      Case No.
              Plaintiff,                8:19-cv-00449-CEH-JSS
 5  vs.

 6  BOB GAULTIERI, Official Capacity
    as Sheriff of Pinellas County,
 7  FLORIDA DEPARTMENT OF CORRECTIONS,
    CORIZON, LLC, MAXIM HEALTHCARE
 8  SERVICES, INC., MATTHEW SWICK, M.D.,
    ALL FLORIDA ORTHOPAEDIC ASSOCIATES,
 9  P.A., and WITCHNER BELIZAIRE, M.D.,

10
              Defendants.
11  _____/

12
        DEPOSITION OF:       KEVIN KYLE, M.D.
13
        DATE:                August 5, 2020
14
        TIME:                1:32 p.m. to 3:54 p.m.
15
        PLACE:               Michael Musetta & Associates
16                           201 North Franklin Street
                             Suite 3400
17                           Tampa, Florida

18      PURSUANT TO:         Notice by counsel for
                             Plaintiff for purposes of
19                           discovery, use at trial or
                             such other purposes as are
20                           permitted under the
                             Florida Rules of Civil
21                           Procedure

22      BEFORE:              ERIC T. FRENCH, RPR, CRR
                             Notary Public, State of
23                           Florida at Large

24
                             Pages 1 - 103
25
```

Page 6

1  A  I didn't even hear that.  He produced what?
2  Q  He produced you as his designee.
3  A  Oh.  I'm sorry.  I didn't hear that.
4  Q  Yeah.  So you're testifying today on behalf of
5  the sheriff.
6  A  Okay.
7  Q  Do you understand that?  You didn't know that
8  before today?
9  A  Well, you say do I understand that.  I mean, I
10 guess I get the implication.  I'm not sure what your
11 understanding of it is.  But I'm here representing the
12 sheriff today.
13 Q  Okay.  We're both on the same page.
14 A  Okay.  Well, I'm sorry.  I can't hear you
15 sometimes.
16 Q  You want me to talk louder?
17 A  I have a slight hearing loss.
18 Q  Is that better?
19 A  That's better.  Yeah.  Go ahead.  That's good.
20 Q  Okay.  I had a dad who couldn't hear, so I'm
21 used to it.
22 A  Wait a minute now.  You're getting offensive.
23 Okay.
24 Q  You know I like you.
25 A  You just called me old.

Page 7

1  Q  No, no.  I didn't call you old.
2  A  I get that at home.
3  Q  So pursuant to the notice, there was different
4  categories to discuss today and documents to be
5  produced.  Did you bring any documents to be produced
6  that's on the list?
7  A  I did not bring any documents.
8     MR. GORDILLO: We produced documents to you
9  prior to the deposition.
10    MS. COMMONS: So all the ones that are on the
11 list are the ones I already have, correct?
12    MR. GORDILLO: They've either been previously
13 given or we provided them today or they don't
14 exist.
15    MS. COMMONS: Okay.  Great.
16    BY MS. COMMONS:
17 Q  You've been with the sheriff since when?
18 A  August the 4th, 2014.
19 Q  And just so you know, if you don't understand
20 any of my questions, please ask me to explain or
21 rephrase or tell me you don't understand; otherwise, I
22 will assume you understand my question.  Okay.
23 A  Okay.
24 Q  Not trying to trick you.  Sometimes my
25 questions get garbled.  And if you don't understand,

Page 8

1  just ask me to rephrase.
2  A  Okay.
3  Q  If you need a break, let me know.  And let's
4  see.  What are your job duties at the sheriff?
5     MR. GORDILLO: Object to asked and answered at
6  the previous deposition.
7     BY MS. COMMONS:
8  Q  You can answer.
9  A  What is my job duties, you say?
10 Q  Yes.  As the medical director.
11 A  Job duties.  Pretty sure I answered that at
12 the last dep.  I think I'll stand by that.
13 Q  This is a new depo, so you have to answer.
14 You're here on behalf of the sheriff.
15 A  On behalf of the sheriff, I think the duties
16 of the medical director are probably written somewhere,
17 and we can get you a copy if you want.  But I can't
18 quote that to you right now.
19 Q  Yeah.  You don't have to.  Just tell me what
20 you --
21 A  I wasn't asked to be prepared for that.  So I
22 didn't review that list of all those things.  Now, I
23 don't want to say two or three things and you call me
24 back and say you didn't say blah, blah, blah, blah,
25 blah, blah.

Page 9

1  Q  What is your -- okay.  Let's do it this way.
2  What's your understanding of what your duties are?
3  A  My understanding is to go there and practice
4  the best medicine we can provide.
5  Q  What else do you do?
6  A  That's what we do.
7  Q  I understood that you do not see patients.  Do
8  you see patients?
9  A  I never told you that.
10 Q  Do you take sick call?
11 A  I told you I don't do sick call, but I do see
12 patients.  I explained to you before, in my other
13 deposition, which I stand by, that if a nurse
14 practitioner is out or a doctor is out, for many
15 reasons, family issues, they're sick, I will go to their
16 building and see their patient.  I never said I didn't
17 see patients.
18 Q  So you cover their sick call?
19 A  Well, I will see patients whenever necessary,
20 I think is a better way to put it.
21 Q  But day in, day out, that's not what you're
22 doing?
23 A  I see some patients almost every day.
24 Q  Was that for the particular area of pulmonary,
25 what you talked about before?

Page 14

1 referred him to this team of human resources to go to
2 orientation?
3   A   I don't refer him to anywhere.  Someone in
4 administration does it.  That's outside of my scope.  I
5 don't do it.  I'm just told this person will be gone for
6 so much time for orientation.
7   Q   Okay.  So do you have full authority to
8 testify on behalf of the sheriff today?
9       MR. GORDILLO: Object to form.
10      THE WITNESS: I don't know how to answer that,
11 unfortunately.  No one called me and said you have
12 full authority to testify.  Is that what you're
13 getting at?
14      BY MS. COMMONS:
15  Q   Do you understand that whatever your answers
16 are today binds the sheriff?
17  A   No, I didn't.
18      MR. GORDILLO: Object to form.
19      BY MS. COMMONS:
20  Q   You were designated as the person with the
21 most knowledge on behalf of the sheriff on these --
22  A   If they told you I had the most knowledge
23 about orientation, they were wrong, because I don't.
24  Q   No.  About the areas.
25  A   Oh, you mean these questions here?

Page 15

1   Q   Yes.
2   A   Yeah.  I'm prepared to answer these questions
3 here.
4   Q   Okay.  And you understand that those will bind
5 the sheriff?  You're not testifying on behalf of
6 yourself, because I've already taken your deposition on
7 behalf --
8   A   But you keep asking me questions about myself.
9 You're not going to ask those any more?
10  Q   Only for background for what your job is with
11 the sheriff.
12  A   Okay.  You're getting me confused, but okay.
13  Q   That's the difference.
14  A   I don't see it the way you're asking me
15 questions.  I see you asking me personal questions.  I'm
16 misinterpreting them.  I do apologize.
17  Q   Okay.  So do you have full authority to
18 testify on behalf of the sheriff today on these areas in
19 the notice?
20      MR. GORDILLO: Object to form.
21      THE WITNESS: No one has told me that I have
22 full authority to do anything.  No one's told me
23 that.  I will do my best to answer these questions
24 for you on behalf of the sheriff.
25

Page 16

1       BY MS. COMMONS:
2   Q   Okay.  Do you understand that they bind the
3 sheriff?
4       MR. GORDILLO: Object to form.
5       THE WITNESS: I don't understand that.  You're
6 saying that.  So if you're saying that it's true,
7 it's true.
8       BY MS. COMMONS:
9   Q   This is called a 30(b)(6) deposition.
10  A   It's a what?
11  Q   A 30(b)(6) deposition.
12  A   I don't know what that is.  No one's ever told
13 me what a 30(b)(6) deposition is.  What's a
14 cardiothoracic unidirectional MRI?
15  Q   I know what that is.
16  A   Okay.  Tell me.  Yeah, right.  I mean, I'm not
17 trying to be difficult, but you're asking me to tell you
18 I know these legal terms, and that's not fair.  You said
19 you were going to be fair to me today.
20  Q   I am being fair to you.
21  A   That's not being fair to me.  I can't tell you
22 what the legal 30(b)(6) deposition is.  I'm not trying
23 to argue with you.  Let's just do the dep.
24      MS. COMMONS: Do you want to explain it to
25 him?  Do you want to go off the record?

Page 17

1       MR. GORDILLO: No.  He knows he's prepared to
2 answer these questions on these topics that --
3       MS. COMMONS: Okay.  And you're designating
4 Dr. Kyle as binding the sheriff for this
5 30(b)(6) --
6       MR. GORDILLO: He's ready to answer these
7 three topics today.
8       MS. COMMONS: So the answer is yes?  Can you
9 put that on the record, please?
10      MR. GORDILLO: He's been designated.  He's the
11 one that's here, sitting here.  I think he needs to
12 give an answer.
13      BY MS. COMMONS:
14  Q   All right.  What research did you do today to
15 be able to be fully prepared to answer questions for
16 these topics today?
17  A   I read these three topics and reviewed the
18 process.
19  Q   What process?
20  A   How do physicians or nurse practitioners
21 communicate to provide continuity of care.  Uses and
22 categories and preservation of communications, including
23 emails, discussing the inmates' medical issues, and
24 needs, and the logistics of care, including housing,
25 escorts, transportations to outside providers, such as

Page 102

1  Q  You don't know anything about it ever having
2  happened before?
3  A  No.
4  Q  With a consulting doctor?
5  A  No.
6     MS. COMMONS: Okay.  Thank you.  For the
7  record, again, that's Exhibit 11 from the 8/5/20
8  depositions.
9     (Brief recess taken.)
10    BY MS. COMMONS:
11 Q  No. 2 of our request, we asked about
12 inmates -- well, there's a statement made.  Inmates do
13 not have the ability to move around inside or outside
14 the institution on their own.  Is that true?
15 A  Move around.  They move around.  They get rec.
16 Q  I mean, can they leave their area?
17 A  Yeah.  They can leave their area and go to
18 rec.
19 Q  Go to rec.
20 A  Yeah.
21 Q  Otherwise, they can't leave the building,
22 right?
23 A  Oh, if they're incarcerated, you mean?
24 Q  Right.
25 A  Oh, no.  You're in jail.

Page 103

1  Q  Right.  That's what I mean.
2  A  I mean, they move around.  We don't have them
3  tied down to the bed.
4  Q  I know you're very literal.  I forgot.
5  A  They can go wash their clothes and go to the
6  rec room.  Huh?
7  Q  I forgot that you're very literal.
8  A  Well, you know, when people change your
9  answers, you've got to be careful.
10 Q  I didn't change your answers, Dr. Kyle.
11 A  Yes, you did.
12 Q  No, I didn't.
13 A  You said, I called Dr. Swick.  I did not.  You
14 said I said I was the ultimate.  I never said that.
15 That's changing my answers.  So I'm just being careful.
16 Q  Actually, what you said was, if you want to be
17 correct, you said that you have a meeting with them and
18 get them to --
19 A  Meeting with who?
20 Q  With anybody who doesn't agree with you.
21 And --
22 A  I didn't say that.
23    MR. GORDILLO: I'm going to object to all of
24 this, ask that we move on to the next question.
25    MS. COMMONS: Yeah.  I'm moving on.

Page 104

1     MR. GORDILLO: Before you ask a question,
2  because I'll forget by the end, the records you're
3  submitting, I'm fine with all of them.  The only
4  one I object to, and it still can go in the record,
5  I know, but I will lodge an objection to the 120
6  whatever page it's going to be NextGen Workflow
7  Demonstration, for all the reasons stated in all
8  the objections while this was being utilized.  I'll
9  just leave it at that.
10    MS. COMMONS: I never was allowed to see the
11 electronic medical record, as I requested.
12    MR. GORDILLO: Next question.
13    BY MS. COMMONS:
14 Q  I want on the record very clear that there is
15 no email communication in the jail medical department,
16 correct?
17    MR. GORDILLO: Object to form.
18    THE WITNESS: You asked about email
19 communication between practitioners?
20    BY MS. COMMONS:
21 Q  Any emails.
22 A  That's not what you're asking me.
23 Q  I'm asking if -- okay.
24 A  Well, you are to now.  You're just saying
25 confirm on the record.  That's not what you asked me

Page 105

1  before.
2  Q  Okay.  Let's clarify that.  Who has email, and
3  what's it being used for?
4  A  There is an email at the jail, and you can
5  email somebody, I want this vacation day off.  You can
6  email a list of who's going on quarantine.  The nurses
7  mostly use the email to email the patient list, these
8  are the people who came back from the hospital that need
9  to be seen today.  These are a list of the people who
10 are still at the hospital.
11 Q  Okay.  What system is that?  Is that Outlook?
12 Is it a different -- do you know?
13    MR. GORDILLO: Object as far as time frame
14 goes.  Are you asking back then or now?
15    BY MS. COMMONS:
16 Q  Yeah, in 2015.
17 A  I don't know what type of system it is.
18 That's above my pay grade.
19 Q  Okay.  Do you know what it is now?  Do you
20 know if the people, when they email, are using Outlook,
21 or are they using their own personal, like MSN or AOL?
22 A  Let me put it this way.  I don't know, but I
23 do know that my email ends with PCSO.net.  It's probably
24 an inside system.  That would be my guess.
25 Q  PCSO.net?

Page 106

1  A  I think that's it.
2  Q  Same as what Mr. Gordillo uses?
3  A  I don't know what Mr. Gordillo uses.
4  Q  Has he ever emailed --
5  A  Oh, his email.  Yes.  He does email me.
6  Q  His has PCSO.net?
7  A  Okay.  I don't read it.  I just look at the
8  email, you know.  I don't look at all that.
9  Q  Okay.  Do you know the name of the IT person
10 who manages the email system?
11     MR. GORDILLO: Object, outside the scope.
12     THE WITNESS: No.
13     BY MS. COMMONS:
14 Q  Were you asked to look for any emails
15 regarding these lists within the jail system that --
16 A  Hold on a second.  Regarding this what?
17 Q  Regarding the list or whatever emails,
18 quarantine, that relate to Mr. Nelson.
19     MR. GORDILLO: Actually, I'm going to object,
20 instruct not to answer, because it sounds like
21 you're getting into attorney/client privilege and
22 what I might have told him in preparation for today
23 by that question.
24     BY MS. COMMONS:
25 Q  Were you asked to produce any emails?

Page 107

1  A  You did not ask me to produce any emails.
2  Q  Were you ever asked in this case to produce
3  any emails?
4     MR. GORDILLO: Same objection as before, to
5  the extent that it invades attorney/client
6  privilege.
7     MS. COMMONS: Okay.  But he can answer.
8     BY MS. COMMONS:
9  Q  If it didn't come from Mr. Gordillo, then you
10 can answer.
11 A  Who is Mr. Gordillo?  She said that as if you
12 weren't here.  I'm missing something.
13    No.  This didn't ask me to look for any
14 emails, so I didn't look for any emails.  But I wouldn't
15 have to.  I never email about a patient to anybody else,
16 so I wouldn't have to look for an email.
17 Q  Okay.  Well, the sheriff's been asked to look
18 for emails and communications from the staff.  So I'm
19 asking if --
20 A  About Mr. Nelson?
21 Q  Or any emails.  Yeah.
22 A  Anyone we know?
23    MR. GORDILLO: Object to outside the scope of
24 this deposition.
25    MS. COMMONS: No.  It's about communication

Page 108

1  and how it's done.
2     MR. GORDILLO: Yeah, but you're asking him
3  discovery questions now.
4     MS. COMMONS: This is the first time I'm
5  hearing about an email.  I've been told
6  everything's verbal.
7     THE WITNESS: It is.
8     MR. GORDILLO: He told you it's for vacation
9  days and things.  He just told you --
10    MS. COMMONS: If a patient is quarantined or
11 if there's a sick list and a patient comes back
12 from the hospital.
13    THE WITNESS: I didn't say a sick list.  I
14 said a list of patients who come back from the
15 hospital.  We don't email sick lists.
16    BY MS. COMMONS:
17 Q  Hospital.
18 A  Right.  Three people came back from the
19 hospital today.  You email and say, hey, be sure you see
20 these three patients.
21 Q  Were you asked to look for any of those kind
22 of emails?
23 A  No one ever asked me about emails.
24 Q  So they would be available, correct?
25    MR. GORDILLO: Object to form.  Outside the

Page 109

1  scope.
2     THE WITNESS: I'm not the IT guy.
3     BY MS. COMMONS:
4  Q  Okay.  Would there be any emails related to
5  scheduling appointments?
6  A  No.
7  Q  How about any emails related to
8  transportation?
9  A  No.
10 Q  All right.
11 A  Not that I'm aware of.
12 Q  Okay.  If transportation is running late on
13 the way back to the jail, can they send an email?
14 A  I don't believe they would send an email if
15 they were running late.  I think that would be a phone
16 call.
17 Q  Okay.  Could they send an email to the sheriff
18 or to dispatch?
19    MR. GORDILLO: Object to form.
20    THE WITNESS: I imagine anybody in the country
21 could, if they wanted.
22    BY MS. COMMONS:
23 Q  Do you know?
24 A  But we don't communicate by emails about
25 transportation.

**Page 150**

1  say every single time.
2      MR. GORDILLO: You want to lower your voice.
3      MS. COMMONS: I will lower my voice when you
4  stop doing this crap.
5      MR. GORDILLO: When you stop asking improper
6  questions --
7      MS. COMMONS: That is a very relevant
8  question.
9      MR. GORDILLO: It is not.
10     MS. COMMONS: It is.
11     MR. GORDILLO: It's not on these topics.
12 That's an ambush. You had him in deposition
13 already.
14     MS. COMMONS: It's not an ambush.
15     MR. GORDILLO: Go to the next question.
16     BY MS. COMMONS:
17 Q   Are you going to answer?
18     MR. GORDILLO: He's not answering.
19     THE WITNESS: You show me the stuff from
20 Morales.
21     MS. COMMONS: You're instructing him not to
22 answer?
23     MR. GORDILLO: That or I'm going to end this
24 deposition.
25     MS. COMMONS: Are you instructing him not to

**Page 151**

1  answer that question?
2      MR. GORDILLO: About Ms. Morales?
3      MS. COMMONS: Yeah.
4      THE WITNESS: Yes.
5      MS. COMMONS: And the delay, the retaliation
6  against my client?
7      MR. GORDILLO: That was not your question.
8      MS. COMMONS: That was. Can you read him back
9  the question?
10     THE WITNESS: That was your question. You
11 asked about --
12     MR. GORDILLO: Read the question back. Please
13 read the question back.
14     (The court reporter read back.)
15     THE WITNESS: How about that. So you made a
16 statement.
17     BY MS. COMMONS:
18 Q   Did you retaliate against --
19 A   No, no. You said like Morales. I didn't
20 retaliate against her. How do I make you wear a CPAP
21 mask? You go home, you don't want to wear it, don't
22 wear it. No one forced her to do anything. She may
23 have found a psychotic lawyer to represent her case, but
24 I should would love to see it, because I don't remember
25 that.

**Page 152**

1 Q   Well, you know Ms. Morales said that she was
2  allergic to the type of mask that you provided her, and
3  she needed a gel mask?
4      MR. GORDILLO: Object.
5      BY MS. COMMONS:
6 Q   You're aware of that?
7      MR. GORDILLO: Hold on. Object. Outside the
8  scope of this deposition. Move on to the next
9  question.
10     BY MS. COMMONS:
11 Q   And Ms. Morales stated that the jail -- that
12 you said that she had to wear a mask that she was
13 allergic to until she broke out and showed you that she
14 had an allergic reaction.
15     Mr. Nelson complained that he wasn't getting
16 treatment for his fractured ankle, and you insist that
17 it wasn't fractured, even though the X-ray says
18 fractured, so you didn't provide any treatment for three
19 and a half months. So did you retaliate against
20 Mr. Nelson?
21 A   Let me correct your lies. I did not retaliate
22 against him. I didn't do anything punitive towards him.
23     MR. GORDILLO: And before you finish, I would
24 say this is outside the scope. I believe any
25 answers being given are being given of Dr. Kyle as

**Page 153**

1  an individual, not at a 30(b)(6) deposition. And
2  again, these are things that could have been done
3  in his deposition, which are highly inappropriate,
4  and I move to strike all of it.
5      THE WITNESS: It was done at the deposition.
6      BY MS. COMMONS:
7 Q   No.
8 A   ==His ankle was not a fracture. It was not a==
9  ==fracture. It was collapsed bone, from a Charcot joint.==
10 ==That's what it was. It was not a fracture. And only==
11 ==clowns keep calling it a fracture. It's not a fracture.==
12 ==It's dissolved bone.==
13 Q   ==You're calling orthopedic surgeons clowns?==
14 ==You're calling orthopedic surgeons clowns?==
15 A   ==I'm calling who?==
16 Q   ==Orthopedic surgeons.==
17 A   ==No. If an orthopedic surgeon looks at that==
18 ==CT scan, they don't call it a fracture.== I know you told
19 me you were going to show me your expert who says it was
20 a fracture. I haven't seen it yet. But I figure you
21 will produce it.
22     But nonetheless, back to the case at hand,
23 because you're getting off course, so, one, there was
24 nothing punitive against him. I had nothing against
25 him. I barely even saw the patient. You needed a