UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:19-cv-00449-CEH-JSS

WAHEED NELSON,

    Plaintiff,

vs.

BOB GAULTIERI, Official Capacity as Sheriff of Pinellas County, FLORIDA DEPARTMENT OF CORRECTIONS, CORIZON, LLC, MAXIM HEALTHCARE SERVICES, INC., MATTHEW SWICK, M.D., ALL FLORIDA ORTHOPAEDIC ASSOCIATES, P.A., and WITCHNER BELIZAIRE, M.D.,

    Defendants.
_____/

## DEFENDANT FLORIDA DEPARTMENT OF CORRECTIONS' RESPONSE TO PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE'S ORDER ON PLAINTIFF'S MOTION TO DEEM REQUESTS FOR ADMISSIONS AS ADMITTED

Defendant Florida Department of Corrections ("FDOC") files its Response to the Plaintiff's Objections to the Magistrate's Order on the Plaintiff's Motion to Deem Requests for Admissions as Admitted [ECF #266] as follows:

On September 17, 2020, the Plaintiff filed his Motion to Deem FDOC's Deficient Responses to Requests for Admissions as Admitted and Motion for Sanctions Under Rule 27 [ECF #173]. On October 5, 2020, the FDOC filed its

Response [ECF #187]. On January 20, 2021, this Court entered an Order denying the Plaintiff's Motion [ECF #263] and on February 3, 2021, the Plaintiff filed his Objection to the Court's Order [ECF #266].

### I.  Background

According to the Complaint, Nelson entered FDOC custody on April 16, 2015, and was released in October 2017. At the time, Defendant Corizon, LLC ("Corizon") was contracted with FDOC to provide medical care to inmates in certain FDOC prisons, including Nelson's place of incarceration. On the day of his arrival, an x-ray apparently revealed a fracture of his right ankle and the radiologist suggested additional x-rays and possible surgery. In May 2015, an MRI indicated the fracture and swelling. Nelson claims Defendant Witchner Belizaire, M.D. ("Belizaire") "did not send [him] for surgery and on July 28, 2015, [he] had to have his right leg amputated [ECF #105, ¶¶56-66].

According to the record, Nelson arrived at the Reception and Medical Center ("RMC"), which includes a licensed Florida hospital operated by FDOC, on April 16, 2015, and a nurse performed a medical evaluation. He was sent to the urgent care portion of the complex and was examined by Marie Garcon, M.D. at 5 p.m. Dr. Garcon ordered x-rays of Nelson's right foot and ankle. Those x-rays were done the same day and the radiologist signed the reports on April 17 and 18. The reports indicated a damaged right foot and ankle.

By Saturday, April 18, 2015, Nelson was transferred to the hospital portion of RMC and was examined by Clifford Adam, M.D. Dr. Adam requested a consultation with an orthopedist, which was approved, and an appointment was set for April 27, 2015. In the meantime, Belizaire ordered follow-up x-rays, which were performed on April 21, 2015 [ECF #52, pp. 7-8]. On April 27, 2015, the orthopedist reported a condition known as Charcot Foot, and recommended follow-up with Dr. Steele, a surgeon [ECF #52, pp. 5-6]. The appointment with Dr. Steele was originally set for May 4, 2015, but he cancelled his appointments at RMC that day and the evaluation was reset for May 18, 2015. Dr. Steele ordered an MRI and noted that Nelson was likely to require a below-the-knee amputation. The same day, Belizaire recognized the order, noting that the MRI was preapproved. [ECF #52, pp. 9-10]. The MRI was done on May 22, 2015, and the resulting diagnosis was "Right ankle fracture with Charcot joint and bone loss." On June 11, 2015, Dr. Williams referred Nelson back to Dr. Steele. Nelson returned to Dr. Steele on June 29, 2015, and he recommended a right below-the-knee amputation. After Nelson consented to the surgery, Belizaire submitted a request for the surgery the following day, and it was approved on July 10, 2015. The leg was amputated on July 28, 2015 and a follow-up procedure was done two days later [ECF #52, p. 15].

In the meantime, Belizaire provided care to Nelson. The first encounter was on April 20, 2015, where Nelson claimed to have fractured his foot while in the Pinellas County Jail. Belizaire ordered x-rays and planned a consultation with an orthopedist. Of course, the orders were redundant to those entered by Drs. Garcon and Adam days before. Belizaire saw him two days later, noting Nelson had hemodialysis the day before and was "doing well." On April 23, Belizaire ordered a CT scan. Belizaire evaluated Nelson following the first visit with the orthopedist on April 27, finding cellulitis in the left foot and a possible bone infection in the right. He ordered a wound culture and Vancomycin, a broad spectrum antibiotic. [ECF ##221-3, pp.20, 23, 28; 221-4, pp. 3, 6].

On May 1, 2015, Belizaire ordered a consultation with a podiatrist and a left foot x-ray, along with instructions to provide topical medications to the left foot. He also ordered Lortab, a prescription pain medication also known as Vicodin, which replaced another pain medication, Tramadol. The order was for 325 mg. four times per day for 20 days. On May 5, 2015, Belizaire ordered Zosyn, an antibiotic, but due to availability issues was changed to Augmentin on May 7. Belizaire saw Nelson on May 8, 12, 13, 14 and 15 in follow-up to the antibiotic therapy without any concerns. Another physician ordered Neurontin, a narcotic pain medication for 30 days on May 17, 2015. On May 23, Dr. Adam renewed the Augmentin order for 14 days and added Tylenol 650 mg. to the medication

ensemble [ECF ##221-3, pp. 28-33; 221-4, pp. 8-12]. Belizaire examined Nelson on May 18, 19, 20, 22, 25, 26, 27 and 29, and renewed the Vicodin order for 10 days on May 22 [ECF ##221-3, pp. 34-38; 221-4, p. 14].

In June 2015, Belizaire examined Nelson on June 2, 4, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26 and 30. He renewed Vicodin for 10 days on the 4th and 22nd [ECF ##221-3, pp. 29-46, 50-51; 221-4, pp. 17, 22]. Other physicians ordered pain medications Toradol, naproxen and Gabapentin throughout the month [ECF #221-4, pp. 16, 19, 21, 23].

Belizaire examined Nelson on July 1, 6, 7-11, 13-17, 20-21, 23 and 27. He ordered an injection of Demerol on July 20 and Tylenol 650 mg. for 14 days on July 23. Another physician renewed Vicodin for 28 days on July, which provided pain medication to the time of surgery [ECF ##221-3, pp. 51-57, 59-62; 221-4, pp. 28-29].

Belizaire's deposition, which lasted nearly six hours, was taken and he was asked to explain the rationale behind his treatment. He did. [ECF #221-5]. But he explained more. Once Nelson was referred to specialists, which was done before Belizaire ever encountered him, it was up to the specialists to determine the plan of care. The orthopedists visited RMC weekly [ECF #221-5, pp. 15-16, 27-28, 41, 46-49, 76-77]. In this case, it was up to the specialists to inform the physicians at RMC of the plan, including whether and when surgery would be done. If the

specialist decided surgery should be done immediately, that order would be carried out, but that never happened in this case. [ECF #221-5, pp. 64-66, 81-91, 95-100, 160-64]. In any case, Belizaire knew surgery would not happen if Nelson was on antibiotics, and he was until at least mid-June 2015 [ECF #221-5, pp. 41-42, 50-52, 82-83, 115-16]. Throughout the pertinent time, from April 16 to the surgery, Nelson remained in the RMC hospital and in bed so he could not further injure the foot [ECF #221-5, p. 47].

Donna Graham testified to the scheduling of appointments with specialty physicians. Specialists come to RMC according to their own schedule and patients are seen either in a clinic or in their own bed in the hospital. If the specialist determines treatment must be done immediately, no one can override that decision. In this case, orthopedics came on Mondays, but Dr. Steele cancelled his appointments for May 5, 2015, when he was to initially examine Nelson. Once a patient is examined by the specialist, whatever testing is ordered is done and if surgery is to be done, it is scheduled by the specialist according to the specialist's availability and available space at Jacksonville Memorial Hospital [ECF #221-6, pp. 13-15, 22-24, 31-33, 48-50].

Corizon, FDOC and Belizaire retained internal medicine and orthopedic surgery experts. Dr. Arthur Fournier is an internal medicine physician, who opines that Nelson's overall care, including that for Charcot Arthropathy of the right foot

and ankle was excellent. The fractures were caused by diabetes and peripheral neuropathy, for which Nelson was appropriately referred to specialists, who alone determined the course of treatment [ECF #221-7]. Dr. John Krause is an orthopedic surgeon. He opines that amputation was the only treatment for this condition, which was Charcot Foot; the condition was the result of poorly-controlled diabetes and no delay changed the outcome [ECF #221-8].

Nelson has no experts.

## II. Argument

### A. Legal Standard

Federal Rule of Civil Procedure 72(a) covers appeals of magistrate judge orders:

> Nondispositive Matters. When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

The review is according to the "clearly erroneous or contrary to law" standard. *In re Commissioner's Subpoenas*, 325 F.3d 1287, 1292 n.2 (11th Cir. 2003) (observing that district court properly applied "clearly erroneous or contrary to law" standard of review in reconsidering magistrate judge's determination of

pretrial matter); *Merritt v. International Brotherhood of Boilermakers*, 649 F.2d 1013, 1017 (5th Cir. 1981) ("Pretrial orders of a magistrate under s 636(b)(1)(A) are reviewable under the 'clearly erroneous and contrary to law' standard; they are not subject to a *de novo* determination ….").

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) (citation omitted). "A magistrate's order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Malibu Media, LLC v. Doe*, 923 F. Supp. 2d 1339, 1347 (M.D. Fla. 2013) (citations omitted).

### B.    The Magistrate Judge's decision should stand.

Issues regarding Request 1 are moot. During the prefiling conference, FDOC agreed to amend its response to this request by withdrawing the objection and admitting the request. The agreement was made before the Motion was filed, was communicated to the Magistrate Judge before the Order was entered [ECF #187, p. 2] and was complete by October 23, 2020 [ECF #268-1]. Nelson's waiver argument is clearly wrong, as matters admitted under Rule 36(a) are "conclusively established, unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). The original response was not an admission, but

an objection. There was never an issue following the prefiling conference, but Nelson filed the Motion and now objects the Magistrate Judge's ruling regarding a moot issue.

In Request 3, Nelson sought an admission that he had undefined "serious medical conditions," and FDOC responded that he had several conditions and they were treated. [ECF #173-2, p.2]. In responding to the Motion, FDOC explained that it could respond in no other manner, as Nelson did not include a definition and seriousness depends on the medical condition [ECF #187, p. 2]. The Magistrate Judge agreed [ECF #263, p. 4]. Here, he claims "serious medical condition" is a term of art in prisoner medical cases [ECF #266, pp. 2, 5-6]. He is, of course, wrong: the term of art he references is "serious medical need," which was enunciated in *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Notably, Nelson does not define it here, just as it wasn't defined in his request. The response was appropriate and should stand. If Nelson wanted a more directed response, he should have made a more direct request.

Request 10 asked FDOC to admit that it "has expressed concern that Corizon failed to provide care to prisoners," and FDOC admitted the request because medical care is always a concern [ECF #173-2, p. 3]. In responding to the Motion, FDOC explained this general response was the result of the general request, which could have included any complaint of any kind made by any of

more than 25,000 employees. The Magistrate Judge found the response sufficient because the request is vague and does not make any specific reference [ECF #263, p. 4]. Here, Nelson claims the Magistrate Judge overruled the objection because he did not "draw a discrete time frame or give specific conditions," but that is not what the Magistrate Judge found lacking [ECF #266, p. 6]. Nelson got the benefit of his bargain: a general response to a general request. If he expected a more specific response, there should have been a more specific request.

Finally, in request 18, Nelson sought an admission that "[s]hort-staffing medical care was a serious problem in FDC during 2015," and FDOC responded that "short staffing medical care" was unintelligible [ECF #173-2, p. 4]. In response to the Motion, FDOC explained that the request made no sense because the phrase made no sense. What does "short staffing medical care mean"? Here, as he did in the Motion, Nelson splits the phrase in half. Giving partial shrift to the argument, he seems to claim the meaning is obvious, but that he does not inform the Court, even now, of what he meant is telling. Admissions are important; they have serious consequences. They must be presented clearly and concisely to compel an answer and FDOC is not required to guess at meanings or define terms that are not clear and concise.

Much of the problem with this appeal is that Nelson never defined the correct standard, so he makes no attempt to apply the standard. He makes no

attempt to convince the Court that it should be "left with the definite and firm conviction that a mistake has been committed." He also makes no attempt to show the Magistrate Judge's decision was the misapplication of the law.

The Order should be affirmed.

By:    /s/ Gregg A. Toomey
Gregg A. Toomey
Florida Bar No. 159689

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of February, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, which will send a copy of the foregoing electronically to the following:

Linda Bellomio Commons, Esq.
*Attorneys for Plaintiff*
Law Offices of Linda Bellomio Commons, P.A.
PO Box 340261
Tampa, FL 33694
Phone: 352.610.4416
Fax: 813.265.3010
Email: lcommons@aol.com
Commons.litigation@gmail.com
Dmheiser1@gmail.com

James V. Cook, Esq.
*Attorneys for Plaintiff*
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
Phone: 850.222.8080
Fax: 850.561.0836
Email: cookjv@gmail.com

Jason Gordillo
*Attorneys for Defendant Gualtieri*
Pinellas County Sheriff General Counsel's Office
10750 Ulmerton Road
Largo, FL 33778
Phone: 727.582.6274
Fax: 727.582.6459
Email: jgordillo@pcsonet.com
rreuss@psconet.com

THE TOOMEY LAW FIRM LLC
*Attorneys for Defendants Corizon, FDOC and Belizaire*
The Old Robb & Stucky Building
1625 Hendry Street, Suite 203
Fort Myers, FL  33901
Phone:  239.337.1630
Fax:  239-337.0307
Email:  gat@thetoomeylawfirm.com, alr@thetoomeylawfirm.com, and hms@thetoomeylawfirm.com

By:     /s/ Gregg A. Toomey
     Gregg A. Toomey
     Florida Bar No. 159689