# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

WAHEED NELSON,

    Plaintiff,

vs.

BOB GUALTIERI, et al.,

    Defendants.

Case No. 8:19-cv-449-T-36JSS

### PLAINTIFF'S RESPONSE TO DEFENDANT GUALTIERI'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT DR. PAUL GENECIN

Plaintiff, WAHEED NELSON, responds to the Sheriff's Motion to Exclude Plaintiff's Expert Dr. Paul Genecin and would show as follows:

Defendant Gualtieri seeks to limit or exclude Dr. Genecin's testimony on the following grounds:

1. That Dr. Genecin is not competent to testify on Medical Malpractice issues.
2. That Dr. Genecin is not competent to testify on *Monell* issues.
3. That Dr. Genecin should be excluded because although he provided a schedule of hourly charges, he did not include the number of hours worked.

Defendant also seeks sanctions for the trouble of drafting the motion. Plaintiff submits that even were these things all true, they would not be a basis to exclude Dr. Genecin's testimony or to justify the imposition of sanctions.

### MEMORANDUM OF LAW

An expert report under Fed. R. Civ. P. 26(a)(2)(B) must contain a complete statement of all the opinions the expert plans to express and the basis for them,

1

the facts considered by the expert in arriving at the opinions, and any exhibits intended to be used in support of the opinions. A District Court's ruling on admissibility of expert testimony is reviewed for abuse of discretion. *General Electric Company v. Joiner*, 522 U.S. 136, 138-39, 118 S.Ct. 512 (1997). Courts apply Federal Rules of Evidence in determining whether to admit expert testimony. *Id.* at 1294-95.

> Rule 702 of the Federal Rules of Evidence provides:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A party offering expert testimony has the burden of laying the foundation for admissibility by the greater weight of the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Dr. Paul Genecin demonstrates specialized knowledge, a grasp of the facts underlying his opinions, and understanding of the facts in this case,

reliable principles and methods, and application of the principles and methods to the facts. His opinions are reliable and will be helpful to the finder of fact.

## THE *DAUBERT* LEGAL STANDARD

"In 2013, the Florida Legislature modified section 90.702 'to adopt the standards for expert testimony of [Florida]'" in state court actions. *Giaimo v. Fla. Autosport, Inc.,* 154 So. 3d 385, 387-88 (Fla. 1st DCA 2014). *Daubert* has long been the standard in federal court actions.

Most notably, in May 2019, the Florida Supreme Court clearly established that *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 503 U.S. 579 (1993), is the standard for admission of expert testimony in Florida. *See In re Amendments to Florida Evidence Code*, 44 Fla. L. Weekly S170 (Fla. May 23, 2019). Under the *Daubert* standard, the trial court serves as a gatekeeper, ensuring that the expert's testimony both rests on a reliable foundation and is relevant to the case. *See Rojas v. Rodriguez*, 185 So. 3d 710, 711 (Fla. 3d DCA 2016).

"A proper *Daubert* motion must identify the source, substance, and methodology of the challenged testimony." *See Booker v. Sumter Cty. Sheriff's Office/N. Am. Risk Servs.*, 166 So. 3d 189, 192 (Fla. 1st DCA 2015). **The party filing the *Daubert* motion bears the burden to provide conflicting expert testimony and literature; otherwise, the court has the ability to decline to hear the motion**. *Id.* at 193. An attack on an expert's background, qualifications, use of accepted methodology, or lack of textual authority is to be

3

considered by the jury in assessing the weight to be accorded to the expert's testimony. *See McCullock v. H.B. Fuller Co.*, 61 F. 3d 1038, 1044 (2d Cir. 1995).

Generally, in a *Daubert* challenge, the trial court conducts in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue.[1] *See Daubert* 503 U.S. 579 (1993). Most *Daubert* challenge focus on relevance, qualifications, helpfulness, or "fit." *See* A. Leah Vickers, Daubert*, Critique and Interpretation: What Empirical Studies Tell Us About the Application of* Daubert, 40 U.S.F. L. Rev. 109, 110, 132, 138; Fed. R. Evid. 702, advisory committee's note (2000).

The inquiry for qualifications of experts is that "they must demonstrate knowledge beyond the understanding of the average person." 4 Weinstein's Federal Evidence §702.03(1). Knowledge may be based on "knowledge, skill, experience, training, or education." Fla. Stat. § 90.702. Moreover, the testimony must be relevant, if it will "help the trier of fact or to understand the evidence or determine a fact at issue." *Id*. The "fit" requirement analyzes the reliable methodology used by the expert fits the facts and data of the case, which assists the jury in deciding the issues in the case. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

---

[1] *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (clarifying that the factors in *Daubert* are not a definitive checklist).

The plain language of the *Daubert* standard permits expert testimony based on experience and knowledge. *See* Fed. R. Evid. 702, advisory committee's note (2000). The *Daubert* standard applies not only to "new or novel" scientific evidence, but also to all other expert opinions, so long as it relies on scientific testimony. *See Perez v. Bell S. Telecommunications, Inc.,* 138 So. 3d 492 (Fla. 3d DCA 2014). <u>Notably, under Florida law, the exclusion of expert testimony is a drastic remedy that should be invoked only under the most compelling circumstances</u>. *See Rojas v. Rodriguez,* 185 So. 3d 710, 711 (Fla. 3d DCA 2016) (citing *Clair v. Perry,* 66 So. 3d 1078, 1080 (Fla. 4th DCA 2011)).

**A. Dr. Genecin' Opinions on Standard of Care Are Helpful**

Defendants argue that Dr. Genecin should not be permitted to testify despite the fact that he is abundantly qualified. Dr. Genecin, MD, F.A.C.P., speaks to his qualifications and nearly 40 years' experience through his CV (ECF 306-8). He was Summa cum laude, Princeton 1997. For more than a decade, he was the Executive Director of Yale Emergency Medical Services. For the past decade, he has been the director of Yale Health. He is familiar with the standard of care in the community. He has testified in Florida. And he is licensed as an expert witness. His specialty is internal medicine, the same specialty as Dr. Kevin Kyle at the Pinellas County Jail who made critical decisions with regard to the care of Waheed Nelson. The fact that he has not worked in a prison may be to his advantage since it appears, through this case, that jail and prison medical providers may sometimes tend to lose focus on the patient.

Genecin reported:

The failure over nearly seven months to provide treatment for Mr. Nelson's fracture represented a serious deviation from the standard of care. Any lay observer would have appreciated that Mr. Nelson suffered a severe injury with "monstrous" ankle swelling and ongoing pain and disablement. Diagnostic imaging only confirmed the impression and raised the specter of osteomyelitis, a treatable bone infection that will progress to permanent disability and even limb loss when not diagnosed timely and treated according to the standard of care.

The failure to treat such a severe fracture and infection over such a sustained period not only resulted in severe ongoing pain, but also risk of limb loss and even death due to sepsis. Infection was not treated and resulted in destruction of the bones due to the failure diagnose and treat osteomyelitis.

The **records indicate knowledge of Mr. Nelson's serious medical condition** by his medical providers but no concern for expediting his treatment and no concern for the consequences of failure to treat. The failure to treat seemed systemic with the Sheriff's Pinellas County Jail and continued with the Department of Corrections and its medical contractor, Corizon in that there was no attempt by anyone to ensure standard orthopedic care and treatment of his fracture and infection. (ECF 306-7 @ 5 Opinion paragraphs 1-3)

The Sheriff attacks Dr. Genecin's statement that the failure to treat seemed *systemic* by noting that Genecin had not looked at the medical records of other inmates.[2] Dr. Genecin did not purport to offer an opinion on *Monell* liability *per se* but recognizes that showing it is the Plaintiff's job. But in the course of reviewing thousands of pages of medical records relating to Mr. Nelson's treatment, and given his administrative experience in emergency medicine, he is

---

[2] Although there is a mechanism in HIPAA regulations, 45 C.F.R. § 164.512(e)(1)(ii)(B) and § 164.512(e)(1)(v), for a broad study of an institution's medical care in a litigation context without the need for individual medical releases, the fierceness with which Sheriff Gualtieri pushed back on Discovery makes it doubtful that the Sheriff would have welcomed or cooperated with any such effort. (ECF 135,167, 168, 174,181,196).

6

well-qualified to recognize a pattern in the history of care that Plaintiff Nelson received. (ECF 306-8). Dr. Genecin reviewed thousands of pages of files from the Pinellas County Jail from 2005, 2009-2010 and 2014-2015. (ECF 306-7) Through his review, Dr. Genecin became familiar with Plaintiff Nelson's comorbidities and how he was treated by a long succession of providers before and after his ankle fracture. He was surprised not to see the severe fracture treated as an emergency.[3] (ECF 306-6 at 53:9-16). He was aware of the danger of severe, ongoing pain, but also the risk of limb loss and even death due to sepsis. ECF 306-6 at 53:20-25). Strong and repeated indicators for infection were ignored and the ongoing suspicion of osteomyelitis, (ECF 306-7 at 3, ¶ 6,7,8) raised by many rounds of diagnostic imaging, was proved to be correct when the right leg was finally amputated and examined by Dr. Maxwell Steel as noted in his post-op report. (ECF 224-8).

The Sheriff has decided to base his whole argument for "insufficient facts" on the theory that Dr. Genecin was required to do a cross-sectional study of the medical care of the Jail population at large. It is simply unfair to say Dr. Genecin is drawing conclusions without existing data and makes a "mere guess." As the Sheriff frequently pointed out in Plaintiff's challenges to the gaps in his discovery, he produced thousands of pages of medical history going back years into prior incarcerations. (ECF 306-7 at 1:1-16 documents reviewed).  Through those

---

[3] By January 25, 2015, an orthopedic consult had been requested three times. On January 28, 2015, Dr. Kyle, the Jail medical director canceled the consult.

records, Dr. Genecin discerned a pattern of failure to treat in numerous situations by practitioners at all levels. Dr. Genecin would have expected him to be moved to a hospital where orthopedics and infectious disease specialists could be consulted due to fracture in the context of history of osteomyelitis and so that he could undergo appropriate diagnostic workup and treatment. (ECF 306-7 at 2). These are pertinent issues a jury must decide to find that the Defendants failed to take reasonable measures to abate the risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Eleventh Circuit Pattern Jury Instruction 5.8 requires a jury to find the following facts by a preponderance of evidence:

> 1. That [name of plaintiff] had a serious medical need;
>
> 2. That [name of defendant] knew that [name of plaintiff] had a serious medical need that posed a risk of serious harm;
>
> 3. That [name of defendant] failed to [provide/get] necessary medical care for [name of plaintiff]'s serious medical need in deliberate indifference to the risk of serious harm;
>
> 4. That [name of defendant]'s conduct caused [name of plaintiff]'s injuries; and
>
> 5. That [name of defendant] acted under color of law.

Eleventh Circuit Pattern Jury Instruction Builder – Civil, Instruction 5.8.[4]

Dr. Genecin's opinions will help a jury understand when Plaintiff began to experience a serious medical need (no. 1); what medical care would have been necessary to address the serious medical need (no. 3); the extent to which the failure to render that care contributed to the Plaintiff's injuries (no. 4); and, to

---

[4] Pattern Jury Instruction Builder – Civil, found at https://pji.ca11.uscourts.gov/.

some extent, his description of how the medical need presented physically could add to circumstantial evidence of the Defendant's subjective knowledge (no. 2).

### B. Dr. Genecin Did Not Lack Facts on the Failure to Treat

Litigants are not permitted to rely on conclusory statements to support the relief requested by motion any more than in pleadings. Just as expert opinions are required to show their reasoning and the facts on which they are based, so are arguments by Defendants in their Motion. Here, they are simply lacking. Defendants do not attack Dr. Genecin' credentials. Rather, they argue that he did not have the "sufficient facts or data" upon which to base his causation opinion as required by Fed.R.Evid. 702.[5] As noted, Dr. Genecin has a distinguished medical history and a broad and varied career stretching back nearly 40 years. He has not worked in prison and jail settings but his administrative career makes him sensitive to the need to respond to emergency medical situations. (ECF 308-8). Since 2010, Dr. Genecin is also a Clinical Associate Professor, Department of Internal Medicine at the Yale School of Medicine. (ECF 308-8 at 1-2).

Dr. Genecin demonstrated that he understood Mr. Nelson's medical history, he knew his medical conditions and listed them, that he was aware of how his condition had changed over time. (ECF 306-7; 306-6 at 16:19-22,25;17:1-6;    20:9-14;21:5-18;28:16-22;29:5-13;35:19-23;37:12-15;20-25;40:23-25;41:1-5,8,9,12-14;47:6-18;48:1-11,13-25;49:1-2,5-9,12-25;50:1-3,5,7-11,14-22;51:1-11,22-

---

[5] Corizon and Dr. Belizaire make no such argument regarding the facts brought to bear while Plaintiff was in the Department of Corrections so that even if Dr. Genecin could be excluded from testifying as to the Pinellas County Jail, the Sheriff's argument would not affect his ability to testify as to Corizon and prison medical providers.

9

25;52:1-14;53:9-16,2025;55:1-6,12-17,19-22,564-9,13-22). He demonstrated that he knew the treatments that Plaintiff received, the antibiotics, the debridement, the diagnostic imaging, and the history of infection. He demonstrated that he knew the timeline, the gaps between injury and treatment. He showed he was aware of the need for immediate off-site care. He tracked the deterioration of the bone through diagnostic imaging. He showed he knew how Mr. Nelson's comorbidities represented special risks. (ECF 306-6 at 53:9-16;20-25;54:1-2;7-16;20-25;55:1-6,12-17, 19-22;56:4-9, 13-22). Dr. Genecin pointed out that the history of osteomyelitis made Plaintiff especially vulnerable to limb loss and septic shock. (ECF 306-7 at 2) (ECF 306-6 at 16:19-22,25; 17:1-6;20:9-14[6]). Defendants don't refute this observation and it is critical to understand where treatment went wrong.[7]

The Sheriff challenges Dr. Genecin's conclusion that the failure to treat Plaintiff seemed to be "systemic," (ECF 306-7 at 5, ¶ 3,4; 307-6 at 41: 1-5,8,9,12-14) by saying that because Dr. Genecin "never received nor reviewed any medical records for any other inmates cared for by the Pinellas County Jail" and because "he does not hold a single opinion as to the medical care provided to any other

---

[6] I will tell you, though, that an internist would know that this is a patient who was required to be hospitalized, biopsied and treated for osteomyelitis if that was the diagnosis. That's what the standard of care required irrespective of what the doctors in this particular case did or didn't do for Mr. Nelson.(ECF 306-6 at 20:9-14)

[7] **I think with reasonable medical certainty, the limb was salvageable in January of 2015**. I'm not an orthopaedist, but I base that on almost 30 years of experience caring for patients with osteomyelitis, diabetes, end-stage renal disease in a hospital setting. It's unusual that a patient in this condition that he was in acutely in January of 2015 would proceed to limb loss, but neglect of all of the diagnostic and therapeutic interventions maximized the likelihood that Mr. Nelson would lose his leg. (ECF 306-6 at 56:13-22)

10

inmate ever housed at the Pinellas County Jail," that he does not have a basis for opining that the pattern of failing to treat Plaintiff over months at the Jail seemed to be "systemic." But the Sheriff's suggested cross-sectional study of the jail population is rarely done in civil rights litigation because of the cost and medical privacy issues. And predictably it would have been fiercely resisted by the sheriff. It might well be attempted in class actions. Longitudinal studies following one person in depth over a substantial period of time along with examination of the jail policies and depositions of providers, all of which Dr. Genecin reviewed (ECF 306-7), are the typical basis of expert medical reports in incarceration settings.

In his opinion (ECF 306-7) and deposition (ECF 306-6), Dr. Genecin showed he was familiar with Plaintiff Nelson's history of medical needs, going back before the ankle fracture, and the history of his interactions with medical staff before and after the incident. He was conversant with the fact that orthopedic consults had been requested multiple times and cancelled. Months passed "without a referral to an orthopedist for consideration of surgery or referral to infectious disease to recommend appropriate antibiotic therapy." (ECF 306-7 at 2-3) (ECF 306-6 at 16:19-22,25;17:1-6; 20:9-14;21:5-18;28:16-22;29:5-13; 35:19-23; 37:12-15; 20-25; 40:23-25; 41:1-5,8,9,12-14; 47:6-18; 48:1-11,13-25; 49:1-2, 5-9,12-25;50:1-3,5,7-11,14-22; 51:1-11,22-25; 52:1-14; 53:9-16,2025; 55:1-6, 12-17, 19-22,564-9,13-22).

> The providers instead attempted to construe the situation as a chronic condition rather than an acute one to justify lack of timely treatment. Dr. Kyle, the medical director, cancelled the referral to an orthopedic surgeon

11

> in January and chose to wait a month to approve the CT scan at an outside service. This was in violation of the policy that if a limb is threatened, transfer to the hospital must be expedited. Moreover, the standard of care mandated that the patient be given the benefit of standard workup and treatment in an effort to salvage the limb.

Genecin Opinion (ECF 306-7 at 3). The Sheriff faults Dr. Genecin for not being an expert on limb salvage or infectious disease himself. But that is no reflection on Dr. Genecin. His career as a medical administrator was to recognize care needs and have them met timely and appropriately. As he pointed out:

> That's not a treatment. The CT scan was done a month after the injury, and its findings were ignored. Q How so? A Well, the patient did not have the benefit of going to see an orthopaedist until the end of the following month. So the CT scan was in early February. The patient didn't see an orthopaedist until March 30th. Q Do you know why that is? A It's because of egregious malpractice. Q Do you believe --A There is a delay in treatment of a patient with a complex orthopaedic problem, for which infection of the bone was the first thing in the differential diagnosis because of the gravity of that situation and the downside to the patient of failure to make a timely diagnosis. Q He had a lot of other life-threatening problems didn't he, such as the diabetes, the renal failure, needing dialysis? A Sure. That's why these patients go to the hospital. You can do multitasking in the hospital. You can provide him with dialysis that he needs. You can provide him with the care that he needs for all of the different problems including the bone infection. Right. So there is really no way to do that in an outpatient setting in a jail, and the standard of care required that Dr. Kyle and his colleagues recognize that the level of care required by this patient was well above what they could safely provide in an outpatient setting at a jail. ECF 306-6 at 49:22-25;50:1-22.

### C. Dr. Genecin Demonstrated Reliable Principles and Methods

Dr. Genecin's Opinions employed reliable medical principles and methods relating to emergency treatment and assessing risk:

> The failure to treat continued into April 2015. The MRI ordered at the end of March 2015 was not expedited and the study was only performed on

> April 14, 2015, more than three months after Mr. Nelsons fall and ankle fracture. The MRI revealed almost total destruction of the calcaneus and talus with a large amount of fluid and debris. There was a concern for septic arthritis and the radiologist recommended aspiration since septic arthritis was favored. (note: this is the diagnosis of the left foot several months earlier in 2014.

Genecin Opinion (ECF 306-7 at 4).

Dr. Genecin's opinions are reliable because of his review of the treatment history as well as his qualifications, his broad-based education and nearly 40 years of experience. Dr. Genecin has been teaching physicians since 2007. (ECF 306-8). Dr. Genecin's opinions were grounded in far more than a "mere guess" to use the Sheriff's words. Aside from commenting that he hasn't worked in a jail or prison, Defendants have not questioned his qualifications. Dr. Genecin' opinions would be helpful to a jury in many respects, based on his distinguished medical career and especially his history as an emergency care administrator.

Dr. Genecin was concerned that there was no indication that providers were communicating and discussing the many abnormal findings that emerged from tests and progress notes with relevant specialists. (ECF 306-7 at 3). Dr. Genecin knew, based on his long medical practice that time for appropriate evaluation and treatment was being lost. Over nearly seven months there was virtually no action to rule out infection. It should not have taken until Mr. Nelson actually had his leg cut off for his medical providers to learn that he really did have osteomyelitis.  This is why he testified it was egregious.  He also testified that performing a CT and doing nothing was not care at all. (ECF 306-6 at 16:19-22,25;17:1-6;   20:9-14;21:5-18;28:16-22;29:5-13;35:19-23;37:12-15;20-25;40:23-

13

25;41:1-5,8,9,12-14;47:6-18;48:1-11,13-25;49:1-2,5-9,12-25;50:1-3,5,7-11,14-22;51:1-11,22-25;52:1-14;53:9-16,2025;55:1-6,12-17,19-22,564-9,13-22).

### D. Genecin Applied Reliable Principles and Methods to the Facts

Although Charcot arthropy was not listed as one of Nelson's medical problems historically, as time went on, medical providers took refuge in the theory that chronic "Charcot arthropy" was responsible for the bone deterioration, not infection, as an excuse for their inaction. Dr. Genecin clearly applied medical principles and methods to recognize the error being committed by the medical providers:

> Mr. Nelson was receiving wound care to both feet in both facilities, Jail and RMC. No notes describe Charcot arthropathy prior to the trauma January 7, 2015. On its face, the claim that his joint destruction was due to Charcot arthropathy was invalid because the patient had a history of osteomyelitis and a radiographic appearance consistent with osteomyelitis with no history of Charcot arthropathy. Even if Charcot arthropathy were part of the differential diagnosis, the standard of care still mandated ruling out infection because failure to treat osteomyelitis with antibiotic therapy will inevitably lead to an adverse outcome. Moreover, acute joint destruction due to Charcot arthropathy also requires urgent diagnosis and treatment to stabilize the joint and prevent loss of function.

Genecin Opinion (ECF 306-7 at 4; see also 306-6 at 47:6-18). Jail medical providers chose to embrace the theory that they felt excused them from taking any affirmative action although Dr. Genecin's report shows that by following up on the warnings in the diagnostic imaging reports, they could have mitigated the harm to Plaintiff even if the problem did turn out to include Charcot arthropathy – and threw away that opportunity. (Id.) That failure to act was not isolated or limited to just one provider. It was endemic throughout Plaintiff's treatment history.

**E. Dr. Genecin Is a Competent Expert as to Medical Malpractice**

Under the amended Florida Rule of Evidence 90.702, the *Daubert* standard requires: (1) the testimony be based upon sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. See *Baan v. Columbia County*, 180 So. 3d 1127 (Fla. 1st DCA 2015); see also *Giaimo v. Florida Autosport, Inc.*, 154 So. 3d 385 (Fla. 1st DCA 2014); *Daubert*, 509 U.S. at 592-93 (1993). Trial courts, under *Daubert,* must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 597. The rationale for this assessment is to assure that experts' testimony are based on professional studies or personal experience "that characterizes the practice of an expert in the relevant field [in the courtroom]." See *Kumho*, 523 U.S. at 152. Most importantly, the assessment must focus "solely on the principles and methodology, not on the conclusion that they generate." See *Daubert* 509 U.S. at 595.

By his years of experience and knowledge, Dr. Genecin is more than qualified to give an expert opinion concerning the lack of care and treatment in patient Nelson. Accordingly, contrary to Defendant's argument, Dr. Genecin does meet the threshold inquiry of qualifying as an expert witness to warrant admissibility into evidence for the applicable subject matter.

The fact that Dr. Genecin shares a medical specialty with the chief Jail physician, Kevin Kyle, is a technical requirement in a medical malpractice case, (same specialty ie. Internal Medicine) but he brings much more than that. It is disingenuous for the Sheriff to claim that because Dr. Genecin admits he is not a "constitutional scholar," that he has nothing to contribute to the overall indictment of the Pinellas County Jail as having systemic problems with medical care. The burden of that showing is on Plaintiff and Dr. Genecin is not a one-man show on *Monell*. In Florida, a plaintiff alleging a medical malpractice claim must establish: the standard of care owed by the defendant, the defendant's breach of that standard, and that said breach proximately caused the damages claimed." *Gooding v. Univ. Hospital, Inc.*, 445 So.2d 1015, 1018 (Fla. 1984). The plaintiff "must show that the injury more likely than not resulted from the defendant's negligence in order to establish a jury question on proximate cause. In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome." *Id.* at 1020. Dr. Genecin has met that challenge abundantly. He testified that his opinions were within a reasonable degree of medical probability. (ECF 306-6 at 29:16-20,30:23-25;31:1-7;38:5-19;46:8-25;47:1-18;48:1-11).

In any case, the Sheriff mis-states the *Monell* test. The Sheriff cites *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986) to the effect that "The custom or policy shown must be 'persistent' and 'widespread,'" *Id.* at 1290-91. However, *Depew* actually says "it is *generally* necessary to show a persistent and

16

wide-spread practice." *Id.* at 1499. However, the sheriff also cites *Canton v. Harris*, 489 U.S. 378, 385 (1989), which holds that if plaintiffs prove that a policy of failure to train is "substantially certain" to result in a deprivation of rights in the future, *Monell* liability can also result. *Id.* at 383. As Justice Brennan pointed out in *Pembaur*, "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

### F. Dr. Genecin Should Not Be Excluded for Failure to State his Hours

Plaintiff submitted a fee schedule in compliance with what he considered the requirement of Rule 26(a)(2)(B)(vi). The fee schedule showed Dr. Genecin's hourly rates. However, it did not specify how many hours Dr. Genecin had expended at any particular point in the case. His work had not ended. No one at deposition asked him how many hours he had spent thus far. *Thornton v. United States*, CV 111-106, at *17 (S.D. Ga. Feb. 5, 2013) (failure to provide compensation data resulted in "no material surprise or harm" rendering the report "woefully inadequate"); *Campbell v. Moon Palace, Inc.*, No. 11-60274-Civ-Cohn/Seltzer, at *10 (S.D. Fla. Feb. 7, 2012) (The court did not find even the complete absence of this data to be a basis for excluding a witness or his report).

The underlying purpose of Rule 26(a) disclosures is to avoid unfair surprise. *Silverstein v. Procter & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312, 1320 (S.D. Ga. 2009).; *see also Abdulla v. Klosinski*, No. 1:10-CV-159, 2012 WL 4429179, at *6 (S.D. Ga. Sept. 25, 2012). Here, Defendants were fairly apprised of

17

the expert's opinions by his Rule 26(a)(2) expert report as well as his hourly rate. Defense counsel could have requested the hours spent so far at deposition but showed no interest in acquiring that information at the time.

As is frequently the case, the experts had not provided a final bill. For one thing, there was concern that Defendants, who refused to pay for deposition time in advance, might refuse to pay for deposition prep time, in which case the cost would devolve on Plaintiff. So, there was no final bill but counsel for Defendants could have asked how many hours had been expended up to that time.

### G. Defendants Do Not Raise Sanctions Issues with Clean Hands

Defendant Gaultieri cites substantial history to plead for sanctions against the Plaintiff. However, the Defendant has had four motions to compel against him and two orders to produce records or answer interrogatories. Defendant sought to avoid producing documents. (ECF 135, 167, 168, 174, 181, 234). Plaintiff's counsel spent many hours working to get those records against unflagging resistance. Plaintiff will not run back through that history except to say that Defendant was never sanctioned and the Plaintiff states, without rancor, that he should be similarly treated.

WHEREFORE, Plaintiff requests this Honorable Court DENY Defendants Motion to Exclude or Limit Dr. Paul Genecin's Testimony.

Respectfully Submitted, */s/ James V. Cook*
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

/s/ Linda Bellomio Commons
Florida Bar No: 0778346
Linda Bellomio Commons, P.A.
P.O. Box 340261
Tampa, Florida 33694
(352) 610-4416; fax 265-3010
Service E-mail: lcommons@aol.com
Dmheiser1@gmail.com

<u>Attorneys for Plaintiff</u>

I CERTIFY that this Memorandum complies with the type and size requirements set forth in the Local Rules.

I CERTIFY the foregoing was filed electronically on 10/18/21, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

*/s/James V. Cook*