# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

WAHEED NELSON,

    Plaintiff,

vs.

BOB GUALTIERI, et al.,

    Defendants.

Case No. 8:19-cv-449-T-36JSS

## PLAINTIFF'S RESPONSE TO DEFENDANT GUALTIERI'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT DR. MARIA DE LOS SANTOS[1]

Plaintiff, WAHEED NELSON, responds to the Sheriff's Motion to Exclude Plaintiff's Expert Dr. Maria De Los Santos and would show as follows:

Defendant Gualtieri seeks to exclude Dr. De Los Santos on these grounds:

1. That Dr. De Los Santos is not competent to testify on Medical Malpractice.

2. That Dr. De Los Santos is not competent to testify on *Monell* issues.

3. That Dr. De Los Santos failed to timely provide a testimony list.

Plaintiff submits that the Defendant Sheriff has not shown a basis on which to exclude her testimony in the case.

## MEMORANDUM OF LAW

An expert report under Fed. R. Civ. P. 26(a)(2)(B) must contain a complete statement of all the opinions the expert plans to express and the basis for them, the facts considered by the expert in arriving at the opinions, and any exhibits intended to support the opinions. A District Court's ruling on admissibility of expert testimony is reviewed for abuse of discretion. *General Electric Company*

---

[1] Corizon, Dr. Belizaire and the Department do not seek exclusion of Plaintiff's experts as to their issues.

1

*v. Joiner*, 522 U.S. 136, 138-39, 118 S.Ct. 512 (1997). Courts apply Federal Rules of Evidence in determining whether to admit expert testimony. *Id.* at 1294-95.

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b. the testimony is based on sufficient facts or data;

c. the testimony is the product of reliable principles and methods; and

d. the expert has reliably applied the principles and methods to the facts of the case.

A party offering expert testimony has the burden of laying the foundation for admissibility by the greater weight of the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Nursing expert witness Maria De Los Santos demonstrates specialized knowledge, a grasp of the universe of facts underlying her opinions, reliable principles and methods, and application of the principles and methods to the facts of this case, and her expertise will assist the trial of fact .

## THE *DAUBERT* LEGAL STANDARD

In 2013, the Florida Legislature modified section 90.702 "to adopt the standards for expert testimony of [Florida]." *Giaimo v. Fla. Autosport, Inc.,* 154 So. 3d 385, 387-88 (Fla. 1st DCA 2014). In May 2019, the Florida Supreme Court

clearly established that *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 503 U.S. 579 (1993), is the standard for admission of expert testimony in Florida. *See In re Amendments to Florida Evidence Code*, 44 Fla. L. Weekly S170 (Fla. May 23, 2019). Under the *Daubert* standard, the trial court serves as a gatekeeper, ensuring that the expert's testimony both rests on a reliable foundation and is relevant to the case. *See Rojas v. Rodriguez*, 185 So. 3d 710, 711 (Fla. 3d DCA 2016). This has been the federal standard for some time.

"A proper *Daubert* motion must identify the source, substance, and methodology of the challenged testimony." *See Booker v. Sumter Cty. Sheriff's Office/N. Am. Risk Servs.*, 166 So. 3d 189, 192 (Fla. 1st DCA 2015). **The party filing the *Daubert* motion bears the burden to provide conflicting expert testimony and literature; otherwise, the court has the ability to decline to hear the motion**. *Id.* at 193. An attack on an expert's background, qualifications, use of accepted methodology, or lack of textual authority is to be considered by the jury in assessing the weight to be accorded to the expert's testimony. *See McCullock v. H.B. Fuller Co.*, 61 F. 3d 1038, 1044 (2d Cir. 1995).

Generally, in a *Daubert* challenge, the trial court conducts in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *See Daubert* 503 U.S. 579 (1993). Most *Daubert* challenge focus on relevance, qualifications, helpfulness, or "fit." *See* A. Leah

3

Vickers, Daubert*, Critique and Interpretation: What Empirical Studies Tell Us About the Application of* Daubert, 40 U.S.F. L. Rev. 109, 110, 132, 138; Fed. R. Evid. 702, advisory committee's note (2000).

The inquiry for qualifications of an expert is that "they must demonstrate knowledge beyond the understanding of the average person." 4 Weinstein's Federal Evidence §702.03(1). Knowledge may be based on "knowledge, skill, experience, training, or education." Fla. Stat. § 90.702. Moreover, the testimony must be relevant, if it will "help the trier of fact or to understand the evidence or determine a fact at issue." *Id.* The "fit" requirement requires the methodology used by the expert to fit the facts and data of the case to assist the jury in deciding the issues. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The plain language of the *Daubert* statute permits expert testimony based on experience and knowledge. *See* Fed. R. Evid. 702, advisory committee's note (2000). The *Daubert* standard applies not only to "new or novel" scientific evidence, but also to all other expert opinions, so long as it relies on scientific testimony. *See Perez v. Bell S. Telecommunications, Inc.,* 138 So. 3d 492 (Fla. 3d DCA 2014). <u>Notably, under Florida law, the exclusion of expert testimony is a drastic remedy that should be invoked only under the most compelling circumstances</u>. *See Rojas v. Rodriguez,* 185 So. 3d 710, 711 (Fla. 3d DCA 2016) (citing *Clair v. Perry,* 66 So. 3d 1078, 1080 (Fla. 4th DCA 2011)).

### A. Dr. De Los Santos' Opinions Will Help the Finder of Fact

The Sheriff contends Dr. De Los Santos can't testify to *Monell* issues and

lacks corrections experience. Dr. De Los Santos, PhD, DNP, ARNP, MSN, MPH, speaks to her qualifications and 30+ years' experience through her CV (ECF 306-13; 306-11 at 37:10-12). She has five advanced degrees including family practice, internal medicine and psychiatry. (ECF 306-13 at 1). In fact, she has also had some corrections experience. (ECF 306-11 at 15:14-5). Dr. De Los Santos made clear corrections medical providers are held to the same standard as in the community. (ECF 306-11 at 60:1-20). Her limited corrections experience may be to her advantage since it appears, through this case, that jail and prison medical providers may sometimes lose sight of something essential to the practice of medicine – the need to advocate for the patient.

The Sheriff dismisses Dr. De Los Santos' testimony that the failure to treat was *systemic*. The fundamental basis of the Sheriff's *Daubert* motion was that Dr. De Los Santos could not claim to have the requisite facts because she had not looked at the medical records of other inmates. But doing a cross-sectional study of inmate care in an institution is rarely done in an individual civil rights case, though it might be essential to a class action. Studies can be cross-sectional or they can be longitudinal. Through thousands of pages of medical records, over years of treatment, Dr. de Los Santos has followed Plaintiff Nelson at the Pinellas County jail, noting how he is treated by a long succession of providers in numerous situations over time. Such a longitudinal study is another valid way of getting a picture of a systemic problem. Dr. De Los Santos shows that she has reviewed jail records from 2005, 2009-10, and 2014-15. She has looked at

5

examining, testing, treating, charting, scheduling, and a whole host of medical processes over substantial periods of time.[2] (ECF 306-12 at 1-6).

Dr. De Los Santos' opinions are reliable because of her qualifications and because of her broad-based nursing education and experience as well as her in-depth review of treatment records in this case. Aside from commenting that she hasn't worked in a jail or prison for a long time, (ECF 306-11 at 15:14-5) Defendants have not questioned her qualifications. Dr. De Los Santos' opinions would be helpful to a jury in many respects, not just in terms of patient advocacy, but nursing and nurse practitioner standards. (ECF 306-13; 306-12 at 6-9)

The Sheriff argues that Dr. De Los Santos cannot contribute to the conversation on Monell liability because she lacks sufficient facts. It is simply unfair to say that Dr. De Los Santos is drawing conclusions without existing data and makes a "mere guess." As the Sheriff frequently pointed out in plaintiff's challenges to the gaps in his discovery, he produced thousands of pages of medical records. Through those records, Dr. De Los Santos discerned a pattern of failure to advocate for the patient in numerous situations by mid-level and

---

[2] Dr. De Los Santos: "[ARNPs] have knowledge and experience to come up with medical judgment. They do not have to refer to a physician for medical decision-making. So if the nurse practitioner finds that something's wrong, this patient's not progressing and this patient's getting worse or having more pain, there's more swelling there could be a DVT, nobody's doing an ultrasound. The nurse practitioner's role as an independent licensed malpracticed (sic) individual is that they take action. They do not necessarily have to defer to a physician. They can make independent decisions. And it seems in this environment everything was the nurses deferred to the doctors, the nurse practitioners deferred to the doctors, so everything was deferred. There was no initiative to have independent decision-making. And everything -- that's what I meant by everybody was passing the buck and dropping the ball. There was no -- no one took -- no one was a patient advocate within their licensing and education authority to take action. (ECF 306-11 at 54:2-25; Q. Okay. But the nurses did refer these issues with Mr. Nelson to the doctors, correct? A. Yes, but that's the -- that's -- that's the problem. All they did was refer, refer, refer. That does not take away your obligation to act. (ECF 306-11 at 55:1-5).

nursing practitioners including failure to advocate for off-site medical treatment, including hospital treatment, failure to advocate for pain management[3], failure to advocate for timely orthopedic referrals and infectious disease referrals and also failure to properly chart progression of disease, for instance by measurement of the swelling- which can be a symptom of infection- a danger that was generally ignored by practitioners at all levels over time.[4] (ECF 306-11 at 40:17-25; 41:1-20; 42:17-25;48:25; 49:1-16; 50:1-16; 51:3-16;52:1-10;61:11-21) . Among other things, a jury must find that the defendants failed to take reasonable measures to abate the risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Eleventh Circuit Pattern Jury Instruction 5.8 requires a jury to find the following facts by a preponderance of evidence:

1. That [name of plaintiff] had a serious medical need;

---

[3] Dr. De Los Santos testified: "[Nelson's pain] was being treated by Tramadol. And one of the things that I found most disturbing is when one of the nurse practitioners tells him that he can just go get Tylenol at the canteen or -- oh, here it is. I just opened it. The Nurse Practitioner Laverde (sic) on March 5th, He has an ankle fracture that is progressing. He's complaining of severe pain swelling, and he complains of reported pain 9 out of 10, and it's even not better with the Tramadol. And she tells him that, 'Oh, I'm sorry. I cannot extend your Tramadol, and you're going to have to go get some analgesic at the canteen.' That's -- I -- I just -- that's -- I don't even have words for what that is." (ECF 306-11 at 51:3-16)

[4] Dr. De Los Santos had a strong basis for discerning patterns in the Jail's medical treatment over time. She testified, "What I had mentioned earlier, in that this was not the failure of one person. This was multiple failure cross different nurses, nurse practitioners, the physicians, where people kept dropping the ball or passing the buck, but nobody took the initiative to get this man the care that he needed on a timely basis. It seems like they were paying more attention to his foot wounds, which were important, but were chronic and not acute, compared to the fracture that he had sustained. And there was no -- there was no, um -- there was no concern over the progression of the destruction of the bone, the swelling, the pain. This man had progressive pain, from the point that he was given Tramadol, the Gabapentin, then the Tramadol had to be increased. So he's had progressive pain, progressive swelling, progression in the disease progression -- in the disease progression under radiology, when you look at the radiology reports, and it didn't seem to impress upon anyone that action needed to be taken. (ECF 306-11 at 48:25; 49:1-16.)

> 2. That [name of defendant] knew that [name of plaintiff] had a serious medical need that posed a risk of serious harm;
>
> 3. That [name of defendant] failed to [provide/get] necessary medical care for [name of plaintiff]'s serious medical need in deliberate indifference to the risk of serious harm;
>
> 4. That [name of defendant]'s conduct caused [name of plaintiff]'s injuries; and
>
> 5. That [name of defendant] acted under color of law.
>
> Pattern Jury Instruction Builder – Civil, Instruction 5.8.[5]

Dr. De Los Santos' opinions will help a jury to understand when Plaintiff began to experience a serious medical need (no. 1); what medical care would have been necessary to address the serious medical need (no. 3); the extent to which the failure to render that care contributed to the plaintiff's injuries (no. 4); and, her description of how the patient's (Mr. Nelson) medical need presented physically. This adds to the circumstantial evidence of the defendant's subjective knowledge (no. 2). A fractured ankle and also the plaintiff's co-morbidities of renal failure, diabetes, history of osteomyelitis, history of recent hospitalization in 2014, the year before, chronic foot ulcers and infection. For medical malpractice, the standards are derived from what a similarly situated nurse or nurse practitioner would do in the same or similar circumstances and then for Dr. De Los Santos be prepared to explain that to a jury. Dr. De Los Santos testified that her testimony was within a reasonable degree of nursing , nurse practitioner / medical certainty . (ECF 306-11 at 65:18-25;66:3-4).

### B. Dr. De Los Santos Did Not Lack Facts on Causation

---

[5] Pattern Jury Instruction Builder – Civil, found at https://pji.ca11.uscourts.gov/.

Litigants are not permitted to rely on conclusory statements to support the relief requested by motion any more than in pleadings. Just as expert opinions are required to show their methodology and the facts on which they are based, so are arguments by counsel in motions. Here, they are simply lacking.

Defendants do not attack Dr. De Los Santos' credentials. Rather, they argue she did not have the "sufficient facts or data" on which to base her causation opinion as required by Fed.R.Evid. 702. As noted, Dr. De Los Santos has five advanced degrees including three in nursing, and a 30+ year nursing career. Since 2007, she has taught at Florida International University as a Clinical Assistant Professor, College of Nursing and Health Sciences and is a full time faculty for both Graduate and Undergraduate Nursing Programs. She has not worked in corrections regularly, but she has had a broad and diverse nursing and administrative career involving all ages and genders of patients. Her administrative career makes her sensitive to the need for accurate charting and follow-through, including the need for specialty referrals. (ECF 306-13).

Dr. De Los Santos demonstrated that she understood Mr. Nelson's medical history, she knew his medical conditions and listed them, that she was aware of how his condition had changed over time. She demonstrated that she knew the treatments that he received, the antibiotics, the debridement, the diagnostic imaging, and the history of infection. She demonstrated that she knew the timeline, the gaps between injury and treatment. She showed that she was aware of the indicators for off-site treatment. She tracked the deterioration of the bone

9

through the diagnostic imaging over time. She showed that she knew how Mr. Nelson's comorbidities represented special risks. (ECF 306-11 at 48:25; 49:1-16.)

The Sheriff says De Los Santos had insufficient evidence because she didn't do a cross-sectional study of other prisoners. Such a study would almost never be done in a lawsuit because of medical privacy issues. It would not be impossible but it would be reserved for class actions. Longitudinal studies following one person in depth over a substantial period of time along with examination of the jail policies themselves, which she also did, and depositions of the providers, which she also reviewed, are the typical bases of expert medical reports in incarceration settings. She also had the fact summaries of her colleagues.

In her opinion (ECF 306-12) and deposition (ECF 306-11), Dr. De Los Santos showed she was familiar with Plaintiff Nelson's history of medical needs, going back before the ankle fracture, and the history of his interactions with medical staff before and after the incident. She was able to specify the treatment needs that were not met, the lost opportunities, and the lack of a patient-centered institutional culture at the Pinellas County Jail.

Dr. De Los Santos was aware of the increasing symptoms of infection, how they presented, delays in responding to mounting serious abnormal indicators, and she was critical of the lack of responsiveness of the Jail staff:

> The nurses and ARNPs at the Jail and RMC fell below the standard of care within a reasonable degree of nursing, as to nurses, and nurse practitioner, probability. The nurses and nurse practitioners failed to practice as other similar nurses and nurse practitioners within the community and fell below the standard of care. The nurses and advance practitioners failed to

>advocate for the patient to be hospitalized, failed to advocate for the patient to receive immediate orthopedic and/or infectious disease consultation, permitted the patient to remain in pain for several months, failed to properly document the condition and progression of the ankle and leg such as swelling, measuring the swelling, and actions taken in relation to the edema which was described by one practitioner as "monstrous". The failure to advocate, intervene and order transfer for admission to the hospital delayed care and caused and/or contributed to the eventual loss of limb. The Pinellas Jail policies permitted the ARNPs to use independent medical judgment and they failed to act and admit the patient to the hospital. The policy recommended admission to the hospital when a limb is at risk.

De Los Santos Opinion (ECF 306-12 at 2).

The Sheriff faults De Los Santos for not being an expert on limb salvage or infectious disease. She made it clear from the beginning that she was an expert on nursing and the nursing and nurse practitioner standard of care. Her testimony is as to nurses and nurse practitioners, same specialty. The Sheriff's argument makes no sense, because he only had nurses and nurse practitioners and internal medicine physicians, who were not orthopedic surgeons or infectious disease doctors. It is simply disingenuous for the sheriff to claim that De Los Santos "does not have the sufficient education, training, or experience to render any opinions regarding Plaintiff's state medical malpractice claim." This statement is all the more remarkable because, although they had her CV, at deposition counsel for the sheriff asked almost no questions about Dr. De Los Santos' education and experience other than what her primary nursing practice had been and whether she had ever worked in a jail or prison.

The Sheriff criticizes de Los Santos because she doesn't appreciate the fine points of legal terminology. The Sheriff misses the point that that is emphatically

not her job and that to even suggest this attempts to usurp the function of the judge. It is not her job to say what qualifies as medical malpractice and what qualifies as deliberate indifference. Ms. De Los Santos derived her opinion from what similarly trained nurse practitioner and nurse would do in like or similar circumstances. This is the standard of care. Her job is to show whether medical (nurse practitioner standard) and nursing treatment meets the standard of care and she opined that even a reasonable lay person would know Mr. Nelson needed to be hospitalized. She performed that function. Accordingly, contrary to Defendant's argument, Dr. De Los Santos does meet the threshold inquiry of qualifying as an expert witness to warrant admissibility into evidence for the applicable subject matter.

### C. Dr. De Los Santos Showed Reliable Principles and Methods

Dr. De Los Santos Opinion employed reliable nursing principles and methods relating to charting, follow-up, and patient advocacy:

> The essence of the practice standards is to comply with medical standards in diagnosis treatment and management. This to know and deploy medical standards as well as advocacy and education components of comprehensive nursing care. In particular, the NP's role[6] is unique in its emphasis in education, training, and practice to be an advocate for the patient's well being both in the particulars of a specific health condition and in the general obligation to be the patient as an advocate in the health care system and in the continuity of care.

---

[6] Nurse Practitioners (NP) provide primary and/or specialty nursing and medical care in the ambulatory, acute, and long-term care settings. NPs are registered nurses with specialized advanced education and clinical practice competency to provide health care for diverse populations in a variety of primary care, acute, and long-term care settings. Master's, postmaster's or doctoral preparation and national board certification is required for entry-level practice. Doc. 306-12 at 6.

12

> The Nurse Practice Act provides the rules and regulations of nursing care in the State of Florida. The Florida None Practice Act, Chapter 464, Florida Statutes. was enacted to ensure that every nurse practicing in Florida meets minimum requirements for safe practice. Section 464.003(3)e), Florida Statutes, defines "nursing diagnosis" to mean "the observation and evaluation of physical or mental conditions, behaviors, signs and symptoms of illness, and reactions to treatment and the determination as to whether such conditions, signs, symptoms, and reactions represent a deviation from normal." Section 464.003(3)(f), Florida Statutes, defines "nursing treatment" to mean "the establishment and implementation of a nursing regimen for the care and comfort of individuals, the prevention of illness, and the education, restoration, and maintenance of health."
>
> Registered Nurses are any persons licensed in Florida to practice professional nursing. The terms "professional nurse" and "registered nurse" are used interchangeably in Florida law, to mean the same thing. "'Registered nurse' means any person licensed in this state to practice professional nursing." Section 464.003(4), Florida Statutes. The scope of practice for a registered nurse is defined in Section 464.003(3)a), Florida Statutes. as follows: "Practice of professional nursing" means the performance of those acts requiring substantial specialized knowledge, judgment, and nursing skill based upon applied principles of psychological, biological, physical, and social sciences which shall include, but not be limited to: 1. The observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care; health teaching and counseling of the ill, injured, or infirm; and the promotion of wellness, maintenance of health, and prevention of illness of others. 2. The administration of medications and treatments as prescribed or authorized by a duly licensed practitioner authorized by the laws of this state to prescribe such medications and treatments. 3. The supervision and teaching of other personnel in the theory and performance of any of the above acts.
>
> Providing competent nursing care also includes using informed judgment and decision making. Informed decision making requires a nurse to use her own knowledge and skills, as well as recognizing when the nurse needs additional assistance.
>
> De Los Santos Opinion (ECF 306-12 at 7).

Dr. De Los Santos was concerned that there was no indication that providers were communicating and discussing the many abnormal findings that emerged from tests and progress notes. Dr. De Los Santos knew, based on her

13

long nursing practice that the fundamentals of standard of care such as timely and appropriate evaluation, treatment, and transfer to higher levels of care when clinically indicated, are the same for nurses and nurse practitioners (same for physician standard) as for other health professionals and her health care perspective will be important to a jury.[7]

The Sheriff selects snippets of the deposition to make Dr. De Los Santos sound simplistic. He reduces her testimony to, "the earlier the better." What she said was, "the earlier and less invasive and more conservative approach is the best to avoid long-term complications." (ECF 306-11 at 17-25). That is especially true in a case where Mr. Nelson got lots of diagnostic images, lots of progress notes, lots of scheduling, cancellations, and rescheduling, but over a period of nearly seven months he received virtually no actual medical intervention. It should not have taken until Mr. Nelson actually had his leg cut off for his medical providers to learn that yes, he really did have osteomyelitis in that ankle. In fact, it was Mr. Gordillo's comment, in the question: "the sooner the better," and she explained: "the earlier the more likely to have a better outcome" states exactly what was needed and what was lacking. Of course, Dr. de Los Santos' testimony contributes much more than this. As she testified, all nurses and nurse practitioners passed the buck here and dropped the ball.

---

[7] The following exchange took place at Dr. De Los Santos' deposition: "Did you see any evidence of the practitioners in this case taking measures, reasonable efforts, to abate the risk of harm and progression? A. No.  Like I said, basically it was refer, pass the buck, drop the ball." (ECF 306-11 at 66:3-4). It should be noted that Plaintiff was promised thousands of e-mail conversations between relevant medical providers in discovery that were never provided.

## D. Dr. De Los Santos Aptly Applied Principles and Methods

Dr. De Los Santos clearly applied the principles and methods of nursing that she set out in her opinion to the actual nursing practice that she saw reflected in the years and thousands of pages of medical records:

> The nurses at the Jail continually ignored the fractured ankle by failing to document the condition of the ankle when the wound care was done. While there are scattered references and some referrals to ARNP, nothing was done to ensure the patient was seen by an orthopedic surgeon or hospitalized for further evaluation, the nurses should have documented this an escalated it to the nursing director. Nurses are responsible for advocating for the patient and are the patient's voice. It is inadequate and below the standard of care to watch the patient's ankle swell and watch the patient be in pain and not go up the chain of command.
>
> The failure over nearly seven months to provide appropriate evaluation treatment for Mr. Nelson's fracture represented a serious deviation from the standard of care. Any lay observer would have appreciated that Mr. Nelson suffered a severe injury with "monstrous" ankle swelling and ongoing pain and disablement.
>
> The nurse practitioners at the Jail, Liberti, Bumiller and Newby, and at RMC, and the nurses at the Sheriff's Pinellas County Jail as well as nurses at RMC, fell below the standard of care within a reasonable degree of medical probability. Osteomyelitis is a treatable bone infection that will progress to permanent disability and even limb loss when not diagnosed timely and treated according to the standard of care. It did progress at RMC to the left foot, the patient had an infection and fever, and fractured the right femur bone.
>
> The failure to treat such a severe fracture and infection over such a sustained period not only resulted in severe ongoing pain, but also risk of limb loss and even death due to sepsis. Infection was not treated and resulted in destruction of the bones due to the failure to diagnose and treat osteomyelitis.
>
> The records indicate knowledge of Mr. Nelson's serious medical condition by his medical providers but little concern for expediting his treatment and for the consequences of failure to treat timely. The failure to treat seemed systemic with the Sheriffs Pinellas County Jail and continued with the Department of Corrections and its medical contractor, Corizon in that they

> failed to ensure Mr. Nelson access to standard orthopedic care and treatment of his fracture and infection.
>
> The nurses and ARNPs at the Jail and RMC fell below the standard of care within a reasonable degree of nursing, as to nurses, and nurse practitioner, as to ARNP, probability. The nurses and nurse practitioners failed to practice as other similar nurses and nurse practitioners within the community and fell below the standard of care. The nurses and advance practitioners failed to advocate for the patient to be receive care within the standard of care and/or be hospitalized, failed to advocate for the patient to receive timely orthopedic and/or infectious disease consultation, permitted the patient to remain in pain for seven months, failed to document the status and progression of the ankle and leg such as swelling, measuring the swelling, and actions taken in relation to the edema which was described by one practitioner as "monstrous". The failure to advocate, intervene and/or order admission to the hospital delayed evaluation and care and caused the eventual loss of limb. The Pinellas Jail policies permitted the ARNPs to use independent medical judgment and they failed to act and/or admit the patient to the hospital. Policy recommended admission to the hospital when a limb is at risk.

De Los Santos Opinion (ECF 306-12 at 8-9)

### E. Dr. De Los Santos Was Able to Comment on *Monell* Liability

Proof of Monell liability was not the job of any single expert. But Dr. De Los Santos was able to describe patterns of failure to treat by multiple providers over a substantial period of time through the years and thousands of pages of medical records reviewed by her and the other experts. She was able to testify as to the nurses and nurse practitioners' failures to follow through with consults, pain management, keep the patient off the leg and ankle, failure to describe the leg, and when described as monstrous nothing was done such as transfer to a hospital with full testing capacities as well as dialysis, leaving Mr. Nelson in a shower alone, where he fell and broke his leg which required two surgeries on the amputated below the knew leg. The nurses and nurse practitioners failure to

advocate for the patient to be hospitalized, to receive immediate orthopedic and/or infectious disease consultation, pain management, and documenting the file. She endorsed the general policy of admission of the Pinellas County Jail that required transfer to the hospital when a limb is at risk. She testified that the nurses failed to follow it.

### F. Dr. De Los Santos' Opinions Pass Muster under *Daubert*

Under the amended Florida Rule of Evidence 90.702, the *Daubert* standard requires: (1) the testimony be based upon sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness must apply the principles and methods reliably to the facts of the case. See *Baan v. Columbia County*, 180 So. 3d 1127 (Fla. 1st DCA 2015); see also *Giaimo v. Florida Autosport, Inc.*, 154 So. 3d 385 (Fla. 1st DCA 2014); see also *Daubert*, 509 U.S. at 592-93 (1993). Trial courts, under *Daubert,* must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 597.

Through her years of experience and knowledge, Dr. De Los Santos is more than qualified to give an expert opinion concerning the lack of care and treatment in patient Nelson. Accordingly, contrary to Defendant's argument, Dr. De Los Santos does meet the threshold inquiry of qualifying as an expert witness to warrant admissibility into evidence for the applicable subject matter.

### G. Plaintiff Should Not Be Excluded Based on Report Appendices

17

Plaintiff had never testified in federal court and had never been asked to create a testimony list. Since her last testimony was in May of 2017, Dr. De Los Santos had actually not testified within the past four years, although at the time her report was initially written, she did have one court testimony, which she listed and which she was not questioned about. A list was quickly put together by searching court databases and supplemented the next day.

The Sheriff also complains that Dr. De Los Santos' compensation schedule did not include hours expended. No one at deposition asked her how many hours she had spent thus far. *Thornton v. United States*, CV 111-106, at \*17 (S.D. Ga. Feb. 5, 2013) (failure to provide compensation information resulted in "no material surprise or harm" rendering the report "woefully inadequate"); *Campbell v. Moon Palace, Inc.*, No. 11-60274-Civ-Cohn/Seltzer, at \*10 (S.D. Fla. Feb. 7, 2012) (The court did not find even the complete absence of this information to be a basis for excluding the witness of her report). The underlying purpose of Rule 26(a) disclosures is to avoid unfair surprise. *Silverstein v. Procter & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312, 1320 (S.D. Ga. 2009).; see also *Abdulla v. Klosinski*, No. 1:10-CV-159, 2012 WL 4429179, at \*6 (S.D. Ga. Sept. 25, 2012). Here, Defendants were fairly apprised of the expert's opinions by her Rule 26(a)(2) expert report as well as her hourly rate and Defense counsel could have requested her hours spent so far at deposition and did not.

As is frequently the case, the experts had not provided a final bill. For one thing, there was concern that Defendants, who refused to pay for deposition time

in advance, might refuse to pay for the deposition prep time, in which case the cost would devolve on Plaintiff. So, there was no final bill but counsel for Defendants could have asked how many hours had been expended to date.

**H. Sheriff Does Not Make a Credible Case on "Ghost Writing"**

Clearly, Dr. De Los Santos' Opinion cannot be dismissed as a copy of the reports of the other experts. Although she adopted the fact summaries that had been done in other reports, she reviewed them and made sure they were accurate to her understanding. De Los Santos testified that she and Attorney Commons had a phone conversation — she didn't say how long nor was she asked — in which she expressed her opinions and then Ms. Commons typed them up. De Los Santos said she modified them. That is a perfectly valid drafting process. De Los Santos said she saw a chronology of events from another expert and she adopted it. She said she didn't see their actual opinions. It should not be surprising that Attorney Commons, who had seen them, might use similar verbiage, but the final draft was reviewed and modified as needed by Dr. De Los Santos. Dr. De Los Santos went into great detail about the different standards for Nurse Practitioners, Registered Nurses and Licensed Practical Nurses.

**I. Defendants Do Not Raise Sanction Issues with Clean Hands**

Defendant Gaultieri cites substantial history to plead for sanctions against the Plaintiff. However, the Defendant has had four motions to compel against him and two orders to produce records or answer interrogatories. Defendant sought to avoid producing documents. (Doc. 135, 167, 168, 174, 181, 234).

Plaintiff's counsel spent many hours working to get those records against unflagging resistance. Plaintiff will not run back through that history except to say that Defendant was never sanctioned and Plaintiff states, without rancor, that he should be similarly treated.

WHEREFORE, Plaintiff requests this Honorable Court DENY Defendant Sheriff's Motion to Exclude or Limit Dr. Maria De Los Santos' Testimony.

Respectfully Submitted, /s/ James V. Cook
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

/s/ Linda Bellomio Commons
Florida Bar No: 0778346
Linda Bellomio Commons, P.A.
P.O. Box 340261
Tampa, Florida 33694
(352) 610-4416; fax 265-3010
Service E-mail: lcommons@aol.com
Dmheiser1@gmail.com

Attorneys for Plaintiff

I CERTIFY that this Memorandum complies with the type and size requirements set forth in the Local Rules.

I CERTIFY the foregoing was filed electronically on 10/19/21, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

/s/James V. Cook