# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

WAHEED NELSON,

    Plaintiff,

vs.

BOB GUALTIERI, et al.,

    Defendants.

Case No. 8:19-cv-449-T-36JSS

## PLAINTIFF'S RESPONSE TO DEFENDANT GUALTIERI'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT DR. DANIEL S. HUSTED

Plaintiff, WAHEED NELSON, responds to the Sheriff's Motion to Exclude Plaintiff's Expert Dr. Daniel S. Husted and would show as follows:

Defendant Gualtieri seeks to limit or exclude Dr. Husted on these grounds:

1. That Dr. Husted is not competent to testify on Medical Malpractice issues.
2. That Dr. Husted is not competent to testify on *Monell* issues.
3. That Dr. Husted should be excluded because although he provided a schedule of hourly charges, he did not include the number of hours.

Defendant also seeks sanctions for the trouble of drafting the motion. Plaintiff submits that even were these things all true, they would not be a basis to exclude Dr. Husted's testimony or to justify the imposition of sanctions.

## MEMORANDUM OF LAW

An expert report under Fed. R. Civ. P. 26(a)(2)(B) must contain a complete statement of all the opinions the expert plans to express and the basis for them, the facts considered by the expert in arriving at the opinions, and any exhibits

intended to be used in support of the opinions. A District Court's ruling on admissibility of expert testimony is reviewed for abuse of discretion. *General Electric Company v. Joiner*, 522 U.S. 136, 138-39, 118 S.Ct. 512 (1997). Courts apply Federal Rules of Evidence in determining whether to admit expert testimony. *Id*. at 1294-95.

> Rule 702 of the Federal Rules of Evidence provides:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> a. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b. the testimony is based on sufficient facts or data;
> c. the testimony is the product of reliable principles and methods; and
> d. the expert has reliably applied the principles and methods to the facts of the case.

A party offering expert testimony has the burden of laying the foundation for admissibility by the greater weight of the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Dr. Husted, an Orthopedic Surgeon, demonstrates specialized knowledge, a grasp of the facts underlying his opinions, and understanding of the facts in this case, reliable principles and methods, and application of the principles and methods to the facts. His opinions are reliable and will be helpful to the finder of fact as to causation for medical malpractice and ignoring the patient's symptoms to the point of causing Mr. Nelson to lose his leg.

## THE *DAUBERT* LEGAL STANDARD

"In 2013, the Florida Legislature modified section 90.702 'to adopt the standards for expert testimony of [Florida].'" *Giaimo v. Fla. Autosport, Inc.*, 154 So. 3d 385, 387-88 (Fla. 1st DCA 2014). Most notably, in May 2019, the Florida Supreme Court clearly established that *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 503 U.S. 579 (1993), is the standard for admission of expert testimony in Florida. *See In re Amendments to Florida Evidence Code*, 44 Fla. L. Weekly S170 (Fla. May 23, 2019). Under the *Daubert* standard, the trial court serves as a gatekeeper, ensuring that expert testimony both rests on a reliable foundation and is relevant to the case. *See Rojas v. Rodriguez*, 185 So. 3d 710, 711 (Fla. 3d DCA 2016). It has long been the federal standard.

"A proper *Daubert* motion must identify the source, substance, and methodology of the challenged testimony." *See Booker v. Sumter Cty. Sheriff's Office/N. Am. Risk Servs.*, 166 So. 3d 189, 192 (Fla. 1st DCA 2015). **The party filing the *Daubert* motion bears the burden to provide conflicting expert testimony and literature; otherwise, the court has the ability to decline to hear the motion**.[1] *Id*. at 193. An attack on an expert's background, qualifications, use of accepted methodology, or lack of textual authority is to be considered by the jury in assessing the weight to be accorded to the expert's testimony. *See McCullock v. H.B. Fuller Co.*, 61 F. 3d 1038, 1044 (2d Cir. 1995).

---

[1] Defendant has not met his burden, failed to show any conflict in testimony or literature. Defendant doesn't like Dr. Husted's opinions and conclusions. The Court should decline to entertain the motion. The case law supports that this is for the jury to decide.

To qualify as an expert, one must "demonstrate knowledge beyond the understanding of the average person." 4 Weinstein's Federal Evidence §702.03(1). This may be based on "knowledge, skill, experience, training, or education." Fla. Stat. § 90.702. Moreover, the testimony must be relevant, if it will "help the trier of fact or to understand the evidence or determine a fact at issue." *Id*. The "fit" requirement analyzes the reliable methodology of the expert to see that it fits the facts and data of the case, which assists the jury in deciding the issues in the case. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The plain language of the *Daubert* statute permits expert testimony based on experience and knowledge. *See* Fed. R. Evid. 702, advisory committee's note (2000). The *Daubert* standard applies not only to "new or novel" scientific evidence, but also to all other expert opinions, so long as it relies on scientific testimony. *See Perez v. Bell S. Telecommunications, Inc.,* 138 So. 3d 492 (Fla. 3d DCA 2014). <u>Under Florida law, the exclusion of expert testimony is a drastic remedy that should be invoked only under the most compelling circumstances</u>. *See Rojas v. Rodriguez*, 185 So. 3d 710, 711 (Fla. 3d DCA 2016) (citing *Clair v. Perry*, 66 So. 3d 1078, 1080 (Fla. 4th DCA 2011)).

### A. Husted's Opinions on Causation/Standard of Care Are Helpful

Defendants argue that Dr. Husted should not be permitted to testify despite the fact that he is abundantly qualified. Dr. Husted, MD, is a Board Certified Orthopedic Surgeon. Dr. Husted graduated from University of Florida as a medical doctor and did a residency in surgery and a residency in orthopedics

at Yale. In addition, he did a fellowship in spine surgery at San Francisco Spine Institute. He is a partner at South Florida Orthopaedics & Sports Medicine in Stuart, Florida. His qualifications are impeccable. (ECF 306-3). He was Summa Cum Laude, at the University of Florida College of Medicine, 2000. For more than a decade, he has been a partner in an orthopaedic and sports medicine practice. He is familiar with the standard of care in the community. He has testified in Florida and is licensed in the State of Florida. Dr. Husted and his partners have a large practice: 15 orthopedic physicians, 12 nurse practitioners, two pain management doctors, 2 podiatrists and 1 rheumatologist. (ECF 306-1 at 42:1-17). Everyone in the practice takes calls, including Dr. Husted, and can handle trauma, including foot and ankle fractures, even if it is not their subspecialty. (ECF 306-1 at 43:3-7,21-25;44:1-4,10-5). Dr. Husted and the practice see prisoners in Martin County. (ECF 306-1 at 48:1-9). He has treated patients with co-morbidities like Mr. Nelson's. Dr. Husted assessed the care in this case, both at the Jail and at the Prison through thousands of pages of records of care over the years during this and a prior incarceration as follows:

> It further appears that the sustained failure to treat Mr. Nelson was systemic and not isolated or due to special limitations or circumstances outside the control of the providers. Rather, it appears that the institutional procedures were not designed to ensure rigorous follow-up and anything less would not have sufficed to save Mr. Nelson's right leg.

(ECF 306-2 at 7). Husted further reported:

> Mr. Nelson suffered a fall on "something wet" on January 7,2015, fractured his ankle and foot but received no treatment for the fracture from January 7,2015 until seven months later on July 28, 2015 when his leg was amputated below the knee.

5

> Although Mr. Nelson was treated for other conditions, and although he was repeatedly examined by multiple clinicians and tested, he received no actual treatment in that there was no medical intervention in the sense of an activity directed at or performed on an individual with the object of improving health or treating disease or injury. It can truly be said that Mr. Nelson's care was so inadequate as to be tantamount to no care at all.
>
> Numerous providers, including Dr. Swick, All Florida Orthopeadics, Dr. Belizaire, and numerous physicians, nurses, and nurse practitioners, the Pinellas County Jail, the Florida Department of Corrections, and Corizon, followed practices that fell below the standard of care and although they were confronted with very concerning records and physical symptoms which they reviewed with apparent understanding, exhibited a lack of concern for the deteriorating condition of Mr. Nelson's fractured ankle and foot. Mr. Nelson should have been immediately hospitalized, put into a total contact cast and treated to salvage the foot and leg. There was a complete lack of urgency, especially with the concern of infection noted on the x-ray and CT scan combined with a past history of osteomyelitis and cellulitis. The lack of urgency and treatment eventually caused the loss of the limb. The same lack of urgency continued under the care of Corizon at the Florida Department of Corrections (FDC) Reception and Medical Center (RMC). This lack of care contributed to cause the loss of the limb and caused more surgeries by delaying more than three more months, causing infection in the left foot and a fractured femur in the right leg necessitating surgery to repair. The patient should have been admitted to the hospital immediately upon transfer.
>
> Ultimately the patient was diagnosed with osteomyelitis and this was a known condition that previously occurred in his left foot in 2014 and was considered in his right foot in 2009. The Charcot arthropathy was not diagnosed prior to the fracture and the CT specifically advised either Charcot traumatic change or infection. Even with a chronic condition there can be an acute condition that requires treatment. This care is entirely inconsistent with the standard of care for all patients, including private citizens. To the extent that the lack of care violated the formal policies of Pinellas Sheriff, the Florida Department of Corrections, and Corizon, there was no indication that the lack of adherence to formal policy was contrary to custom.

(ECF 306-2 at 2-3).

The Sheriff stated that Dr. Husted had no evidence, his opinions were unreliable and not useful to the jury and faults him for not looking at the medical

records of other inmates in a cross-sectional study.[2] Dr. Husted testified that any lay person would know that Mr. Nelson needed to be hospitalized[3]. (ECF 306-1 69:2-5,8-14,17-18,21,22,24;70:1-10, 19-25). Dr. Husted reviewed thousands of pages of files from the Pinellas County Jail from 2005, 2009-2010 and 2014-2015. (ECF 306-2) Through his review, Dr. Husted became familiar with Plaintiff Nelson's co-morbidities and how he was treated by a long succession of providers before and after his ankle fracture. He was aghast that the severe ankle fracture was not treated as an emergency and the patient was not admitted to a hospital in the community for access to various specialties and immediate testing, casting and infection treatment.[4] He was aware of the ongoing pain, delay in care, risk of limb loss and even death due to sepsis. (ECF 306-1 at 67:1-4,9-10). Strong and repeated indicators for infection were ignored and the ongoing suspicion of osteomyelitis, also ignored, consults cancelled or changed to routine from an emergency (ECF 306-1-7 at 21:4-13,20-25;22:1-5;23:14-15;25:1-7) and raised by

---

[2] Although there is a mechanism in HIPAA regulations, 45 C.F.R. § 164.512(e)(1)(ii)(B) and § 164.512(e)(1)(v), for a broad study of an institution's medical care in a litigation context without the need for individual medical releases, the fierceness with which Sheriff Gualtieri pushed back on Discovery makes it doubtful that the Sheriff would have welcomed or cooperated with any such effort. (ECF 135,167, 168, 174,181,196).

[3] HUSTED: "Would a layperson know that someone that presented with Mr. Nelson's symptoms that we've been discussing that objectively this was a serious medical need for treatment? Yeah, in my opinion, they would. This was a markedly enlarged, painful ankle and foot and that would be described as massive or impressive or monstrous throughout the different areas of the record. So it should be something that any layperson would look at and say I think that needs to be dealt with." (ECF 306-1 at 69:1-14)

[4] Dr. Kyle, the Sheriff's medical director canceled the consult with an orthopedic surgeon. (ECF 306-2 at 3 ¶1 ,6; 5 ¶3 last sentence;6 ; 7¶ 3,4; 306-1 at13:4-6; 19:24-25;21:4-13,20-25;22:1-5;23:14-15;25:1-7;30:7-14;31:12-23;40:23-25;41:1-5,8-18;48: 21-5; 49: 1-3,6-10;51:14-24;52:2-13,24-25; 53:1-5, 7-9, 12-14,18-22,24-25;54:1-10,25; 55:1-2,13-15,17-19,21-22; 56:4-9;57:2-4;58:23-25;59:1-3;60:16-25;69:2-5,8-14,17-8, 21-2, 24; 70:1-10,19-25;72:20-23,73:1,3-6,9-10)

7

many rounds of diagnostic imaging, which was proved to be correct when the right leg was finally amputated and examined by Dr. Maxwell Steel as noted in his post-op report. (ECF 224-8). No reasonable effort was made to reduce the risk of harm within a reasonable degree of medical probability and certainty. (ECF 306-1 at 72:20-23;73:1,3-6,9-10,12-14). Dr. Husted testified:

> Dr. Kyle, through the jail, admitted that he [cancelled the orthopedic appointment], but I think it was in the records that he had canceled and I think he admitted it later when questioned. But he did so because I think it was -- I think the reasoning was that it was going to conflict with dialysis or something to that effect, which as an orthopedist, **that to me was horrible because this patient had, as I just said, a limb-threatening injury in the jail**. To put off seeing the orthopedist because he's going to get dialyzed that day just was not a reason.

ECF 306-1 at 21:21-25; 22:1-5).

> If it's oh, well, Dr. Steel is not seeing patients today, we'll put it off for another period of time, that is my problem with this whole situation. That would **not be acceptable for anybody in this room**.

(ECF 306-1 at 20-23)

The Sheriff has decided to base his whole argument for "insufficient facts" on the theory that Dr. Husted was required to do a cross-sectional study of the medical care of the Jail population at large. It is simply unfair to say Dr. Husted is drawing conclusions without existing data and makes a "mere guess." As the Sheriff frequently pointed out in Plaintiff's challenges to the gaps in his discovery, he produced thousands of pages of medical history going back years into prior incarcerations. (ECF 306-2 at 1-2: a-q; documents reviewed; 306-1:46:5-7). Through those records, Dr. Husted discerned a pattern of failure to treat in numerous situations by practitioners at all levels. Dr. Husted opined that Mr.

8

Nelson needed to be hospitalized where orthopedics and infectious disease specialists and other specialists could be consulted, due to fracture in the context of a history of osteomyelitis, and so that he could undergo appropriate diagnostic workup and treatment. (ECF 306-1 at 13-4-6; 19:24-25;21:4-13,20-25;22:1-5;23:14-15;25:1-7;72:20-23,73:1,3-6,9-10; 51:14-24;52:2-13,24-25; 53:1-5, 7-9, 12-14,18-22,24-25;54:1-10,25). These are pertinent issues a jury must decide to find that the Defendants failed to take reasonable measures to abate the risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Eleventh Circuit Pattern Jury Instruction 5.8 requires a jury to find the following facts by a preponderance of evidence:

> 1. That [name of plaintiff] had a serious medical need;
>
> 2. That [name of defendant] knew that [name of plaintiff] had a serious medical need that posed a risk of serious harm;
>
> 3. That [name of defendant] failed to [provide/get] necessary medical care for [name of plaintiff]'s serious medical need in deliberate indifference to the risk of serious harm;
>
> 4. That [name of defendant]'s conduct caused [name of plaintiff]'s injuries; and
>
> 5. That [name of defendant] acted under color of law.

Eleventh Circuit Pattern Jury Instruction Builder – Civil, Instruction 5.8.[5]

Dr. Husted's facts are sufficient for a finding of deliberate indifference even in the absence of a general history of abuses. Sheriff mis-states the *Monell* test. The Sheriff cites *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986) to the effect that "The custom or policy shown must be 'persistent' and

---

[5] Pattern Jury Instruction Builder – Civil, found at https://pji.ca11.uscourts.gov/.

'widespread,'" *Id.* at 1290-91. *Depew* actually says "it is *generally* necessary to show a persistent and wide-spread practice." *Id.* at 1499. But the sheriff also cites *Canton v. Harris*, 489 U.S. 378, 385 (1989), which holds that if plaintiffs prove a policy of failure to train is "substantially certain" to result in a deprivation of rights in the future, *Monell* liability can also result. *Id.* at 383. As Justice Brennan pointed out in *Pembaur*, "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Dr. Husted's opinions will help a jury to understand causation, when Plaintiff began to experience a serious medical need (no. 1); what medical care would have been necessary to address the serious medical need (no. 3); the extent to which the failure to render that care contributed to the plaintiff's injuries (no. 4); and, to some extent, his description of how the medical need presented physically, which could add to the circumstantial evidence of the defendant's subjective knowledge (no. 2).

### B. Dr. Husted Did Not Lack Facts on the Failure to Treat

Litigants are not permitted to rely on conclusory statements to support the relief requested by motion any more than in pleadings. Just as expert opinions are required to show their reasoning and the facts on which they are based, so are arguments by Defendants in their Motion. Here, Defendant's are simply lacking.

Defendant Sheriff attempts to attack Dr. Husted's credentials and take his opinions out of context. Dr. Husted did not say that medical judgment was the

reason the providers at the jail caused the delay and ultimate amputation. Rather he stated the providers did not follow their own policies (ECF 306-1 at 60:10-25;61:1-6). Sheriff argues Husted did not have the "sufficient facts or data" upon which to base his causation opinion as required by Fed.R.Evid. 702.[6] Dr. Husted reviewed thousands of pages of medical history taken over years. Dr. Husted demonstrated that he understood Mr. Nelson's medical history, he knew his medical conditions and listed them, that he was aware of how his condition had changed over time.[7]. He demonstrated that he knew the treatments that Plaintiff received, the antibiotics, the debridement, the diagnostic imaging, and the history of infection, delay and falling in the shower necessitating two additional surgeries on the amputated leg. He demonstrated that he knew the timeline, the gaps between injury and treatment. He showed he was aware of the need for immediate off-site care. He tracked the deterioration of the bone through diagnostic imaging. Dr. Husted pointed out that the history of osteomyelitis and continued weight bearing, and not getting him to a hospital, made Plaintiff especially vulnerable to limb loss. (ECF 306-2; fn 8;306-1 at 7:4-25,8:1-14) He explained how the body reacts to fractures to heal. (ECF 306-1 at 14:22-5;15:1-9).

---

[6] Corizon and Dr. Belizaire make no such argument regarding the facts brought to bear while Plaintiff was in the Department of Corrections so that even if Dr. Husted could be excluded from testifying as to the Pinellas County Jail, the Sheriff's argument would not affect his ability to testify as to Corizon and prison medical providers.

[7] (ECF 306-2 at 3 ¶1 ,6; 5 ¶3 last sentence;6 ; 7¶ 3,4; 306-1 at13:4-6; 19:24-25;21:4-13,20-25;22:1-5;23:14-15;25:1-7;30:7-14;31:12-23;40:23-25;41:1-5,8-18;48: 21-5; 49: 1-3,6-10;51:14-24;52:2-13,24-25; 53:1-5, 7-9, 12-14,18-22,24-25;54:1-10,25; 55:1-2,13-15,17-19,21-22; 56:4-9;57:2-4;58:23-25;59:1-3;60:16-25;69:2-5,8-14,17-8, 21-2, 24; 70:1-10,19-25;72:20-23,73:1,3-6,9-10)

The Sheriff challenges Dr. Husted's conclusion that the failure to treat Plaintiff was causally related to the amputation.[8] Sheriff attacks by saying that because Dr. Husted "never received nor reviewed any medical records for any *other* inmates cared for by the Pinellas County Jail" and because "he does not hold a single opinion as to the medical care provided to any *other* inmate ever housed at the Pinellas County Jail," that he does not have a basis for opining that the pattern of failing to treat Plaintiff over months at the Jail. But a cross-sectional study would not have been helpful in understanding the patterns of Mr. Nelson's medical treatment in any way. The Sheriff also tried to say this was just a matter of medical judgment by his providers. Dr. Husted refuted the theory that it was medical judgment that led to the delay that caused the amputation.

The Sheriff's suggested cross-sectional study of the jail population is rarely done in civil rights litigation because of the cost and medical privacy issues. It might well be appropriate in class actions. Longitudinal studies following one person in depth over a substantial period of time along with examination of the jail policies and depositions of providers, all of which Dr. Husted reviewed (ECF 306-2), are the typical basis of expert medical reports in incarceration settings.

In his opinion (ECF 306-2) and deposition (ECF 306-1), Dr. Husted showed he was familiar with Plaintiff Nelson's history of medical needs, going

---

[8] The Alabama cases cited on page 13 of defendant's motion to exclude Dr. Husted a are not even remotely relevant to this case because they are cases where the expert testified outside the specialty. *Harvey*, maxillofacial surgeon attempted to testify about the cause of a cancer, osteonecrosis, or in *Lowery*, no experience to testify about a range of potential diagnoses in a product liability case, or in *Jones*, an internist testifying about causation when this fell to the expertise of the orthopedic surgeon on causation. If anything these cases demonstrate the need for Dr. Husted.

12

back before the ankle fracture, and the history of his interactions with medical staff before and after the incident. He was conversant with the fact that orthopedic consults had been requested multiple times and cancelled. Months passed "without a referral to an orthopedist for consideration of surgery or referral to infectious disease to recommend appropriate antibiotic therapy." (See footnote 7 for citations to the record).

The Sheriff's attack on Dr. Husted seems to suggest that this Board Certified Orthopedic Surgeon, with a sub-specialty in spine surgery, cannot opine on causation from the delay by the nurses, doctors and nurse practitioners, failure to act and send Mr. Nelson to the hospital. As Dr. Husted testified, he treats patients with limb trauma, including foot and ankle, and Charcot disease. His testimony was that he would stabilize the patient, cast him and refer him to a partner with a subspecialty in foot and ankle. Dr. Husted explained the process after fracture, that testing repeatedly was not treatment, that all providers failed to immobilize the limb, and that Mr. Nelson needed a cast. (FN 7 citations)

### C. Dr. Husted Demonstrated Reliable Principles and Methods

Dr. Husted's opinions are reliable because of his review of the treatment history as well as his qualifications, his education and training and experience. Dr. Husted's opinions were grounded in far more than a "mere guess" to use the Sheriff's words. Aside from commenting that he hasn't worked in a jail or prison, Defendant has questioned his qualifications but those questions are answered by Dr. Husted at the deposition. Not only is Dr. Husted Board Certified in

Orthopedic Surgery, he trained in trauma, has a large orthopedic practice and testified that orthopedic surgeons are trained to handle Mr. Nelson's fracture, Charcot disease and co-morbidities. Dr. Husted's opinions would be helpful to a jury in understanding the lysis that occurs with bone fractures and the body's ability to try to heal itself as well as the detriment in delaying hospitalization and casting of the limb. (ECF 306-1 at 7:4-25,8:1-14;14:22-5;15:1-9 ;ECF 306-2; fn 8) .

### D. Dr. Husted Applied Principles and Methods to the Facts

Dr. Husted clearly applied medical principles and methods to recognize the error being committed by the medical providers:

> Numerous providers, including Dr. Swick, All Florida Orthopeadics, Dr. Belizaire, and numerous physicians, nurses, and nurse practitioners, the Pinellas County Jail, the Florida Department of Corrections, and Corizon, followed practices that fell below the standard of care and although they were confronted with very concerning records and physical symptoms which they reviewed with apparent understanding, exhibited a lack of concern for the deteriorating condition of Mr. Nelson's fractured ankle and foot. Mr. Nelson should have been **immediately hospitalized,** put into a total contact cast and treated to salvage the foot and leg. There was a complete lack of urgency, especially with the concern of infection noted on the x-ray and CT scan combined with a past history of osteomyelitis and cellulitis. The lack of urgency and treatment eventually caused the loss of the limb. The same lack of urgency continued under the care of Corizon at the Florida Department of Corrections (FDC) Reception and Medical Center (RMC). This lack of care contributed to cause the loss of the limb and caused more surgeries by delaying more than three more months, causing infection in the left foot and a fractured femur in the right leg necessitating surgery to repair. The patient should have been admitted to the **hospital** immediately upon transfer.
>
> Ultimately the patient was diagnosed with osteomyelitis and this was a known condition that previously occurred in his left foot in 2014 and was considered in his right foot in 2009.
>
> The Charcot arthropathy was not diagnosed prior to the fracture and the CT specifically advised either Charcot traumatic change or infection. Even with a chronic condition there can be an acute condition that requires treatment. This care is entirely inconsistent with the standard of

14

> care for all patients, including private citizens. To the extent that the lack of care violated the formal policies of Pinellas Sheriff, the Florida Department of Corrections, and Corizon, there was no indication that the lack of adherence to formal policy was contrary to custom.

Husted Opinion (ECF 306-2 at 2 and 3.

Dr. Husted's report shows they could have mitigated the harm to Plaintiff even if it did turn out to be Charcot arthropathy . (Id.) That failure to act was not isolated or limited to just one provider at the Jail or at the Prison. It was endemic throughout Plaintiff's treatment history.

### E. Dr. Husted Is an Appropriate Expert as to Medical Malpractice

Under the amended Florida Rule of Evidence 90.702, the *Daubert* standard requires: (1) the testimony be based upon sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness must apply the principles and methods reliably to the facts of the case. See *Baan v. Columbia County*, 180 So. 3d 1127 (Fla. 1st DCA 2015); see also *Giaimo v. Florida Autosport, Inc.*, 154 So. 3d 385 (Fla. 1st DCA 2014); see also *Daubert*, 509 U.S. at 592-93 (1993). Trial courts, under *Daubert,* must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 597. Sheriff cites the wrong medical malpractice statute 766.102(5)(c), as Dr. Husted is a specialist. This is the same specialty the Sheriff referred Mr. Nelson to, Dr. Swick.

The Sheriff attempts to create an issue under Daubert with the conflicting testimony of a podiatrist, who is his expert. But where experts disagree, there

tends to be a jury question. It is the theory that they defended on – that there was no fracture, but a collapse due to Charcot.  The rationale for this assessment is to assure that experts' testimony are based on professional studies or personal experience, "that characterizes the practice of an expert in the relevant field [in the courtroom]." See *Kumho*, 523 U.S. at 152. Most importantly, the assessment must focus "solely on the principles and methodology, not on the conclusion that they generate." See *Daubert* 509 U.S. at 595. Dr. Husted's years of training, experience and knowledge, demonstrate that he is more than qualified to give an expert opinion critical of every provider concerning the delay in care and causation (no one acted, used faulty judgment, did not immobilize, hospitalize - this delay caused the result).[9] Accordingly, contrary to Defendant's argument, Dr. Husted does meet the threshold inquiry of qualifying as an expert witness to warrant admissibility into evidence for the applicable subject matter.

Dr. Genecin and Dr. De Los Santos each testified that an orthopedic surgeon would be the specialty to decide limb salvageability. In Florida, a plaintiff alleging a medical malpractice claim must establish: the standard of care owed by the defendant, the defendant's breach of that standard, and that said breach proximately caused the damages claimed." *Gooding v. Univ. Hospital, Inc.*, 445 So.2d 1015, 1018 (Fla. 1984). The plaintiff "must show that the injury more likely than not resulted from the defendant's negligence in order to establish a jury

---

[9] Sheriff attempts to blame Dr. Albert Li, a podiatrist, not a defendant in this case, without any record evidence that Dr. Li was even told of the fracture and without him see the patient after the fracture on January 8, 2015. Dr. Li signed off on Feb. 12, 2015 for healing ulcers. ECF 248-7 at 153:8-21)

question on proximate cause. In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome." *Id.* at 1020. Dr. Husted has met that challenge abundantly. He testified that his opinions were within a reasonable degree of medical probability. "No, I don't think a reasonable effort was made" in response to a question as to whether the defendants made reasonable effort to reduce the harm. (ECF 306-1 at70:1-10,12-25;71:1-2,11-24;72:2-6,9, 20-23; 73:1,3-6,9-10;12-14) (ECF 306-2 at 6 ¶1)).

### F. Husted Should Not Be Excluded for Failure to State his Hours

Plaintiff submitted a fee schedule in compliance with what he considered the requirement of Rule 26(a)(2)(B)(vi) The fee schedule showed Dr. Husted's hourly rates. However, it did not specify how many hours Dr. Husted had expended at any particular point in the case. His work had not ended. No one at deposition asked him how many hours he spent thus far. He was only asked how many hours he spent preparing for his deposition. (ECF 306-1 at 46:8-11). *Thornton v. United States*, CV 111-106, at *17 (S.D. Ga. Feb. 5, 2013) (failure to provide compensation data resulted in "no material surprise or harm" rendering the report "woefully inadequate"); *Campbell v. Moon Palace, Inc.*, No. 11-60274-Civ-Cohn/Seltzer, at *10 (S.D. Fla. Feb. 7, 2012) (The court did not find even the complete absence of this data to be a basis for excluding the witness).

The underlying purpose of Rule 26(a) disclosures is to avoid unfair surprise. *Silverstein v. Procter & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312, 1320 (S.D. Ga. 2009).; *see also Abdulla v. Klosinski*, No. 1:10-CV-159, 2012 WL

17

4429179, at *6 (S.D. Ga. Sept. 25, 2012). Here, Defendant was fairly apprised of the expert's opinions by his Rule 26(a)(2) expert report as well as his hourly rate. Defense counsel could have requested the hours spent so far at deposition but showed no interest in acquiring that information at the time.

### G. Defendants Do Not Raise Sanction Issues with Clean Hands

Defendant Gaultieri cites substantial history to plead for sanctions against the Plaintiff. However, the Defendant has had four motions to compel against him and two orders to produce records or answer interrogatories. Defendant sought to avoid producing documents that should have been produced. (Doc. 135, 167, 168, 174, 181, 234). Plaintiff's counsel spent many hours working to get those records against unflagging resistance. Plaintiff will not run back through that history except to say that Defendant was never sanctioned and Plaintiff asks, without rancor, that he be similarly treated.

WHEREFORE, Plaintiff requests this Honorable Court DENY Defendants Motion to Exclude or Limit Dr. Daniel S. Husted's Testimony.

Respectfully Submitted, *s/ James V. Cook*
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com
Attorney for Plaintiff

I CERTIFY that this Memorandum complies with the type and size requirements set forth in the Local Rules.

18

I CERTIFY the foregoing was filed electronically on 10/21/21, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

*/s/James V. Cook*